## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **DOYLE LEE HAMM,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION NO. 5:06-cv-00945-KOB** |
| | ) |
| **RICHARD F. ALLEN, Commissioner,** | ) |
| **Alabama Department of Corrections,** | ) |
| | ) |
| **Respondent.** | ) |

## MEMORANDUM OPINION

Petitioner Doyle Lee Hamm has filed a petition for writ of habeas corpus pursuant to 28

U.S.C. § 2254.  He challenges the validity of his conviction for capital murder and the sentence of

death imposed upon him.  Upon consideration, the court finds that the petition is due to be denied.

## I.  THE OFFENSE CONDUCT

The following summary of the evidence relevant to the offense is taken from the opinion of

Alabama Court of Criminal Appeals on direct appeal.

> The prosecution's evidence established that, on January 24, 1987, a Saturday,
> Patrick Cunningham was working the 3:00 p.m. to 7:00 a.m. shift as the desk clerk
> of Anderson's Motel in Cullman, Alabama.  At approximately 10:30 p.m., Kathy
> Flannagan, who was en route from Florida to Missouri, stopped at the motel to rent
> a room for the night.  While registering, Flannagan observed a small-frame white
> male, who was wearing a blue v-neck sweater and a windbreaker (hereinafter
> "Subject One"), enter the motel lobby and ask Cunningham about a room for three.
> Cunningham informed Subject One that he had to have a reservation, and that subject
> left.  Moments later, as Flannagan was about to leave the lobby, Subject One
> re-entered, accompanied by another white male, who was dressed in blue jeans and
> a faded green army fatigue jacket (hereinafter "Subject Two").  Cunningham told
> Flannagan that it "looks like there is going to be trouble," and he hurriedly pointed
> her toward her room.  When Flannagan got into her car, she looked back inside the
> lobby and observed Subject Two pointing a shiny-looking revolver in the direction

1

of the reception desk where Cunningham had been standing when she left. Flannagan was unable to actually see behind the desk because that portion of her view was obstructed. However, she observed Subject One standing near the door that the two men had entered, and she also saw a "banged up" early 1970's model car parked, with its engine running, just outside the motel door. The car sounded as if it did not have a muffler. There was possibly a third person inside the car. Flannagan acted as though she saw nothing, drove to a nearby telephone, and called the police. She reported to the dispatcher that the motel was being robbed, and she was instructed to return there to meet the police, which she did, whereupon she gave them a description of the men and of the car she had seen.

Cunningham's body was subsequently discovered on the floor behind the reception desk. He had been killed by a single shot to the head from a .38 caliber pistol. The evidence revealed that Cunningham was lying on the floor when he was shot in the temple area from a distance of approximately 18 inches. Investigation at the scene revealed that Cunningham's wallet, which his wife later estimated had contained approximately $60, was missing. The motel cash drawer, which should have contained in excess of $350 in cash was empty except for some coins.

Officer Lynn Wood of the Cullman Police Department, who headed the investigation, learned from a teletype received by the Cullman Police and from a telephone conversation with the Sheriff of Tishomingo County, Mississippi, that two men matching the descriptions given by Flannagan were wanted in Mississippi in connection with a robbery-murder which had occurred there earlier that same day. Officer Wood also learned that a .38 caliber, nickel-plated revolver had been taken in that Mississippi robbery.

The following day, Sunday, January 25, Officer Wood talked with Douglas Roden, who had been stopped by authorities in Decatur, driving a car that matched the description of, and that was later positively identified by Flannagan as, the car she had seen at the motel. Roden told Officer Wood that he and Regina Roden, his sister-in-law, had been kidnapped by appellant, Jimmy Wardlow, and Paula Cook. He said that they had been held in a trailer at a trailer park in Cullman and that appellant and Wardlow had left the trailer for about two hours on the night of the motel robbery, driving that same car. Roden said that he had seen a nickel-plated pistol at the trailer and one or two knives. He informed Officer Wood that he and Regina had escaped from the trailer that morning, Sunday, January 25, in the car and had driven to Decatur, where they were stopped by the police. The Rodens took Officer Wood to Lake's Trailer Park and pointed out trailer # 10, which was later determined to be the residence of appellant's nephew, Alfred Uselton, as the place where they had been held and where they had last seen appellant.

2

Later that same day, a search warrant for the # 10 trailer and two fugitive from justice warrants for a robbery in Lee County, Mississippi (one for appellant and one for Wardlow) were issued upon an affidavit prepared by Officer Wood, the district attorney, and Sheriff Payne of Tishomingo County, Mississippi. After the warrants were signed, Officer Wood proceeded to Lake's Trailer Park where other officers already had the # 10 trailer under surveillance. Officer Wood radioed that the paperwork was complete, and the officers on the scene ordered appellant, Jimmy Wardlow, and Paula Cook out of the trailer and took them into custody. Officer Wood arrived on the scene with the warrants, and the trailer was searched. Inside the trailer, the officers found and seized a nickel-plated .38 caliber pistol, numerous rounds of .38 caliber ammunition, a faded green army fatigue jacket with several .38 caliber bullets in the pocket, some knives, and some clothing.

Appellant was transported to jail and booked as a fugitive from justice. At the sheriff's office, appellant gave a statement, in which he apparently denied any involvement in the Anderson Motel incident, and he participated in a lineup at which Flannagan failed to identify him as one of the men she had seen at the motel. Thereafter, appellant was placed under arrest for the Anderson Motel robbery. The following day, appellant gave a second statement, which was taped and later played for the jury, wherein he admitted that his initial statement was false and wherein he confessed to the robbery and murder of Patrick Cunningham. Subsequently, appellant was charged with the capital offense of robbery-murder.

It was later determined and ultimately testified to at trial by the Rodens that their original statements, leading up to appellant's arrest, were partly false. They had not been kidnapped by appellant and Wardlow, but had gone of their own accord to Lake's Trailer Park with them and Paula Cook. It was further discovered that the Rodens had, in fact, been the two individuals with appellant at Anderson's Motel on the night of the robbery-murder. Douglas Roden was the first man seen by Flannagan, Subject One, and Regina Roden had remained outside in the car. The record indicates that both of the Rodens entered into an agreement with the state whereby they would testify against appellant at trial, which they did, in exchange for being allowed to plead guilty to lesser offenses. The record indicates that Douglas Roden, who was charged with capital murder, agreed to plead guilty to the lesser offense of murder, for which he would receive a life sentence. The record also reveals that Regina Roden agreed that, in exchange for her testimony, she would plead guilty to robbery, for which she would be sentenced to seven years, and to hindering prosecution, for which she would receive a concurrent sentence of three years' imprisonment.

Appellant did not testify during the guilt phase of the trial, nor did he offer any evidence in his defense.

*Hamm v. State*,  564 So. 2d 453, 455-57 (Ala. Crim. App. 1989).

On September 26, 1987, Hamm was convicted of murder during a robbery in the first degree in violation of ALA. CODE § 13A-5-40(a)(2) (1975).

## II.  THE SENTENCING

On September 28, 1987, the penalty phase of trial took place, and after deliberation, the jury recommended that Hamm be sentenced to death by a vote of eleven to one.

On November 9, 1987, the court held a sentencing hearing.  After consideration of the evidence before it, the trial judge found two aggravating circumstances: (1) the murder was committed while Hamm was engaged in the commission of a robbery in the first degree, and (2) Hamm was previously convicted of a felony involving the use or threat of violence to a person. (C.R. Vol. 33, Tab. 54, p. 4).[1]  Although the court found no statutory mitigating circumstances, the following excerpt reflects the trial judge's findings regarding the non-statutory mitigating circumstances presented by Hamm:

> The Defendant was born February 14, 1957, and Defendant was raised by his Mother and Father and lived in Colbert County, Alabama, until 1975. Defendant was the eighth of ten children born to these parents.  It appears that he had a good Mother, but no[t] much can be said of his Father.  It appears that his Father was a heavy drinker and had spent time in prison.  It seems that he tried to instill in his children the idea that if they did not steal they weren't a "Hamm."  The Defendants's Father

---

[1] The court will utilize the following method of citation to the record.  References to specific pages of the court record on direct appeal are designated "C.R.___", and references to the transcript on direct appeal are designated "R.___."  References to the court record of the Rule 32 proceedings are designated "Rule 32 C.R. __", and references to the transcript on collateral appeal are designated "Rule 32 R.___."  The court will strive to list any page number associated with the court records by reference to the numbers at the bottom of each page of a particular document, if those numbers are the most readily discoverable for purposes of expedient examination of that part of the record. Otherwise, the page numbers shall correspond with those listed at the upper right hand corner of the record.  Additionally, if an easily identifiable tab number is close to any cited material, the court has made reference to that tab number for the reader's benefit.

died in 1971 when Defendant was 13 years old.  Afterwards, he was raised by his Mother.  Ruthie Murphree, his Sister, helped the Mother raise the Defendant.  Ruthie is slightly older than the Defendant and has no record of criminal activity.  She is married and is a housewife.  The Defendant's Brothers, James, Roy, Horace, Jimmy, O'Neal, David, and Danny, all either served time in prison or are now serving time in prison.  James died in 1969 and Roy hanged himself in 1978.  Defendant has another Sister, Linda Hamm Murphree, age 29, who is married to Johnny Murphree and who appears to be a nice person who has never been in trouble.  She is married to Johnny Murphree who is a Brother to Ruthie's husband.  The fact that the Defendant and all his Brothers have prison records is certainly an indication that their Father was a terrible influence on his children.  His conduct while participating in the raising of these boys created an obstacle to the development of their character, which was, indeed, difficult to overcome.  The defendant had no control over the conduct of his Father and, of course, this type of conduct by his Father was irresponsible and deplorable.  It absolutely had a negative influence on the Defendant.  It is to be noted, however, that the two girl children were able to rise above this influence and appear to be good citizens.  The Defendant had a poor education and suffered from epilepsy.

> The Defendant has, since his conviction of this offense and while being incarcerated in the Cullman County Jail, agreed to talk to offenders about changing the direction of their lives away from crime.  Defendant allowed law enforcement personnel to use him and his situation as an example of how crime can ruin your life.  The Defendant did voluntarily confess to the crime.

*Id.* at 7-8.

After weighing the aggravating and mitigating circumstances found to exist and considering the jury's death recommendation, the court held, "The mitigating circumstances have weighed heavily in these considerations, but it is the Judgment of this Court that the aggravating circumstances outweigh the mitigating circumstances in the case." *Id*. at 8.  The trial court sentenced Hamm to death.  *Id.*

### III. PROCEDURAL HISTORY

On June 16, 1989, the Alabama Court of Criminal Appeals affirmed Hamm's conviction and sentence.  *Hamm*, 564 So. 2d 453.  Hamm filed a petition for writ of certiorari before the Alabama Supreme Court, but that was denied on March 23, 1990.  *Ex parte Hamm*, 564 So. 2d 469 (Ala.

1990).[2]  On December 3, 1990, the United States Supreme Court denied the petition for writ of certiorari.  *Hamm v. Alabama*, 498 U.S. 1008, 111 S. Ct. 572 (1990).

On December 3, 1991, Hamm filed a Petition for Relief from Conviction and Sentence of Death Pursuant to Rule 32 of the Alabama Rules of Criminal Procedure.  (Rule 32 C.R. Vol. 21, Tab. 40, pp. 1-40).  The case remained pending in the Circuit Court of Cullman County, Alabama, for almost eight years before the court held an evidentiary hearing.  On July 26, 1999, the court conducted a Rule 32 evidentiary hearing, with Ms. Pam Nail acting as Hamm's post-conviction counsel.  (Rule 32 R.  Vol. 21, Tab. 42, pp. 1-64).  Mr. Hugh Harris and Ms. Martha Williams, the attorneys who represented Hamm at trial and on direct appeal, were the only witnesses to testify at the hearing.  *Id*. at 7-63.

On December 6, 1999, the circuit court denied Hamm Rule 32 relief.  (Rule 32 C.R. Vol. 33, Tab. 58, pp. 1-89).  On February 1, 2002, the Alabama Court of Criminal Appeals affirmed the denial of the Rule 32 petition.  *Hamm v. State*, 913 So. 2d 460 (Ala. Crim. App. 2002).  On May 20, 2005, the Alabama Supreme Court denied Hamm's petition for writ of certiorari.  *Id.*  On November 14, 2005, the United States Supreme Court denied the petition for writ of certiorari.  *Hamm v. Alabama*, 546 U.S. 1017, 126 S. Ct. 651 (2005).

On May 16, 2006, Hamm filed this federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Doc. no. 1).

_____

[2] On June 15, 1990, the Alabama Supreme Court overruled Hamm's application for rehearing. *Hamm v. State*, 564 So. 2d 453, 455-57 (Ala. Crim. App. 1989).  Although not material to any habeas issue, this court notes that the State also filed an application for rehearing in which it requested the Alabama Supreme Court modify its opinion to delete a reference to pecuniary gain as an aggravating circumstance in Hamm's case.  (C.R. Vol. 10, Tab. 36).  The Alabama Supreme Court granted the modification and deleted the inaccurate reference.  *Ex parte Hamm*, 564 So. 2d 469, 473 (Ala. 1990).

## IV. THE GENERAL SCOPE OF FEDERAL HABEAS REVIEW

A federal district court is prohibited from entertaining a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court ..." unless the petitioner alleges "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In other words, this court's review of habeas claims is limited to federal constitutional questions. Claims pertaining solely to questions of state law fall outside the parameters of this court's authority to provide relief under § 2254. Thus, unless otherwise expressly stated, use of the word "claim" in this opinion presupposes a claim of federal constitutional proportion.

### A. Exhaustion and Procedural Default

#### 1. *Exhaustion*

Prior to seeking relief in federal court from a state court conviction and sentence, a habeas petitioner first is required first to present his federal claims to the state court by exhausting all of the state's available procedures. 28 U.S.C. § 2254(b)(1)(A); *Medellin v. Dretke*, 544 U.S. 660, 666, 125 S. Ct. 2088 (2005) (A petitioner "can seek federal habeas relief only on claims that have been exhausted in state court."). The purpose of this requirement is to ensure that state courts are afforded the first opportunity to correct federal questions affecting the validity of state court convictions.

As explained by the Eleventh Circuit:

> In general, a federal court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state remedies. 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that ... the applicant has exhausted the remedies available in the courts of the State...."). "When the process of direct review ... comes to an end, a presumption of finality and legality attaches to the conviction....The role of federal habeas

7

proceedings, while important in assuring that constitutional rights are observed, is secondary and limited.  Federal courts are not forums in which to relitigate state trials." *Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)).

> Exhaustion of state remedies requires that the state prisoner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard v. Connor*, 404 U.S. 270, 275-76 (1971) (internal quotation marks omitted).  The Supreme Court has written these words:
>
>> [T]hat the federal claim must be fairly presented to the state courts . ... it is not sufficient merely that the federal habeas applicant has been through the state courts....  Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies.
>
> *Picard*, 404 U.S. at 275, 92 S. Ct. at 512.  *See also Duncan*, 513 U.S. at 365, 115 S. Ct. at 888 ("Respondent did not apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment.").
>
> Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues.  "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 5-6, 103 S. Ct. 276, 277, 74 L. Ed. 2d 3 (1982) (citations omitted).

*Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (first alteration in original) (bracketed footnote added).

The phrases "fairly presented" and "properly exhausted" are synonymous.  *O'Sullivan v. Boerckel,* 526 U.S. 838, 848, 119 S. Ct. 1728 (1999).  As the Supreme Court explained, the question is "not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, *i.e.*, whether he has fairly presented his claims to the state courts." *Id*.

## 2. *Procedural Default*

Moreover, if a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits, *i.e.*, "the petitioner will have *procedurally defaulted* on that claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2009) (emphasis added). Stated differently, exhaustion for purposes of *federal habeas review* means not only presenting to fruition all available state remedies but doing so in compliance with the state procedural rules.

As explained by the United States Supreme Court:

> In habeas, the sanction for failing to exhaust properly (preclusion of review in federal court) is given the separate name of procedural default, although the habeas doctrines of exhaustion and procedural default "are similar in purpose and design and implicate similar concerns," *Keeney v. Tamayo–Reyes*, 504 U.S. 1, 7, 112 S. Ct. 1715, 118 L. Ed. 2d 318 (1992). See also *Coleman v. Thompson*, 501 U.S. 722, 731–732, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991). In habeas, state-court remedies are described as having been "exhausted" when they are no longer available, regardless of the reason for their unavailability. See *Gray v. Netherland*, 518 U.S. 152, 161, 116 S. Ct. 2074, 135 L. Ed. 2d 457 (1996). Thus, if state-court remedies are no longer available because [for example] the prisoner failed to comply with the deadline for seeking state-court review or for taking an appeal, those remedies are technically exhausted, *ibid.*, but exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding. *Id.*, at 162, 116 S. Ct. 2074; *Coleman*, *supra*, at 744–751, 111 S. Ct. 2546.

*Woodford v. Ngo,* 548 U.S. 81, 92-93, 126 S. Ct. 2378 (2006) (brackets added).

Usually, if the last state court to examine a claim explicitly finds that the claim is defaulted because the petitioner failed to follow state procedural rules, then federal review of the claim also is precluded pursuant to federal procedural default principles. *See Cone v. Bell,* 556 U.S. 449, 465, 129 S. Ct. 1769, 1780 (2009); *Coleman v. Thompson*,  501 U.S. 722, 731, 111 S. Ct. 2546 (1991)

("when a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review.").

The Eleventh Circuit explained the effect and reason for the rule:

> The federal courts' authority to review state court criminal convictions pursuant to writs of habeas corpus is severely restricted when a petitioner has failed to follow applicable state procedural rules in raising a claim, that is, where the claim is procedurally defaulted. Federal review of a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, *Harris v. Reed*, 489 U.S. 255, 263, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989), and that bar provides an adequate and independent state ground for denying relief. *See id.* at 262, 109 S. Ct. at 1042-43; *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S. Ct. 1981, 1987, 100 L. Ed. 2d 575 (1988). The doctrine serves to ensure petitioners will first seek relief in accordance with state procedures, *see Presnell v. Kemp*, 835 F.2d 1567, 1578-79 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S. Ct. 882, 102 L. Ed. 2d 1004 (1989), and to "lessen the injury to a State that results through reexamination of a state conviction on a ground that a State did not have the opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, 499 U.S. 467, 111 S. Ct. 1454, 1470, 113 L. Ed. 2d 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991).[3]

---

[3] "When the last state court rendering judgment affirms without explanation, [the court will] presume that it rests on the reasons given in the last reasoned decision." *Mason*, 605 F.3d at 1118 n.2. As the Supreme Court observed:

> The problem we face arises, of course, because many formulary orders are not meant to convey *anything* as to the reason for the decision. Attributing a reason is therefore both difficult and artificial. We think that the attribution necessary for federal habeas purposes can be facilitated, and sound results more often assured, by applying the following presumption: Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground. If an earlier opinion "fairly appear[s] to rest primarily upon federal law," we will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place. Similarly where, as here, the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.

Federal deference to a state court's clear finding of procedural default under its own rules is

so strong that

> "[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding.  Through its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."  *Harris*, 489 U.S. at 264 n.10, 109 S. Ct. 1038 (emphasis in original).  *See also Alderman v. Zant*, 22 F.3d 1541, 1549-51 (11th Cir. 1994) (where a Georgia habeas corpus court found that the petitioner's claims were procedurally barred as successive, but also noted that the claims lack merit based on the evidence, "this ruling in the alternative did not have an effect . . . of blurring the clear determination by the [Georgia habeas corpus] court that the allegations was procedurally barred"), *cert. denied*, 513 U.S. 1061, 115 S. Ct. 673, 130 L. Ed. 2d 606 (1994).

*Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999).

### 3.   *"Adequate" and "Independent" defined*

The Supreme Court defines an "adequate and independent" state court decision as one which

"rests on a state law ground that is *independent* of the federal question and *adequate* to support the

judgment.'"  *Lee v. Kemna,* 534 U.S. 362, 375, 122 S. Ct. 877 (2002) (quoting *Coleman v.

Thompson*, 501 U.S. at 729 (emphasis added)).  Whether a state procedural rule is "adequate and

independent" so as to have a preclusive effect on federal review of a claim "'is itself a federal

question.'"  *Id.*  (quoting *Douglas v. Alabama*, 380 U.S. 415, 422, 85 S. Ct. 1074 (1965)).

A state procedural rule is "independent of the federal question" when it "rests solidly on state

law grounds [that are] not intertwined with an interpretation of federal law." *Judd v. Haley,* 250 F.3d

1308, 1313 (11th Cir. 2001) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)).  An

example of intertwining would be when "the State has made application of the procedural bar depend

---

*Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590 (1991) (citation omitted).

on an antecedent ruling on federal law, that is, on the determination of whether federal constitutional error has been committed." *Ake v. Oklahoma* 470 U.S. 68, 75, 105 S. Ct. 1087 (1985). Stated differently, if "the state court must rule, either explicitly or implicitly, on the merits of the constitutional question," before applying the procedural rule to a constitutional question, then the rule is *not* independent of federal law. *Id.*

To be considered "adequate," by a federal court, the state procedural rule must be both "'firmly established and regularly followed.'" *Lee v. Kemna,* 534 U.S. at 375 (quoting *James v. Kentucky*, 466 U.S. 341, 348, 104 S. Ct. 1830 (1984)). In other words, the rule must be "clear [and] closely hewn to" by the state for a federal court to find it to be adequate. *James v. Kentucky*, 466 U.S. at 345. This requirement does not mean that the procedural rule must be applied rigidly in every instance, or that occasional failure to do so eliminates its "adequacy." Rather, the "adequacy" requirement means only that the procedural rule "must not be applied in an arbitrary or unprecedented fashion." *Judd v. Haley*, 250 F.3d at 1313. If it is adequate, then the federal court normally will foreclose its review. If, however, the rule is not firmly established, or if it is applied in an arbitrary, unprecedented and manifestly unfair fashion, it is not adequate to preclude federal review. *Card v. Dugger*, 911 F.2d at 1517.

**B.**     *Overcoming Procedural Default*

Only three circumstances arise in which an otherwise valid state-law ground will not bar a federal habeas court from considering a constitutional claim that was procedurally defaulted in state court: (1) where the petitioner had "good 'cause' for not following the state procedural rule" and was actually "'prejudice[d]' by not having done so"; (2) "where the state procedural rule was not 'firmly established and regularly followed'"; and (3) where failure to consider the petitioner's "claims will

result in a 'fundamental miscarriage of justice.'" *Edwards v. Carpenter*, 529 U.S. 446, 455, 120 S. Ct. 1587 (2000) (Breyer, J., concurring) (citations omitted); *see also*, *e.g.*, *Coleman v. Thompson*, 501 U.S. at 749-50 (holding that a state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice") (citations and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."); *Smith v. Murray*, 477 U.S. 527, 537, 106 S. Ct. 2661 (1986) (same); *Davis v. Terry*, 465 F.3d 1249, 1252 n.4 (11th Cir. 2006) ("It would be considered a fundamental miscarriage of justice if 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327, 115 S. Ct. 851 (1995) (in turn quoting *Murray v. Carrier*, 477 U.S. at 496)).

### 1.   The "Cause and Prejudice" Standard

"A federal court may still address the merits of a procedurally defaulted claim if the petitioner can show cause for the default and actual prejudice resulting from the alleged constitutional violation." *Ward v. Hall*, 592 F.3d 1144, 1157 (citing *Wainwright v. Sykes*, 433 U.S. 72, 84-85, 97 S. Ct. 2497 (1977)).   This so-called "cause and prejudice" standard is clearly framed in the conjunctive; therefore, a petitioner must prove both parts. *Cf. id.*   To show "cause," a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim previously. *Murray v. Carrier*, 477 U.S. at 488; *see also Amadeo v. Zant*, 486 U.S. 214, 221-22, 108 S. Ct. 1771 (1988).

13

> Objective factors that constitute cause include "'interference by officials'" that makes compliance with the State's procedural rule impracticable, and "a showing that the factual or legal basis for a claim was not reasonably available to counsel." In addition, constitutionally "[i]neffective assistance of counsel ... is cause." Attorney error short of [constitutional] ineffective assistance of counsel [on direct review], however, does not constitute cause and will not excuse a procedural default.

*McCleskey v. Zant*, 499 U.S. 467, 493-94, 111 S. Ct. 1454 (1991) (citations omitted) (brackets added).

While "[a]ttorney error [on direct review] that constitutes ineffective assistance of counsel" has long been accepted as cause to overcome a procedural default, the errors of post-conviction counsel on collateral review have heretofore been neither a proper constitutional claim nor proper to offer as cause and prejudice to overcome a procedural default. *Coleman v. Thompson*, 501 U.S. at 754 (brackets added). Pursuant to the reasoning in *Coleman*, because "there is no right to counsel in state collateral proceedings," a petitioner cannot allege the constitutional ineffectiveness of his post-conviction counsel as cause to overcome a claim that was procedurally defaulted during collateral proceedings. *Id.* at 757.

However, last year in *Martinez v. Ryan*, ---- U.S. ----, ----, 132 S. Ct. 1309, 1317 (2012), the United States Supreme Court narrowly modified *Coleman's* long-standing principle after studying "[t]he precise question [of] whether ineffective assistance in an initial-review on a claim of ineffective assistance at trial may provide cause for a procedural default in a federal habeas proceeding." The Supreme Court in *Martinez* held that

> [t]o protect prisoners with a potentially legitimate claim of ineffective assistance of trial counsel, it is necessary to modify the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default. This opinion qualifies *Coleman* by recognizing a narrow exception: Inadequate assistance of counsel at initial-review

14

> collateral proceedings may establish cause for a prisoner's procedural default of a
> claim of ineffective assistance at trial.

*Id.* at 1315 (brackets added).  The Court also explained that the phrase "initial-review post-

conviction proceedings" was meant to exclusively refer to post-conviction proceedings at the trial

court level,

> [w]hen an attorney err[or makes it] likely that no state court at any level will hear the
> prisoner's claim.  This Court on direct review of the state proceeding could not
> consider or adjudicate the claim.  See, *e.g.*, *Fox Film Corp. v. Muller*, 296 U.S. 207,
> 56 S. Ct. 183, 80 L .Ed. 158 (1935); *Murdock v. Memphis*, 20 Wall. 590, 22 L. Ed.
> 429 (1875); cf. *Coleman, supra*, at 730–731, 111 S. Ct. 2546.  And if counsel's errors
> in an initial-review collateral proceeding do not establish cause to excuse the
> procedural default in a federal habeas proceeding, no court will review the prisoner's
> claims.
>
> The same is not true when counsel errs in other kinds of postconviction
> proceedings.  While counsel's errors in these proceedings preclude any further review
> of the prisoner's claim, the claim will have been addressed by one court, whether it
> be the trial court, the appellate court on direct review, or the trial court in an
> initial-review collateral proceeding.  *See*, e.g., *Coleman*, *supra*, at 756, 111 S. Ct.
> 2546.

*Martinez v. Ryan*, 132 S. Ct. at 1317 (brackets added).

Still, this narrow exception only applies to States that "move the trial-ineffectiveness claim

outside of the direct-appeal process."  *Id.* at 1317.  In 1987, in Alabama, ineffective assistance of

counsel claims could potentially be made during the direct appeal process if those claims had been

initially raised and litigated in a motion for new trial.  *Ex parte Jackson*, 598 So. 2d 895, 897 (Ala.

1992).  However, the presupposition in that procedure was that new counsel had been appointed to

represented a defendant on direct appeal.  *Id.*  Hamm's circumstances did not allow his trial-

ineffectiveness claims to be presented on direct appeal because Hugh Harris and Martha Williams,

Hamm's trial counsel, also acted as his counsel on direct appeal.  (C.R. Vol. 7, pp. 1376-1380).

15

In any event, the holding in *Martinez* is not "a constitutional ruling" but an "equitable ruling." *Id.* at 1320. Thus, a petitioner still has no independent constitutional right to post-conviction counsel, and any equitable cause and prejudice allegations concerning the inadequacies of post-conviction counsel can be asserted *only* in an attempt to overcome the procedural default of an ineffective assistance of trial counsel claim when the default occurred at the Rule 32 court level. Even in that instance, the alleged post-conviction counsel error must be of such a degree as to offend the *Strickland* standard. *Martinez*, 132 S. Ct. at 1318 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).

*Martinez* does *not* apply to errors made by post-conviction counsel in any other collateral proceedings or any issue other than failure to raise an ineffective assistance of trial counsel claim. Thus, if post-conviction counsel properly raised an ineffective assistance of trial counsel claim before the trial (Rule 32) court, but then failed to properly raise the same claim on collateral appeal, neither *Coleman* or *Martinez* allows the petitioner to argue ineffective of collateral appeal counsel as cause and prejudice for the default. The Supreme Court instructed,

> The rule of *Coleman* governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts. *See* 501 U.S., at 754, 111 S. Ct. 2546; *[Murray v.] Carrier*, 477 U.S., at 488, 106 S. Ct. 2639. It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons.

*Martinez*, 132 S. Ct. at 1320.

In any event, once the petitioner proves cause, he also must show prejudice. Such a showing must go beyond proof "that the errors at his trial created a possibility of prejudice, but that they

worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584 (1982); *see also McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992) (per curiam). In the event that the cause appears in the form of a *Martinez* exception, a specialized prejudice standard applies. Under this standard, "[t]o overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 132 S. Ct. at 1319 (citing for comparison *Miller–El v. Cockrell*, 537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (describing standards for certificates of appealability to issue)).

### 2.    *The "Fundamental Miscarriage of Justice" Standard*

In a "rare," "extraordinary," and "narrow class of cases," a federal court may consider a procedurally defaulted claim in the absence of a showing of "cause" for the procedural default if either: (1) a fundamental miscarriage of justice "has probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. at 537-38 (quoting *Murray v. Carrier*, 477 U.S. at 496); or (2) the petitioner shows "by *clear and convincing evidence* that[,] but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Bell*, 513 U.S. 298, 323 (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336, 112 S. Ct. 2514 (1992)); *see also*, *e.g.*, *Smith v. Murray*, 477 U.S. at 537-38.

Even when exhaustion and procedural default are not at issue, federal review of a claim that has been decided on the merits by a state court is restrictive as will be discussed below.

### C.       Statutory Rules Governing Habeas Corpus Cases Under § 2254

When Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), it significantly limited the circumstances under which a habeas petitioner may obtain relief. "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of this Court, § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412, 120 S. Ct. 1495 (2000); or that it 'involved an unreasonable application of' such law, § 2254(d)(1); or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court, § 2254(d)(2)." *Harrington v. Richter*, ---- U.S. ----, 131 S. Ct. 770, 785 (2011). "Moreover, a state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence." *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (citing 28 U.S.C. § 2254(e)(1)).

A state court's adjudication of a claim will be sustained under § 2254(d)(1), unless it is "contrary to" clearly established, controlling Supreme Court precedent, *or* it is an "unreasonable application" of that law. These two different inquiries are not to be confused, nor conflated, as the Supreme Court explained in *Williams v. Taylor*:

> Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "*contrary to* ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "*involved an unreasonable application of* ... clearly established Federal law, as determined by the Supreme Court of the United States." (Emphases added.)

*Williams*, 529 U.S. 362, 404. The statute limits the source from which "clearly established Federal law" can be drawn to "holdings, as opposed to the dicta, of the [Supreme] Court's decisions as of

the time of the relevant state-court decision." *Id.* at 412; *see Jones v. Jamrog*, 414 F.3d 585 (6th Cir. 2005); *Warren v. Kyler*, 422 F.3d 132, 138 (3rd Cir. 2005) ("[W]e do not consider those holdings as they exist today, but rather as they existed as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted).

A state-court determination can be "contrary to" clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams v. Taylor*, 529 U.S. at 405.

Likewise, a state-court determination can be an "unreasonable application" of clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Id.* at 407; *see also Putman v. Head*, 268 F.3d 1223 (11th Cir. 2001). Whether a particular application of Supreme Court precedent is "reasonable" turns not on subjective factors, but on whether the application of Supreme Court precedent at issue was "objectively unreasonable." *Williams v. Taylor*, 529 U.S. at 409-10. In other words, "[f]or purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Harrington v. Richter*, 131 S. Ct. at 785 (citing *Williams*, 529 U.S. at 410). The question is not

whether the state court "correctly" decided the issue, but whether its determination was "reasonable," even if incorrect.  *See Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843 (2002).  In other words, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington*, 131 S. Ct. at 787.

Having explained the scope of this court's authority to review state court decisions, the next step is to examine the federal procedural rules applicable to the controversy presently before the court.

**D.**     *Procedural Rules Governing Habeas Corpus Cases Under § 2254*

Because "habeas corpus review exists only to review errors of constitutional dimension," a habeas corpus petition must meet the "heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2c."  *McFarland v. Scott*, 512 U.S. 849, 856, 114 S. Ct. 2568 (1994) (other citations omitted).  A petitioner must specify all grounds for relief available to him, state the facts supporting each ground, and state the relief requested.  28 U.S.C. § 2254, Rule 2(c)(1)(2)(3) of the Rules Governing Section 2254 Cases.  A "general reference to the transcripts, case records and briefs on appeal patently fails to comply with Rule 2(c)."  *Phillips v. Dormire*,  2006 WL 744387, * 1, No. 4:04CV1483 (E.D. Mo. 2006) (citing *Adams v. Armontrout*, 897 F.2d 332, 333 (8th Cir. 1990)).

The burden of proof rests on the habeas petitioner to establish a factual basis for the relief he seeks.  *See Hill v. Linahan*, 697 F.2d 1032, 1034 (11th Cir. 1983) (explaining that a petitioner must be given notice that his case may be dismissed under Rule 9(a) and an opportunity to present facts showing why the delay is not prejudicial or why it is excusable).  The mere assertion of a

ground for relief, without more factual detail, does not satisfy petitioner's burden of proof or the requirements of 28 U.S.C. § 2254(e)(2) and Rule 2(c), *Rules Governing § 2254 Cases in the United States District Courts*.

## V.  PARTICULAR MATTERS AFFECTING THE SCOPE OF HABEAS REVIEW IN HAMM'S CASE

The state court history of Hamm's habeas claims shows that many of his claims appear to be procedurally defaulted for failure to comply with three particular types of state procedural rules, while others simply fail to present issues of federal constitutional proportion.  Because a large number of Hamm's claims will be uniformly affected by determinations as to the proper scope of habeas review,  these specific matters are placed in this section of the Memorandum Opinion.

A. *The preclusionary provisions of Rule 32.2(a), Ala. R. Crim. P. are adequate and independent state procedural rules*

Hamm properly exhausted only a portion of one of the substantive habeas claims that state procedural rules required him to raise on direct review.  (*See* Claim VI.W, *infra* (failure to suppress Hamm's statement and certain evidence)).  Therefore, virtually all of his substantive claims are defaulted.  The root of this procedural default may be found in Rule 32.2(a)(2), (3) and (5), Ala. R. Crim. P., which instructs,

> A petitioner will not be given relief under this rule based upon any ground: .... (2) Which was raised or addressed at trial; or (3) Which could have been but was not raised at trial, unless the ground for relief arises under Rule 32.1(b); ... or (5) Which could have been but was not raised on appeal, unless the ground for relief arises under Rule 32.1(b).

Rule 32.2 is an adequate and independent state procedural rule for federal preclusionary purposes.  (See *Brownlee v. Haley*, 306 F.3d 1043, 1065-66 (11th Cir. 2002), wherein provisions of Rule 32.2(a) were acknowledged as established, codified Alabama state procedural rules governing

post-conviction relief, and the district court's recognition of the state court's procedural default determination based on petitioner's failure to comply with the provisions was affirmed.)  Therefore, to the extent this rule required Hamm to exhaust his habeas claims first in state court and he failed to do so, his habeas claims are procedurally defaulted.  In fact, Hamm *concedes* that virtually all of his substantive claims are defaulted  for lack of compliance with Rule 32.2(a)(2), (3) and (5),  A. R. Crim. P., but argues that the ineffectiveness claims he raised during post-conviction proceedings as to his trial and appellate counsel provide the cause to overcome the procedural default of the substantive claims.  This argument leads the court to examine the state court history of Hamm's post-conviction claims.

**B**.   *The summary dismissal of pleading and proving requirements of Rule 32.3 and 32.6(b), Ala. R. Crim. P. are adjudications of the claims on the merits*

Hamm alleges that "respondent argues in its brief" that some of his claims[4] "are defaulted because he did not comply with the pleading and proving rules imposed by Rule 32."  (Doc. no. 20, pp. 31-34, 69, 124-129) (citing Rules 32.3 and 32.6(b), Ala. R. Crim. P.).  Hamm declares that the default should not be honored because these rules are neither adequate nor independent to preclude federal review.  *Id.*

First and foremost, Respondent does not argue that any of Hamm's habeas claims are procedurally defaulted in connection with Rule 32.3 or Rule 32.6(b), Ala. R. Crim. P.  (Doc.  no. 16, pp.  8-15).   Further, none of Hamm's habeas claims were dismissed during post-conviction proceedings on the grounds that Hamm failed to comply with these rules.  Even if the claims had been so dismissed, a dismissal pursuant to a combination of Rules 32.3 and 32.6(b) now is regarded

---

[4] As set out in his reply brief, these are Claims VI.B., VI.C. and "certain sub-claims" Hamm never identifies.  (Doc. no. 20, pp. 31-34, 69, 124-129).

by *federal* law as an adjudication "on the merits,"[5] which does not implicate the procedural-default doctrine.  *See Powell v. Allen*, 602 F.3d 1263 (11th Cir. 2010); *Borden v Allen*, 646 F.3d 785 (11th Cir. 2011).  As such, Hamm has no legal or factual basis to insert a challenge to Rules 32.3 and 32.6(b) in his habeas petition.

    **C.**    *Procedural default and the viability of ineffective assistance of counsel claims as "cause" to overcome it when a state court determines that the ineffective assistance of counsel claims were abandoned on collateral appeal pursuant to Rule 28(a), Alabama Rules of Appellate Procedure.*

    Procedural default plays a major role in the scope of habeas review in Hamm's case.  In fact, many of the claims are affected by layers of procedural default, most of which entail ineffective assistance of counsel claims.  Therefore, this section is intended as a guide to peel back those layers.

    **1.**    *The viability of ineffective assistance of counsel as "cause" to overcome procedural default when a state court determines that the counsel claims were abandoned on collateral appeal pursuant to Rule 28(a), Alabama Rules of Appellate Procedure*

    The Sixth Amendment guarantees a defendant the right to competent counsel, and as such the United States Supreme Court has held that independent ineffective assistance of trial and appellate counsel ("IAC") claims are among the type of external impediments that can be asserted as 'cause' to overcome the procedural default of another claim.  *Murray v. Carrier*, 477 U.S. at 488. To successfully do so, however, the petitioner must meet two hurdles.  First, a petitioner must exhaust independent IAC claims under the principles set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984);  *Murray v. Carrier*, 477 U.S. at 488-489.

---

[5] A state adjudication on the merits also would require 28 U.S.C. § 2254(d) review, not *de novo* review.

If an ineffective assistance of trial or appellate counsel claim is itself procedurally defaulted, the IAC claim cannot be offered as cause for the procedural default of another claim *unless* the defaulted IAC claim also is excused by a showing of cause and prejudice. *Edwards v. Carpenter*, 529 U.S. 446, 450-53, 120 S. Ct. 1587 (2000). Even if the independent IAC claim is not procedurally defaulted, the second hurdle to success requires that the ineffectiveness claim have merit to serve as cause to overcome the procedural default of another claim. *Id.* at 451; *Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002).[6]

Hamm seeks to establish the necessary cause and prejudice to overcome the procedural default of many of his substantive claims through independent claims of ineffective assistance of trial and appellate counsel. However, on collateral appeal the Alabama Court of Criminal Appeals found that a large number of his ineffectiveness claims were abandoned because Hamm failed to comply with Rule 28(a)(5)[7] of the Alabama Rules of Appellate Procedure. Hamm argues that he did comply with this rule, and that in any event, Alabama courts either have rejected application of the Rule or have failed to regularly follow it. (Doc. no. 20, pp. 98, 119).

    **a.**     *Whether Hamm abandoned many of his IAC claims on collateral appeal pursuant to Rule 28(a), Alabama Rules of Appellate Procedure*

---

[6] It bears repeating that these principles do not extend to *post-conviction* counsel's performance because a petitioner has no Sixth Amendment right to competent counsel during collateral proceedings. *See supra, Martinez v. Ryan*, 132 S. Ct. at 1320. *See also*, *Henderson v. Campbell,* 353 F.3d 880, 892 (11th Cir. 2003) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). As such, a petitioner can neither assert an independent claim of ineffective post-conviction counsel nor can he proffer allegations of inadequate post-conviction counsel as cause to overcome the procedural default of another claim unless the circumstances indicate a *Martinez* exception, *i.e.*, Rule 32 counsel failed to raise an ineffective assistance of trial counsel claim before the trial court.

[7] This rule now is numbered Rule 28(a)(10), Ala. R. App. P.

When a state court has found a claim to be "abandoned" on collateral appeal, the Eleventh Circuit has considered the claim to be "procedurally defaulted for federal habeas purposes." *Sims v. Singletary*, 155 F.3d 1297, 1311 (11th Cir. 1998). Therefore, the first step in determining the scope of habeas review in Hamm's case is to decide whether the Alabama Court of Criminal Appeals' Rule 28(a)(5) decision should be honored for federal preclusion purposes. If so, then a significant number of Hamm's ineffectiveness claims are uniformly procedurally defaulted and cannot be used as cause to overcome the procedural default of other claims. If not, then Hamm is entitled to a merits review of those IAC claims. Assuming the IAC claims are meritorious, then Hamm has the potential to overcome the procedural default of other claims—hence, this court's earlier reference to layers of default.

> **i.**  *Applicable portions of Hamm's appellate brief and the Alabama Court of Criminal Appeals' Rule 28(a), Alabama Rules of Appellate Procedure holding*

This court's analysis begins with an examination of the IAC claims affected by the state court's abandonment findings - as those claims appear in Hamm's appellate brief. (Rule 32 C.R. Vol. 28, Tab. 45, pp. 64-95). Section VII.A. of Hamm's collateral appeal brief reveals a five-page legal discussion on the general *Strickland* standard. (Rule 32 C.R. Vol. 29, Tab. 45, pp. 64-68). The discussion includes genres of ineffectiveness claims at the guilt and penalty phases of trial that are supported by citations to state and federal case law. *Id.* None of this section, however, contains allegations underlying Hamm's case in particular, nor does it contain any specific cross-reference in this section to a particular sub-claim in the remainder of the appellate brief. Sections VII.C.

through VII.D.[8] of the brief, however, do pertain to individual incidents of ineffective assistance of trial counsel at the penalty and guilt phases of Hamm's trial.

        **(1)**    *IAC penalty phase portion of trial in Hamm's brief on collateral appeal*

Because the Alabama Court of Criminal Appeals quoted the portion of Section VII.C. in Hamm's appellate brief that it found did not meet the requirements of Rule 28(a)(5), Ala. R. App. P., the appellate court's opinion is sufficient for analysis. It reads:

> At page 84 of his brief to this Court, Hamm concludes the portion of his argument regarding the allegations that he received ineffective assistance of counsel at the penalty phase of his trial:
>
>> "[Defense counsel] failed to properly object to impermissible security measures at the penalty phase, failed to excuse jurors from the panel, failed to object to the cruel and unusual nature of death by electric chair, [citation to petition], failed to object properly to the court's not finding the mental health mitigating circumstance, failed to adequately articulate to the jury and sentencing court reasons why Mr. Hamm's life should be spared. Mr. Hamm has set out in detail the deficiencies of counsel's performance at the penalty phase in his petition for habeas corpus relief and other pleadings. [citation to entire Rule 32 petition and to Hamm's response to the State's motion for partial dismissal]. All of those grounds will not be repeated here, but Mr. Hamm relies upon all of them...."

(Hamm's brief at p. 84.)

This type of "scattergun" approach to appellate argument has been criticized.[FN13] *Moreover, Rule 28(a)(5), Ala. R. App. P., requires parties to include in their appellate briefs an argument section with citations to relevant legal*

_____

[8] The reader is advised that the appellate brief also contained a Section VII.B. wherein Hamm alleged his counsel had an actual conflict of interest. When the appellate court addressed this claim on collateral appeal, it found that Hamm had waived the claim because he never properly raised it initially before the Rule 32 court—not because he had engaged in Rule 28(a)(5) abandonment on collateral review. In the interest of addressing the Rule 28 (a)(5) abandonment issue at this juncture, the court has decided to reserve discussion of the isolated waiver issue of Section VII.B. in Hamm's appellate brief as it appears in his habeas claims. (*See* Claim VI.F.2.)

> *authorities and to portions of the record relied on in the claims for relief. Recitation of allegations without citation to any legal authority and without adequate recitation of the facts relied upon has been deemed a waiver of the arguments listed. Gay v. State, 562 So. 2d 283, 289 (Ala. Crim. App. 1990).* Accordingly, we hold that Hamm waived for purposes of appellate review in this Court the claims quoted above.
>
> The trial court correctly denied Hamm relief on his claim that he had received ineffective assistance of counsel at the penalty phase of his trial. The trial court's decision on that portion of the petition is due to be affirmed.

*Hamm v. State*, 913 So. 2d at 490-91 (footnote omitted) (brackets in original) (italics added).

In addition to this paragraph, the Alabama Court of Criminal Appeals made an additional finding regarding another sentence in Hamm's appellate brief pertaining to *some* of his allegations that counsel failed to object to improper prosecutorial comment at the sentencing phase of trial. Quoting the sentence at issue, the court held:

> At page 81 of his brief to this Court, Hamm states, "In these and numerous other passages, see R-1286, R-1283; R-1282, the prosecutor engaged in improper argument." *Hamm has not identified to this Court what statements on those pages he deems objectionable, and he has failed to present any argument regarding the statements made on the cited pages.* Therefore, we deem any claims related to the portions of the prosecutor's argument on the pages merely listed in brief to be abandoned for purposes of appellate review. Rule 28(a)(5), Ala. R. App. P.

*Hamm v. State*, 913 So. 2d at 488 n.12 (italics added).

> **(2)**     *The IAC guilt phase portion of trial in Hamm's brief on collateral appeal*

In a portion of Section VII.D. of his brief on collateral appeal, Hamm alleged that counsel were ineffective at the guilt phase of trial because:

> Mr. Hamm was also denied the effective assistance of counsel at the guilt-phase trial. Hugh Harris and Martha Williams, defense counsel, failed to object to the court's failure to give a felony-murder instruction; failed to object to the court's instruction on accomplice liability; failed to adequately object to the improper prosecutorial comments; failed to adequately research, prepare and argue motions, including a Motion for Change of Venue; failed to adequately object to the

27

prejudicial security measures taken at trial; failed to adequately object to venire members that were unalterably in favor of the death penalty; failed to adequately challenge for cause venire member Sylvia Burks, failed to adequately elicit information from the venire members on voir dire, to adequately challenge for potentially biased venire members and strike certain jurors; failed to adequately object to the unequal distribution of peremptory challenges between the state and the defense; failed to adequately object to the introduction of bullets, of a green army jacket and of testimony surrounding these items; failed to adequately object to the state's failure to turn over in discovery exculpatory material; failed to adequately object to the court's instruction on reasonable doubt; failed to adequately object to the court's refusal to give the proposed instruction on voluntary intoxication; failed to adequately object to the introduction of gruesome, prejudicial, manipulated and unnecessary photographs; failed to adequately object to the admission of Doyle Hamm's statement and of evidence seized in the search of the trailer; failed to adequately investigate and present mental health defenses at the guilt phase; failed to object to the trial court's failure to qualify expert witnesses; failed to prepare, investigate and pursue an effective defense; *and* failed to raise these issues - with the exception of two issues - on appeal.  These failures of trial and appellate counsel resulted in Doyle Hamm's improper conviction for capital murder, and thus, jointly and separately, resulted in severe prejudice to Doyle Hamm's case in violation of *Strickland v. Washington*, 466 U.S. 668 (1984).

Mr. Hamm has set out in detail the deficiencies of counsel's performance in his petition for habeas corpus relief.  All of those grounds will not be repeated in this brief, but Mr. Hamm relies upon all of them, as well as the entire record of his trial and appeal, and the transcripts and entire record developed during these post-conviction proceedings.  Many of the legal issues which Mr. Hamm alleges as grounds for ineffectiveness are discussed elsewhere in this brief.  Mr. Hamm will not repeat arguments made elsewhere, but relies upon those arguments as they relate to aspects of ineffectiveness set out in his petition....

(Rule 32 C.R. Vol. 29, Tab. 45, pp. 88-89) (emphasis in original).

When the Alabama Court of Criminal Appeals reviewed this portion of the appellate brief,

it made the following findings:

At pages 88-89 of his brief to this Court, Hamm includes a list of more than 20 allegations of ineffective assistance of trial counsel, and he offers no citations to the record or to any legal authority to support his specific allegations.  Instead, Hamm states that he "has set out in detail the deficiencies of counsel's performance in his petition for habeas corpus relief," and he invites this Court to examine the claims comprehensively.  This type of "scattergun" approach to appellate argument is forbidden by Rule 28(a)(5), Ala. R. App. P.  *That rule requires parties to include in*

*their appellate briefs an argument section with citations to relevant legal authorities and to portions of the record relied on in their claims for relief.  Recitation of allegations without citation to any legal authority and without adequate recitation of the facts relied upon has been deemed a waiver of the arguments listed.  Gay v. State, 562 So. 2d 283, 289 (Ala. Crim. App. 1990).  Accordingly, we hold that Hamm waived for purposes of appellate review in this Court the claims set out at pages 88-89 of his brief, with the exception of the claims discussed in a., b., and c, above.  Hamm presented at least some argument with citations to the record and to legal authorities as to the claims discussed in a., b., and c., above.[9]  Hamm has forfeited any right of review to the remaining claims from the "laundry list" of claims set out on pages 88-89.*

*The trial court correctly denied Hamm's claim that he did not receive effective assistance of counsel at the guilt phase of his trial.  Hamm is not entitled to any relief on this claim.*

*Hamm v. State*,  913 So. 2d at 485-86 (emphasis and bracketed footnote added).

## ii.   *Discussion*

No one disputes that during the time period at issue, Alabama Rule of Appellate Procedure 28(a)(5) required an appellant's argument to "contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to cases, statutes, other authorities, and parts of the record relied on[.]"  As stated earlier herein,  Hamm argues that he did comply with this rule, and that in any event, Alabama courts either have rejected the rule or have failed to regularly follow it.

---

[9] Sections "a., b., and c., above" refer to the appellate court's merits opinion concerning what it is now known as Claim VI.F.5. in the habeas petition, *infra*, that trial and appellate counsel were ineffective for failing to object to the trial court's failure to give a felony-murder jury instruction; Claim VI.F.6 in the habeas petition, *infra*, that trial and appellate counsel were ineffective for failing to object to the trial court's accomplice liability instruction; and Claims VI.F.17 and 18 in the habeas petition, *infra*, that trial and appellate counsel were ineffective for failing to adequately question, object to or strike biased jurors respectively.  Although these claims also were among those laundry listed in the appellate brief, *unlike* the rest of the list, Hamm did make an additional effort to set out some supporting argument for these three claims further in his brief.  (Rule 32 C.R. Vol. 29, Tab. 45, pp. 89-92).

> **(1)**     *Hamm's contention that his appellate claims were dismissed solely for lack of citation to legal authority*

Hamm asserts that he "extensively cited legal authority on the issue of ineffective assistance of counsel, especially in Part VII.A. of his brief to the Court of Criminal Appeals," and, therefore, the appellate court erred when it held that he "failed to offer legal authority in support of his claim of ineffective assistance of counsel." (Doc. no. 20, pp. 98, 119).  In other words, Hamm argues that his brief did comply with Rule 28(a)(5) and the state court's finding that he did not is unreasonable and arbitrary.  True, the first subsection of Hamm's appellate brief contained a five page explanation of the *Strickland* standard in various contexts.  However, *none* of the information was explained in the context of any individual ineffectiveness claim pertaining to Hamm's circumstances.  Further, the Alabama Court of Criminal Appeals' application of Rule 28(a)(5) did not hinge solely on Hamm's failure to cite legal authority for his claims in the appellate brief.  As can be seen in the emphasized portions of the appellate court's opinion, *supra*, Hamm's claims were deemed abandoned for lack of factual support, argument and legal support.  In short, his brief provided no legal analysis tying his cited authority to any facts with support from the record and failed to present any true legal argument to the court.  Therefore, Hamm's first argument is rejected.  The state court's factual determination was not unreasonable in the light of the material contained in Hamm's appellate brief, nor did the state court apply Rule 28(a)(5) to Hamm's brief in a novel or unfair manner.

> **(2)**     *The Alabama Court of Criminal Appeals relied on a procedural rule that has been rejected by that State*

In his second argument against the preclusive effect of the Rule 28(a)(5) determinations, Hamm contends that

the Alabama Court of Criminal Appeals, in other cases, has expressly rejected the idea that claims should be waived on these grounds.  *See*, *Arnold v. State*, 601 So. 2d 145[, 155] (Ala. Cr. App. 1991) (application of the rule is "useless legal fiction"); *Page v. State*, 622 So. 2d 441[, 445] (Ala. Cr. App. 1993) (stating that the court "no longer follows" this rule); *May v. State*, 672 So. 2d 1307[, 1308] (Ala. Cr. App. 1993) (declining to follow rule).

(Doc. no. 20, p. 98) (brackets added).  The court has carefully examined each of these cases and finds this argument to be without merit.

The circumstances underlying the courts' refusals to follow the waiver/abandonment rule in those cases are very different from Hamm's circumstances.  In each of the three cases Hamm relies upon, the State had filed a responsive brief in which it encouraged the appellate court to find the appellant had waived certain claims *only* because the appellant had not cited *legal authority* for his claims.  *See Arnold v. State*, 601 So. 2d at 155; *Page v. State*, 622 So. 2d at 445; *May v. State*, 672 So. 2d at 1308.  In each instance, the Alabama Court of Criminal Appeals refused to find waiver/abandonment simply because the appellant cited no legal authority.  *Id.*

In Hamm's case, the State did not file a response encouraging waiver/abandonment of appellate claims solely on the lack of legal authority.  (Rule 32 C.R. Vol. 29, Tab. 46, pp. 52-134).  Instead, it responded fully to any claim Hamm's appellate brief made.  *Id.*  It appears that the State failed to respond to a handful (penalty phase only) of the laundry list of claims, but for the most part it answered that the laundry list claims were without merit.  *Id.* at 96.  It even responded more fully to some of the laundry list claims and commented that some had been poorly pled in the Rule 32 petition.  *Id.* at 96-97.[10]  In fact, the State only mentioned the term "abandoned" once, in footnote

_____

[10] The court emphasizes the word "comment."  None of the state courts on collateral appeal dismissed any of Hamm's claims on the grounds that the claims were insufficiently pled.

31

5 of its responsive brief, when it observed that Hamm had "[a]pparently" abandoned claims which did not appear at all (*i.e.* in any form, however meager) in his appellate brief.  *Id.* at 96 n.5.

The express language of the Rule 28(a)(5) makes clear that an appellant must list and explain the reasons for his claims and provide record citations in support thereof.  The claims that the Alabama Court of Criminal Appeals found to be waived and abandoned by in Hamm's case did not comply with this rule.  The Eleventh Circuit has accepted and acknowledged application of the rule in this context as a procedural default.  For instance, the Eleventh Circuit in *Brownlee v. Haley* held that a claim is defaulted in federal court if the state court finds that the claim has been abandoned. 306 F.3d 1043 (11th Cir. 2002).  It wrote:

> The procedural default governing the racial bias claim is slightly different, but equally valid.  Although it is true that, like the other procedurally defaulted claims, this claim was not raised at trial or on direct appeal, the Court of Criminal Appeals rejected it on the ground that it was abandoned.  Brownlee did raise the issue before the trial court in the Rule 32 proceedings, but he did not expressly include it in his appellate brief challenging the denial of his Rule 32 motion.  Instead, he stated in a footnote of the brief that he was preserving all of the issues raised in his initial Rule 32 petition.  As the Court of Criminal Appeals noted, this footnote was insufficient to preserve an issue under Alabama law.  *See Brownlee*, 666 So. 2d at 93; *see also Burks v. State*, 600 So. 2d 374, 380 (Ala. Crim. App. 1991)("Errors assigned and not argued will be treated as abandoned.  Issues listed in [a] brief but not argued will not be reviewed on appeal.  Allegations not expressly argued on appeal are deemed by us to be abandoned.") (citations, quotations, and punctuation omitted).  Plainly, this ruling constituted a dismissal of the claim on a procedural ground, thus barring federal habeas review.

306 F.3d at 1066.[11]

---

[11]  The Alabama Supreme Court in *Burks v. State* further stated:

> In a *pro se* brief filed April 26, 1991, the appellant raises 26 additional issues. The allegations contained in the appellant's brief are confusing and disorganized, sometimes to the point of being unintelligible and incoherent.  Most of the issues are not supported by legal authority.  Most of the appellant's references to specific pages in the record on appeal do not sustain the argument for which they are cited.  In such

On the basis of the foregoing, this court concludes that a failure to cite legal authority, standing alone, does not result in abandonment under Rule 28(a)(5).  Instead, the language *and* application of Rule 28(a)(5) shows that Alabama courts have found waiver/abandonment of appellate claims when an appellant listed or assigned error with no argument.  These latter defects are the type of errors in Hamm's appellate brief and are the express reasons the Alabama Court of Criminal Appeals found the claims to be abandoned.  Rule 28(a)(5) has not been rejected by the Alabama courts.  Indeed, it has been consistently applied to appellate briefs that assign error without argument or factual support.

**(3)**      *Rule 28(a)(5) is not regularly followed*

Hamm's third and final argument against the preclusive effect of Rule 28(a)(5) provides that the Rule is inadequate because it "has not been consistently applied."  (Doc. no. 20, pp. 98, 119).  He cites one State case in support of this contention:  citing *Hallford v. State*, 629 So. 2d 6 (Ala. Crim. App. 1992) in which the Alabama Court of Criminal Appeals observed that it could correctly

---

cases as that presented here, the appellate courts of this state have not been reluctant to hold that the appellant has waived the alleged errors. "The law is settled that '"[w]here an appellant fails to cite any authority, we may affirm, for it is neither our duty nor function to perform all the legal research for an appellant.'" *McConico v. McKibben*, 581 So. 2d 829 (Ala. 1991).  *Accord, Vinzant v. State*, 462 So. 2d 1037 (Ala. Cr. App. 1984).  Errors assigned and not argued will be treated as abandoned. *See Edgil v. City of Carbon Hill*, 214 Ala. 532, 533, 108 So. 355, 356 (1926). Issues listed in brief but not argued will not be reviewed on appeal.  *Jackson v. State*, 265 Ala. 690, 692, 93 So. 2d 808, 810 (1957).  "[A]llegations ... not expressly argued on ... appeal ... are deemed by us to be abandoned."  *United States v. Burroughs*, 650 F.2d 595, 598 (5th Cir.), *cert. denied*, 454 U.S. 1037, 102 S. Ct. 580, 70 L. Ed. 2d 483 (1981).

600 So. 2d at 380.

refuse to address the appellant's footnoted laundry list of arguments pursuant to Rule 28(a)(5), Ala. R. App. P, but "because of the nature of the case" would choose instead to consider the issues. However,  as set out earlier, satisfaction of the requirement that a rule be firmly established and regularly followed does not mean that the procedural rule must be applied rigidly in every instance, or that occasional failure to do so eliminates its adequacy.  (*See* Section IV.A.3, *supra*).  Rather, the "adequacy" requirement means only that the procedural rule "must not be applied in an arbitrary or unprecedented fashion." *Judd v. Haley,* 250 F.3d at 1313.  Accordingly, the court rejects Hamm's third argument.

**b.** *Conclusion - IAC claims abandoned on collateral appeal cannot be "cause" to overcome the procedural default of another claim*

For all of the foregoing reasons, Hamm failed to comply with Rule 28(a)(5) of the Alabama Rules of Appellate Procedure.  That rule was firmly established and regularly followed during the time period in which Hamm litigated his collateral appeal.  Moreover, the state court's application of that rule to the claims in Hamm's appellate brief was neither novel nor arbitrary under the circumstances.  Thus, to the extent Alabama expressly found Hamm's IAC claims to be waived and abandoned on collateral appeal, the procedural default shall be honored under federal preclusionary principles.  The necessary implication of this default means that Hamm cannot offer those IAC claims as cause to overcome the procedural default of another habeas claim in this proceeding.

**D.** *Claims that are not of federal constitutional proportion*

Finally, three of Hamm's habeas claims are ultimately complaints about the process Hamm was afforded during collateral proceedings.  (*See* Claims VI.G., VI.H, and VI.X., *infra*).  However, "[f]ederal habeas relief is available to remedy defects in a defendant's conviction and sentence, [and] 'an alleged defect in a collateral proceeding does not state a basis for habeas relief.'" *Alston v. Dep't*

*of Corr., Fla.*, 610 F.3d 1318, 1325-1326 (11th Cir. 2010) (quoting *Quince v. Crosby*, 360 F.3d 1259, 1262 (11th Cir. 2004) (brackets added) (additional citation omitted)).   Therefore, Claims VI.G., VI.H. and VI.X. do not state claims of federal constitutional proportion, and the court will dismiss these claims.  *See* 28 U.S.C. § 2254(a).

## VI.  THE CLAIMS

A.    *The trial court failed to instruct the jury on the lesser included offense of felony murder in violation of state law and petitioner's constitutional rights guaranteed by* Beck v. Alabama.  (Doc. no. 1, ¶¶ 38-43, pp. 10-12) (Doc. no. 16, pp. 11-17).

Hamm alleges that "the trial court improperly instructed the jury that voluntary intoxication would reduce capital murder to *manslaughter*, rather than felony-murder." (Doc. no. 1, p. 10).   He argues that he was entitled to a felony murder instruction because his "principal defense at trial was that he was intoxicated and was not the trigger person." (Doc. no. 1, p. 10) (Doc. no. 16, pp. 11-12).  However, Hamm failed to raise this claim at trial or on direct appeal.  When Hamm raised this issue in the Rule 32 petition, the circuit court found the claim to be barred, "at least in part, by [Hamm's] failure to raise [it] at trial and then on direct appeal." (Rule 32 C.R. Vol. 33, Tab. 58, pp. 5, 7) (citing Rule 32.2(a)(3) and (a)(5), *Alabama Rules of Criminal Procedure*) (brackets added).  The Alabama Court of Criminal Appeals was the last state court to address the claim on collateral review, and it expressly held that "the trial court correctly applied the procedural bars of Rule 32.2, Ala. R. Crim. P. and found the claim[] to be precluded." *Hamm v. State*, 913 So. 2d at 493 (brackets added).  Therefore, the *Beck* claim is precluded from federal review because of Hamm's procedural default in state court.

Hamm seeks to excuse his procedural default by arguing as cause the ineffective assistance of trial and appellate counsel.  (Doc. no. 20, pp. 13-14)  But for independent claims of ineffective

assistance of counsel to serve as cause to overcome a procedural bar, the IAC claims must be meritorious.  *See Edwards v. Carpenter*, 529 U.S. 446.  In this instance, as discussed subsequently, Hamm's IAC trial and appellate claims are procedurally defaulted or without merit to the extent he alleges the non-triggerman theory and without merit to the extent he raises the intoxication theory. As such, the ineffectiveness claims, therefore, cannot constitute cause to excuse the procedural default.  (*See* Claims VI.F.5 and VI.F.32, *infra*).  Accordingly, the court will dismiss this claim.

Alternatively, Hamm's *Beck* claim is without merit.  To be entitled to habeas relief on this claim, Hamm must show that the trial court's failure "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  To do so, he relies upon the Supreme Court's decision in *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382 (1980).  That case addressed Alabama's previous capital punishment regimen, under which the trial judge was

> specifically prohibited from giving the jury the option of convicting the defendant of a lesser included offense.  Instead, the jury [was] given the choice of either convicting the defendant of the capital crime, in which case it [was] required to impose the death penalty, or acquitting him, thus allowing him to escape all penalties for his alleged participation in the crime.  If the defendant [was] convicted and the death penalty imposed, the trial judge [was then required to] hold a hearing with respect to aggravating and mitigating circumstances; after hearing the evidence, the judge [was permitted to] refuse to impose the death penalty, sentencing the defendant to life imprisonment without possibility of parole.

*Beck v. Alabama*, 447 U.S. at 628-29 (footnotes omitted).

The defendant in *Beck* and an accomplice had been charged with the capital offense of an intentional killing in the course of a robbery.  The evidence adduced at trial would have entitled the defendant to an instruction on "felony murder" as a lesser included offense, absent the statutory prohibition on such instructions.  As the Supreme Court noted,

Because of the statutory prohibition, [however,] the court did not instruct the jury as to the lesser included offense of felony murder.  Instead, the jury was told that if petitioner was acquitted of the capital crime of intentional killing in the course of a robbery, he "must be discharged" and "he can never be tried for anything that he ever did to Roy Malone [the victim]."  Record 743.  The jury subsequently convicted petitioner and imposed the death penalty; after holding a hearing with respect to aggravating and mitigating factors, the trial court refused to overturn that penalty.

*Id*. at 630.

Beck appealed, eventually to the United States Supreme Court, where he argued that

the prohibition on giving lesser included offense instructions in capital cases violates both the Eighth Amendment as made applicable to the States by the Fourteenth Amendment and the Due Process Clause of the Fourteenth Amendment by *substantially increasing the risk of error in the factfinding process*.  Petitioner argues that, in a case in which the evidence clearly establishes the defendant's guilt of a serious noncapital crime such as felony murder, forcing the jury to choose between conviction on the capital offense and acquittal creates a danger that it will resolve any doubts in favor of conviction....

*Id*. at 632 (emphasis supplied) (footnote omitted).[12]   The Supreme Court agreed, holding that Alabama's statutory prohibition on giving lesser included offense instructions in capital cases was unconstitutional because it did substantially increase the risk of prejudicial error in the factfinding process.  *Beck v. Alabama*, 447 U.S. at 637 ("[W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense–but leaves some doubt with respect to an element that would justify conviction of a capital offense–the failure to give the jury the 'third option' of

---

[12] The Supreme Court granted *certiorari* to decide the following question:

"May a sentence of death constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict?"

*Beck v. Alabama*, 447 U.S. at 627 (quoting *Beck v. Alabama*, 444 U.S. 897, 100 S. Ct. 204 (1979) (memorandum)).

convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.").

Hamm is not entitled to habeas relief based on the claim that the trial court failed to instruct the jury on the lesser included offense of felony murder in violation of *Beck*.  *Beck* has not been extended by the Supreme Court.  In fact, the Court has taken pains to explain that *Beck's* holding does not stretch beyond the peculiar facts it addressed.  *See id*. at 635 ("Alabama's failure to afford capital defendants the protection provided by lesser included offense instructions is *unique in American criminal law*.") (emphasis supplied) (footnote omitted).  For example, in *Schad v. Arizona*, 501 U.S. 624, 111 S. Ct. 2491 (1991), the Court rejected an argument that due process required a jury in a capital case to be instructed on *every* lesser included offense supported by the evidence:

> Petitioner's second contention is that under *Beck v. Alabama*, 447 U.S. 625 (1980), he was entitled to a jury instruction on the offense of robbery, which he characterizes as a lesser included offense of robbery murder. *Beck* held unconstitutional an Alabama statute that prohibited lesser included offense instructions in capital cases.  Unlike the jury in *Beck*, the jury here was given the option of finding petitioner guilty of a lesser included noncapital offense, second-degree murder.  While petitioner cannot, therefore, succeed under the strict holding of *Beck*, he contends that the due process principles underlying *Beck* require that the jury in a capital case be instructed on every lesser included offense supported by the evidence, and that robbery was such an offense in this case.

> Petitioner misapprehends the conceptual underpinnings of *Beck*.  Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all.  We explained:

> > "'[O]n the one hand, the unavailability of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason — its belief that the defendant is guilty of some serious crime and should be punished.  On the other hand, the apparently mandatory nature of the death penalty may encourage it to acquit for an equally impermissible reason — that, whatever his crime, the defendant does not deserve death . . . .

[T]hese two extraneous factors . . . introduce a level of uncertainty and unreliability into the factfinding process that cannot be altered in a capital case." [*Beck*, 447 U.S. at 642-43] (footnote omitted).

We repeatedly stressed the all-or-nothing nature of the decision with which the jury was presented. *See id.*, at 629, 630, 632, 634, 637, 642-43, and n.19. As we later explained in *Spaziano v. Florida*, 468 U.S. 447, 455 (1984), "[t]he absence of a lesser included offense increases the risk that the jury will convict . . . simply to avoid setting the defendant free . . . . The goal of the *Beck* rule, in other words, is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence." See also, *Hopper v. Evans*, 456 U.S. 605, 609 (1982). The central concern of *Beck* is simply not implicated in the present case, for petitioner's jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence.

*Schad v. Arizona*, 501 U.S. at 645-47.[13]

*Beck* and its progeny did not entitle Hamm to a jury instruction on felony murder. Therefore, the trial court's failure to give such an instruction was neither contrary to, nor did it involve an unreasonable application of clearly established federal law. Hamm argues that this court should grant habeas relief based on *Daniel v. Thigpen*, 742 F. Supp. at 1548 (holding that under *Beck* "[d]ue process requires that a jury in a capital case be charged on lesser included offenses when the evidence warrants it"). One flaw in this argument is that *Daniel* is not "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Moreover the United States Supreme Court in *Schad* instructed that *Beck's* holding applied only to the "all or nothing" situation faced by the jury in Beck's case and did not extend beyond that circumstance.

---

[13] The foregoing excerpts from the *Schad* opinion not only explain the scope of *Beck's* holding, but also address every Supreme Court decision cited in Hamm's brief, with the exception of *Hopkins v. Reeves*, 524 U.S. 88, 118 S. Ct. 1895 (1998). Even so, *Hopkins* affords Hamm no precedential assistance. The issue in *Hopkins* was whether a Nebraska trial court in a capital case was required by *Beck* to give requested jury instructions on offenses that historically had not been considered by the courts of that state to be lesser included offenses.

Hamm's circumstances are not akin to those of the petitioner in *Beck* because the jury in Hamm's case was not faced with a decision to convict him of capital murder or acquit him completely.  Instead, his jury was instructed on several lesser-included offenses, including murder and manslaughter – as distinguished from capital murder under 13A-5-40(a)(2).[14]  If the jurors were convinced that Hamm had committed a homicide, but not convinced that he was guilty of capital murder, they were presented with the option of convicting him of the lesser-included, noncapital offense of murder.  Moreover, the jurors were also instructed on the noncapital offense of manslaughter and voluntary intoxication.  These instructions allowed the jury to determine whether Hamm's intoxication was so extreme that it negated the specific intent element required to commit murder, which would have justified a manslaughter conviction.  Thus, petitioner's jury was *not* "faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence." *Schad*, 501 U.S. at 647.

For these reasons, Hamm has failed to show that the trial court's failure to instruct the jury on felony murder as a lesser included offense was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

This claim is due to be dismissed as procedurally defaulted, or in the alternative, due to be denied.

**B.**     *The prosecutor failed to turn over to the defense exculpatory evidence about State witness and co-defendant Doug Roden and State witness Kathryn Flanagan[15] in*

---

[14] The other lesser-included offense charged was robbery.

[15] In the trial transcript, Ms. Flanagan was referred to as Kathlyn Flan*n*agan. (R. Vol. 2, p. 295).  On direct appeal, the Alabama Court of Criminal Appeals referred to her as Kathy Flan*n*agan,

*violation of* Brady v. Maryland.  (Doc. no. 1, ¶¶ 44-50, pp. 12-14; Doc. no. 20, pp. 17-34).

    **1.**    *Evidence concerning Doug Roden*  (Doc. no. 1, ¶¶ 45-50, pp. 12-14; Doc. no. 20, pp. 17-34).

Hamm alleges that the prosecutor failed to turn over sealed mental health records showing that co-defendant Doug Roden, the only other individual who could have been the triggerman and the "principal witness" who testified against Hamm at trial, had been "diagnosed as having borderline and possibly antisocial personality, and was suffering from alcohol and substance abuse problems." (Doc. no. 20, p. 28 and Doc. no. 1, p. 12, respectively).  As a result of this failure, Hamm asserts that at trial, defense "counsel ... had no evidence to impeach Doug Roden about his track record of lying, about his own drug problems, or about his mental health problems."  (Doc. no. 1, p. 13).  Hamm contends that the withheld impeachment evidence violated his right to due process of law in that a reasonable probability arises that the outcome of his case would have been different had defense counsel been given the mental health records.  *Id.* at 14 (citing *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555 (1995); *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375 (1985); and *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963)).  Hamm concedes that he did not raise the *Brady* claim about the Roden information at trial or on direct appeal, but argues that he did not do so because he was unaware of the existence of the sealed records.

While Hamm did raise a *Brady* claim in his December 3, 1991, Rule 32 petition, the only allegations underlying that claim involved Kathryn Flanagan.  (Rule 32 C.R. Vol. 21, Tab. 40, pp.

---

*Hamm v. State*, 564 So. 2d at 455.  On appeal from the denial of the Rule 32 petition, Ms. Flannagan was referred to as Kathryn Flanagan.  *Hamm v. State*, 913 So. 2d at 479.  The court will refer to her as Kathryn Flanagan as that is the spelling relied upon by Hamm and the Alabama Court of Criminal Appeals on collateral review.

32-33).  Again, Hamm contends that he remained unaware of the Roden records until approximately April 20, 1995, when in the course of post-conviction discovery the Cullman County Circuit Court Clerk sent him copies of original sealed documents from the case of *State v. Douglas Woodrow Roden*, CC-87-100.  (Rule 32 C.R. Vol. 15, p. 852).[16]  This discovery occurred more than three years after he filed the Rule 32 petition on December 3, 1991, and more than four years before the July 26, 1999, Rule 32 evidentiary hearing.  Yet, Hamm never amended his Rule 32 petition to include the Roden documents or information as part of the allegations underlying his *Brady* claim.

Still, Hamm contends that the *Brady* claim about the Roden information was properly raised before the Rule 32 court because (although he was represented by counsel) on July 19, 1999, he filed a *pro se* handwritten motion entitled "Motion to Consider My Documentary Evidence in Support of Rule 32 Petition."  (Rule 32 C.R. Vol. 11, pp. 172-73).  The motion was signed by Hamm on July 5, 1999.  *Id.* at 173.  In it, Hamm requested that the court consider documentary evidence attached to the motion as support for his Rule 32 petition and "in addition to whatever other evidence is presented at my Rule 32 hearing."  *Id.*  The third category of documents listed as being attached to the motion is "the original, signed copy of the sealed records from the case of *State v. Douglas Woodrow Roden*, CC-87-100."  *Id.*

---

[16]  The court located Hamm's post-conviction motion for discovery.  (Rule 32 C.R. Vol. 21, pp. 2038-53).  The State filed a response to that discovery, and later Hamm requested the circuit court to enter an order granting his discovery motion so that he could effectuate his requests.  *Id.* at 2012-14.  The Rule 32 court apparently never entered an Order regarding discovery.  Thus, while Hamm asserts that the circuit court directed that the medical records in the court files of Roden's case be unsealed, copied and sent to Hamm, the record contains no order to that effect.

This *pro se* motion appears to have been accompanied by a handwritten letter that also was filed July 19, 1999, but dated July 5, 1999.[17]  (Rule 32 C.R. Vol. 15, pp. 850-51).  The letter was accompanied by a typed affidavit in which Hamm requested that his *former*[18] Rule 32 lawyer, Bernard Harcourt, be allowed to represent him if necessary alongside Ms. Pam Nail, the lawyer appointed by the court.  *Id.* at 850-51.  In the letter, Hamm also asked that certain "enclosed evidence be considered by the court in these Rule 32 proceedings."  *Id.* at 850.  A review of the pages following show the "enclosed evidence" to be the April 20, 1995, clerk's certification page regarding copies of the Roden documents, along with those copies, which are described by the clerk as: "(1) a sworn statement by Douglas Roden,[19] (2) documents from Central Records, Alabama Department of Corrections, (3) documents from Correctional Medical Systems, and (4) documents from Bryce

---

[17]  This portion of the post-conviction record contains repetitively filed letters and pleadings while a singular copy of the documentary evidence supporting the pleadings is unevenly attached to various copies of the letters and pleadings.  For instance, another copy same letter and affidavit described above are file stamped July 22, 1999, and are accompanied by some of the documents referenced in the motion. (Rule 32 C.R. Vol. 11, pp. 172-73).  Because Hamm signed his letters and motions on July 5, 1999, and copies of the letters, affidavit, and motions are duplicated and file stamped on July 19, 1999, and July 22, 1999, the court can only assume that Hamm himself separately submitted portions of his documentary evidence, or the items were duplicated by the clerk. No one disputes that the letters, pleadings and supporting documents are part and parcel of the same matter, so the court shall review the letters, pleadings and attachments in a cohesive manner.

[18]  Bernard Harcourt represented Hamm from the time the Rule 32 petition was filed in 1991 until May 1, 1998.  On May 1, 1998, the circuit court judge withdrew Harcourt as counsel for Hamm based on a letter Harcourt wrote on April 20, 1998, in which he informed the court that he was looking for substitute counsel because of scheduling conflicts, a new faculty appointment, and his growing family – all of which made his continued representation of Hamm difficult.  (Rule 32 C.R. Vol. 19, pp. 1610-12).  While Harcourt did not specifically request that he be allowed to withdraw as counsel, the state court interpreted the letter in such a fashion.  At that time, the court appointed Pam Nail to represent Hamm.

[19]  This statement was given to law enforcement on January 28, 1987, pertains to the murder-robbery, but it is not sworn.  In any event, Hamm agrees he was aware of this statement at the time of trial, and explains that his *Brady* claim is based on suppression of the remaining health records.

43

Hospital." *Id.* at pp. 852-977 (bracketed footnote added).  Hamm provided no explanation about the significance the circuit court was supposed to attach to these documents.

Before the Rule 32 evidentiary hearing began, Hamm objected to proceeding without the attorney of his choice (Harcourt), asserted that he waived no issues, asked the court to "admit into evidence and consider in support of my Rule 32 Petition all of the evidence that I sent to the courts," and requested copies of court orders.  (Rule 32 R. Vol. 21, Tab. 42, p. 5).  The court responded that it had addressed the issue of Barnard Harcourt on two previous occasions, and stated that Harcourt's position and location as a professor at the University of Arizona had "created a quite of bit of difficulty in dealing with him."  *Id.* at 6.  The court expressed that Harcourt had "asked to be relieved from"[20] Hamm's case and that Ms. Nail was a competent attorney to represent Hamm's interests. *Id.*  The court agreed to send Hamm copies of orders.  *Id*.  In response to Ms. Nail's statement concerning "[the information that was sent to the Court last week[,]" the court responded, "Yes. Yes. All of that has been file stamped and included as part of the Court record."  *Id.*

The evidentiary hearing then proceeded.  Mr. Harris and Ms. Williams, Hamm's trial and appellate counsel, were the only witnesses called by Petitioner during the evidentiary hearing, and neither of them were questioned about Doug Roden's mental health records nor were the Roden

---

[20] Harcourt disagreed with the circuit court's assessment of the situation, and upon resuming his position as post-conviction counsel (along with Ms. Kimberly Dobbs-Ramey) on collateral appeal, unsuccessfully argued that the circuit court had violated Hamm's constitutional rights by refusing to allow Harcourt to represent Hamm.  (Rule 32 C.R. Vol. 29, "appellate brief" Tab. 45, pp. xi-xxix; 1-10).  *See also*, *Hamm v. State*, 913 So. 2d at 467-74 & n.5.  He makes the same claim before this court at Section VI.G, *infra*, but as set out in the discussion of that issue, these allegations do not state a habeas claim because they fall outside the scope of this court's proscribed review.  28 U.S.C. § 2254(a).

records mentioned.  *Id.* at 7-63.[21]  In its final order following the hearing the circuit court held that "the claim that Hamm's constitutional rights were violated when the State failed to turn over exculpatory evidence to him before trial" was barred because Hamm raised it at trial but not on appeal. (Rule 32 C.R. Vol. 33, Tab. 58, p. 4).  Of course, this opinion is referring to the only *Brady* claim raised in the Rule 32 petition, the Flanagan *Brady* claim, which indeed was raised at trial but not on direct appeal.

Hamm first described and alleged that the prosecution withheld the Roden records in violation of *Brady v. Maryland* in his brief on collateral appeal.  The Alabama Court of Criminal Appeals addressed this issue in the following manner:

> Hamm ... alleges that the prosecution failed to disclose sealed records of his codefendant, Doug Roden.
>
> ....  The court did not address the portion of the claim relating to the sealed records of codefendant Doug Roden because that claim was not raised in the petition.  The claim was not presented to the trial court, and it cannot now be considered on appeal. *See*, *e.g.*, *Morrison v. State*, 551 So. 2d 435, 437 (Ala. Crim. App. 1989).
>
> Even if the claim had been presented in the postconviction petition, it would have been procedurally barred from review because it could have been, but was not, raised at trial and on direct appeal. Rule  32.2(a)(3), (5), Ala. R. Crim. P.[22]

*Hamm v. State*, 913 So. 2d at 479-80 (bracketed footnote added).

Respondent takes the position that the *Brady* claim about the Roden information is procedurally defaulted because Hamm failed to raise it at trial, on direct appeal or during the Rule

---

[21] None of the 8 exhibits (7 were admitted) that were offered into evidence during the actual hearing pertained to Doug Roden.  *Id.* at 14, 17 and 63.  (*See also* Clerk's transcript Rule 32 C.R. Vol. 11, p. 11).

[22] The appellate court offered no explanation as to why it determined that Hamm could have but did not raise the *Brady* claim about the Roden information at trial and on direct appeal, nor is it readily apparent from the record.

32 proceedings.  (Doc. no. 16, p. 8).  In so doing, Respondent admits that Hamm "did attempt to raise this claim on appeal from the denial of the Rule 32 petition," but points out that the Alabama Court of Criminal Appeals refused to consider it because Hamm had "not presented [it] to the Rule 32 court."  (Doc. no. 15, pp. 5-6).[23]

Hamm disagrees with Respondent's position, and argues that the state appellate court erred when it found that he had not presented his Roden *Brady* claim in circuit court.  Hamm relies heavily on his pre-evidentiary hearing letters, motions and attachments, as well as his colloquy with the trial court before the hearing began, to argue that he did indeed present this claim during Rule 32 proceedings.  However, Hamm *never explained* the significance of the Roden information to the trial court in his pleadings, correspondence, oral argument or questioning during the Rule 32 hearing, nor were the Roden documents admitted into evidence at the hearing.  Therefore, the Alabama Court of Criminal Appeals' determination that Hamm failed to raise the claim in the Rule 32 petition and before the trial court is supported by the record.

Hamm argues that he cannot be blamed for failing to represent himself properly when he was denied his counsel of choice, Barnard Harcourt.  But Hamm had ample opportunity during Harcourt's representation of him to file a motion to amend the Rule 32 petition to identify the failure to produce the Roden records as another *Brady* violation, to explain the relevance of the documents

---

[23] Respondent argues that the claim is procedurally defaulted because Hamm never raised his Roden *Brady* claim in state court at all.  (Doc. no. 16, p. 8).  This position encompasses a failure to raise the claim at trial and on direct appeal, but does not address it within the context of the appellate court's alternate Rule 32.2(a)(3) and (5) holding.  Nonetheless, for the reasons set out further herein, the state appellate court's first determination that Hamm failed to preserve his claim in the Rule 32 circuit court is due to be honored.  Even if the alternate procedural default holding raises questions, ultimately it matters not because Hamm's *Brady* claim is without merit.

subsequent to the 1995 certification, after he received the documents in April, 1995 and before the court withdrew Harcourt from the case in 1998.  He did not do so.

In short, the Roden *Brady* claim was not fairly presented in the Rule 32 proceedings because it was not included in the Rule 32 petition, the state circuit court was never advised of the relevance of the documents, and those documents were not offered or admitted into evidence at the Rule 32 hearing.  These failures resulted in the appellate court's determination that Hamm had not preserved the claim for review on collateral appeal, which is an adequate and independent state procedural default finding.  *See Brown v. State*, 1 So. 3d 1073, 1075 (Ala. Crim. App. 2007) (Rule 32 claims that are not presented to the circuit court are not preserved for appellate review.) (citing *Whitehead v. State*, 593 So. 2d 126 (Ala. Crim. App. 1991)).  Accordingly, the habeas claim also is procedurally defaulted.

To the extent that Hamm is attempting to argue as constitutional errors that the circuit court refused to allow him his post-conviction counsel of choice or that post-conviction counsel was ineffective for failing to present the claim in circuit court, his argument is rejected.  A petitioner has no constitutional right to an attorney in state post-conviction proceedings, much less counsel of choice.  *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Murray v. Giarratano*, 492 U.S. 1, 109 S. Ct. 2765 (1989); *Wainwright v. Torna*, 455 U.S. 586, 102 S. Ct. 1300 (1982).  Further, any alleged inadequacies of Harcourt or court-appointed counsel in their failure to preserve a *Brady* claim before the Rule 32 court cannot constitute cause to overcome the procedural default.  *Martinez v. Ryan*, 132 S. Ct. at 1320.  Accordingly, the court will dismiss this claim.

Alternatively, the court finds this claim should be denied because it is without merit.  In *Brady v. Maryland* the United States Supreme Court held that "the suppression by the prosecution

of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*, 373 U.S. at 87.

When this rule is broken down, "suppression" is understood to mean evidence "known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103,  96 S. Ct. 2392 (1976).  "Evidence" is interpreted as that which is "'favorable to an accused,'" and the two types of evidence that "fall[] within the *Brady* rule" are "impeachment evidence" and  "exculpatory evidence." *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375 (1985) (quoting *Brady*, 373 U.S. at 87)  (citing *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763 (1972)) (brackets added).  Finally, in the *Brady* context, the term "material" is a measure of prejudice that requires a petitioner to show that the nondisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S. Ct. 1555 (1995).  Thus, "[t]here are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 289-90, 119 S. Ct. 1936 (1999) (brackets added).

Having set out the *Brady* rule, the court now turns to Roden's mental health records.  In doing so, the court assumes without deciding that the Roden records were suppressed by the prosecutor under the *theory* that Hamm's discovery motion at trial encompassed this information, the prosecution was aware of the information (which had been sealed by the court and was located

in Roden's court records), but the prosecution failed to turn the information over to Hamm at trial. (Doc. no. 20, p. 29).

Hamm argues that the information in the Roden records is favorable impeachment evidence because it would have established Roden's "track record of lying, ... drug problems ... and mental health problems." (Doc. no. 1, p. 13). He supports the claim by arguing that

> [a]n effective cross-examination by competent defense counsel using these [mental health records] would have revealed Mr. Roden for what he was: a lying, drug-addicted, biased witness who was protecting himself and Regina Roden by framing his friend, Doyle. After having initially lied about being "kidnapped" by Doyle Hamm, Doug Roden and Regina Roden gave the police their concocted version of the event that absolved them of the major liability. At trial, however, counsel for Mr. Hamm had no evidence to impeach – therefore asked no questions to impeach – Doug Roden about his track record of lying, about his own drug problems, and about his untrustworthiness. The cross-examination is barren of any such impeachment evidence.

> It is important for this Court to review the short, ineffective cross-examination of Doug Roden and to see how little defense counsel had to work with, compared to how much there was in the mental health records. Without [the impeachment] materials, counsel could not challenge Roden's credibility based on his lying about his alcohol and drug addiction, about abusing drugs while in a drug treatment program while incarcerated, about using serious intravenous drugs – not just marijuana – and later lying about using drugs in treatment! Counsel had no evidence to question – and therefore did not question – Roden about his own drug and alcohol addiction, and his own need for money to satisfy his addiction that may have given rise to the robbery-murder. Counsel had no evidence to question ... Roden about being picked up several times for public intoxication. Counsel could also have used the evidence to impeach Roden about his own condition on the night of the murder. For instance, on cross examination, Roden said he was not drunk the night of the murder:

> Q.     You said Doyle was drunk? Were you drunk?

> A.     I wasn't. I had a buzz going. TR-903.

> Clearly, the evidence of drug and alcohol addiction and of lying would have been devastating during cross examination. Instead, there was no effective cross-examination.... At the trial, the jury heard Douglas Roden testify that he had entered the hotel lobby, but that it was Doyle Hamm and not he who had shot the victim

49

during the robbery.  The only alternative triggerman was Doug Roden.  He was the state's principal witness....

.... When the Court examines the totality of the impeachment evidence, it is clear that the failure to disclose undermines our outcome in the proceedings.  The undisclosed evidence establishes a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Bagley*, 473 U.S. 66, 682 (1985).  This goes both to the guilt phase of Doyle Hamm's trial, as well as to the penalty phase; but for sure, it undermines our confidence in the death sentence.  Just like in the *Banks* case, "At least as to the penalty phase, in sum, one can hardly be confident that [Doyle Hamm] received a fair trial, give[n] the jury's ignorance of" Doug Roden's lack of credibility and Kathy Flanagan's coaching.  *Banks*, 540 U.S. at 702.

(Doc. no. 20, "Hamm's Reply Brief," at pp. 27-29).

After carefully examining these allegations, this court harbors serious questions about whether the information in the Roden mental health records was "favorable" to the defense from a bias or credibility standpoint.  Most certainly the evidence was not material to Hamm's case at either the guilt or penalty phase of trial.  A review of the medical records shows that in 1985, while Roden was incarcerated for burglary in the custody of the Alabama Department of Corrections, he was given a mental health examination and diagnosed as having a possible anti-social personality.  Roden also underwent drug and alcohol treatment, where he admitted serious drug and alcohol use but denied that he had a drug and alcohol problem.  He did participate in the treatment program until a drug screening showed that he had been smoking marijuana, which caused him to be terminated from the program.

This information would not have resulted in a devastating cross-examination of Roden at trial.  At best, it shows that Roden was an individual who possibly had anti-social personality disorder with drug and alcohol issues.  Although Hamm denies its existence, the trial record shows very powerful impeachment evidence that was used at trial to undermine Roden's credibility.  Roden

was questioned on both direct examination and on cross examination about his plea agreement in exchange for testifying against Hamm.  (R. Vol. 5, pp. 874-75, 902, 921).  The agreement allowed Roden to escape the capital murder charge against him, plead guilty to murder, and receive a life sentence.  Roden also was questioned regarding the earlier inconsistent stories he told regarding his involvement in the murder-robbery, which included the purported kidnapping story.  *Id*. at 897, 907-11, 917-18, 920.  Finally, he was questioned about his two prior burglary convictions.  *Id.* at 900.  Aside from Roden himself, it cannot be overlooked that Hamm confessed that he was the triggerman (R. Vol. 6, pp. 1077-88) and that Regina Roden corroborated (R. Vol. 5, pp. 821-69) both Hamm's confession and the testimony of Doug Roden.  In the end, Hamm could not have derived any real benefit from a cross-examination of Doug Roden about his mental health and drug history, and certainly not enough to undermine confidence in the guilt or penalty phase of trial.  In fact, the jury likely distilled from the trial evidence that Roden had some alcohol and anti-social personality issues.  As such, the records are not material, and the Roden *Brady* claim lacks merit.

For all of the foregoing reasons, the Roden *Brady* claim is procedurally defaulted or alternatively without merit.  The undisclosed evidence of Roden's drug addiction, lying about such addiction and possible antisocial personality does not undermine confidence in either Hamm's conviction or the death sentence.  The court finds that Hamm is not entitled to habeas relief as to the Roden *Brady* claim.

> **2.** *Evidence regarding Kathryn Flanagan*  (Doc. no. 1, ¶¶ 50, p. 14) (Doc. no. 20, pp. 17-34).

Hamm alleges "[t]he prosecutor failed to turn over in a timely manner prior statements of Ms. Kathryn Flanagan, an eyewitness to the murder-robbery," and these statements showed

51

inconsistencies with Ms. Flanagan's trial testimony on direct examination.  (Doc. no. 1, p. 14).

Hamm declares that the prosecution failed to disclose three statements.

Although the record will be fleshed out in detail further subsequently, here is the short form

of the historic record and the three statements.  Flanagan testified on direct that both of the robbers

were male, and that the triggerman wore a faded green army jacket.  (R. Vol. 2, Tab. 9, pp. 301-05).

She also admitted she had previously picked a female out of a line-up.  *Id.* at 315.  She admitted on

cross-examination that there was a conflict between what she described as an initial oral statement

and written statement she gave to police that identified the robbers as male and her subsequent

identification of a female as one of the potential defendants.  *Id.* at 346-62.  She also revealed that

she had given a third statement identifying the get-away car[24] when the car was shown to her by law

enforcement.  *Id.*  On motion of defense counsel, these statements were turned over to the defense

for examination.  *Id.* at 392-96.

Counsel discovered that Ms. Flanagan initially stated that the triggerman was wearing a dark

colored jean jacket.  *Id.* at 397.  He cross-examined Ms. Flanagan on the matter and she stated that

after getting some sleep the night of the robbery, she began to think and remembered the jacket was

a faded green army jacket, so she informed the police of this correction the day following the crime.

*Id.* at 397-99.

Hamm did not raise a *Brady* claim concerning Ms. Flanagan's prior statements on direct

appeal.  He did make such a claim in his Rule 32 petition, but the circuit court found it to be

procedurally defaulted because, although Hamm raised the claim at trial, he failed to do so on direct

appeal, as required by Rule 32.2(a)(5), Ala. R. Crim. P.  (Rule 32 C.R. "Petition" Vol. 21, Tab. 40,

_____

[24] Hamm makes no remark or argument concerning this statement.

pp. 32-33; *id.* "Rule 32 opinion" Vol. 33, Tab. 58, p. 4). The Alabama Court of Criminal Appeals

affirmed the circuit court's decision on collateral review:

> The circuit court denied relief as to the portion of the claim regarding Kathryn
> Flanagan's statements on procedural bar grounds. (C. 32.) The court determined,
> and we agree, that the claim was barred from postconviction review because it was
> raised and addressed at trial. Rule 32.2(a)(2), Ala. R. Crim. P. (T. 1335-36.) The
> claim was also procedurally barred because it could have been, but was not, raised
> on appeal. Rule 32.2(a)(5), Ala. R. Crim. P.

*Hamm v. State*, 913 So. 2d at 479.

Because the last state court to address the claim found it to be procedurally defaulted

pursuant to Rule 32.2(a)(5), an adequate and independent state procedural rule, this court is

precluded from conducting a federal review of the claim. Hamm does argue an ineffective assistance

of appellate counsel claim as cause for the procedural default as to Kathryn Flanagan. (Doc. no. 20,

pp. 101-02). But, as set out in Claims VI.F.22 and VI.F.32, *infra*, the IAC claims are procedurally

defaulted or without merit, and, therefore, cannot be utilized in that capacity.

Alternatively, the Flanagan *Brady* claim is without merit. In his reply brief, Hamm argues

that the prosecution did not provide the three statements by eyewitness Kathryn Flanagan to defense

counsel until mid-trial. He alleges:

> Those statements were clearly exculpatory. Kath[r]yn Flanagan was shown
> two photo line-ups and three live line-ups. Vol. 2-TR-352. Ms. Flanagan was able
> to identify two individuals. Ms. Flanagan identified a female (Ms. Paula Cook,
> another suspect) as being the first person who walked into the motel. Vol. 2-TR-352.
> In other words, she believed that a woman was the first person to walk into the motel
> lobby, and, of course, Regina Roden was the only woman among the three
> accomplices. Ms. Flanagan then also identified Douglas Roden as being either the
> first or the second person in the motel. Vol. 2-TR-354. Ms. Flanagan did not
> identify Doyle Hamm in the line-ups.

> Defense counsel was only given the statements after the second-cross
> examination of Ms. Flanagan, the next morning of trial, after persistently demanding
> the statements and presenting legal authority, and counsel only had a few minutes to

read the statements to prepare a third cross-examination. At that time, counsel was able to point out some inconsistencies, such as the fact that Kathy Flanagan had originally said that the second person to enter the motel lobby may have been wearing a jean jacket, rather than a military jacket. Vol. 2-TR-398. (At trial, the prosecution tried to establish that Doyle Hamm wore the military jacket). Yet Ms. Flanagan had told the investigator that the second person was wearing "a loose fitting jean jacket." Vol. 2-TR-399. The evidence at trial was uncontradicted that the *second* person who entered the lobby and who went behind the registration counter committed the murder. Therefore, the eye-witness identification raised the distinct possibility that Doyle Hamm, in his state of intoxication, was a non-triggerman accomplice: that he was neither the young woman who entered first, nor the triggerman wearing a jeans jacket. And of course, he was never identified–in contrast to the others. This exculpatory evidence was contained in prior statements by the witness, Ms. Flanagan. However, those statements were not turned over to the defense until after the defense cross-examination and re-cross-examination. Vol. 2-TR-392. In other words, they were not turned over to the defense until after the defense attorneys had already had two bites at the apple of impeaching the witness.

*Id.* at 23-24.

The record regarding the identity of the offenders shows that Flanagan *never* identified any of the actual defendants or suspects (Hamm infers Flanagan identified Paula Cook as a suspect) involved in the murder-robbery in any photo, line-up or statement so there are no inconsistencies regarding that matter. Regarding prior inconsistent statements concerning the description of the second offender's jacket, Flanagan did testify during direct examination at trial that she only saw two male individuals enter the lobby of the Anderson Motel, and that the second male and subsequent triggerman was wearing a faded green army fatigue jacket. (R. Vol. 2, Tab. 9, pp. 301-05). During Harris's first cross-examination of Flanagan he discovered that around 3 a.m. on the morning following the murder she had made a taped statement and a written statement. *Id.* at 359, 361. Before the prosecutor began redirect, defense counsel Harris asked to approach the bench and it was agreed that the court would take the statements into its possession for *in camera* review. *Id.* at 363-64. The prosecutor conducted his redirect, counsel conducted re-cross, and because it was late in

the day, the court excused the jury for the evening and expressed to counsel that it would review the *in camera* statements overnight.  *Id.* at 380, 384.

The next morning Harris argued without objection that he was entitled to review the statements if they contained inconsistencies about the identity of the robbers, whereupon the court directed that copies of the statements be given to defense counsel.  *Id.* at 392-96.  The court invited counsel to take the time he needed to review the statements before resuming his cross-examination of Ms. Flanagan.  *Id.* at 396.  Thereafter, defense counsel questioned Flanagan concerning the jacket worn by the second person to enter the motel lobby, and she testified that she first told officers that the second person to enter the motel lobby may have been wearing a loose fitting jean jacket.  *Id.* at 397-99).  When Flanagan was asked about the inconsistency between her testimony that the second person was wearing a military jacket, she explained:

> Q: Okay.  Did you ever tell anyone that this second individual would have been wearing anything other than a military jacket?
>
> A: What happened was when I first, when I was being first questioned, they asked me what kind of jacket it was and the fatigue jacket, I knew what a fatigue jacket was, it came to my mind.  I described it as a loose fitting long jacket, dark color.  And then I went back to my motel room at 6:00 that morning and Lynn told me to think, run the case over and over again in my head.  And it came to me that it was a fatigue jacket which the second male was wearing.  And the next time - I saw the officers during the lineup and that is the first thing that I told Gordon that Sunday evening.  I said, I made a mistake it was a fatigue jacket which the second male was wearing when he came in.
>
> Q: Did you originally tell Johnny Nesmith that it was possibly a jean jacket?
>
> A: I told him that it was a loose fitting, long, dark colored jacket.  It might have been a jean jacket.  And then once I thought about it, it was a fatigue jacket.

*Id.* at 397-98.

Flanagan did make prior statements that were not consistent with her description on direct examination of the jacket worn by the shooter.  Although the statements were discovered mid-trial, there is no indication that defense counsel was not able to take full advantage of the inconsistencies on cross-examination.[25]  Defense counsel seized on the opportunity to point out the inconsistency in her initial description of the jacket and her description the next day and at trial.  These statements also were disclosed prior to the testimony of accomplices Regina Roden and Doug Roden, both of whom testified that Hamm was wearing an army jacket and Doug Roden was wearing a blue vest and black jacket.  (R. Vol. 5, pp. 830-31, 882, 887).  In his taped confession which was admitted at trial, Hamm stated that he was wearing a green army jacket and Doug Roden was wearing a blue vest and black Member's Only jacket.  (R. Vol. 7, pp. 1388, 1390, 1393).  Hamm also stated that he robbed and killed the victim and that no one else knew what was going to happen beforehand.  *Id.* at 1383, 1400.

Under the circumstances, the failure to disclose Flanagan's statements prior to trial does not undermine confidence in the conviction or death sentence – not only in light of her explanatory testimony – but also the consistent testimony of Regina Roden and Doug Roden and Hamm's confession, all of which indicate that the person who shot the desk clerk was Hamm who was wearing an army jacket while Doug Roden was wearing a blue vest and black jacket.  In his

---

[25] Hamm also suggests that the prosecutor coached Ms. Flanagan to make statements concerning a female and the army jacket so that the jury would conclude Doug Roden was the first individual to walk into the hotel and, therefore, could not have been the triggerman.  (Doc. no. 20, pp. 22-23 (citing R. Vol. 2, Tab. 9, p. 352)).  But, Ms. Flanagan was responding to defense cross-examination at the portion of the trial record he cites (concerning a potential female) and Flanagan did not state anyone told her about an army jacket.  *Id.* at 397-99.  Further, defense counsel and the prosecutor asked Flanagan questions concerning her contact with law enforcement and the district attorney immediately before and during trial, and Flanagan stated that she only was told to tell the truth.  *Id.* at 362-65.

confession, Hamm stated that he intended to rob the victim and intended to use force to get the money and even intended to kill him "if that's what it took." (R. Vol. 7, Tab. 28, pp. 1393, 1398). Hamm went into great detail about what he did, what the victim did, the clothing worn by the victim as well as the clothing worn by both him and Roden. Roden testified that Hamm shot the victim, that he (Doug Roden) did not know what was about to happen. *Id.* at 1382-1400. Regina Roden testified that from the car she saw Hamm point the gun toward the desk clerk and then heard a gun shot. (R. Vol. 5, pp. 831-33). Doug Roden further testified that when Hamm entered the motel, he pointed a gun at the desk clerk who raised his hands; Hamm motioned to the desk clerk and the desk clerk laid down behind the desk; Hamm stepped behind the desk and Roden heard a shot after which Hamm pulled things from behind the desk and ran to the car. *Id.* at 890-93.

As for the record regarding the sex of one of the offenders, Flanagan did testify at trial on direct examination that she only saw two male individuals enter the lobby of the Anderson Motel, that the first male to enter was wearing a blue velour pullover shirt, and that she heard him mumble something. (R. Vol. 2, Tab. 9, pp. 301-05). To the extent this testimony pertains to the sex and clothing of the first individual, it is entirely consistent with the taped statement she gave officers. (R. Vol. 3, pp. 309-400). After she gave this statement, Flanagan was shown a line-up of females and she admitted picking out a female as a possible suspect. (R. Vol. 2, Tab. 9, p. 315). On cross-examination, she explained that she second-guessed her intuition regarding the sex of the individual in a blue velour pullover because she saw a woman in the line-up whose facial features had some similarities to that individual, she had not gotten a clear view of his face, and he was short with an extremely slight build. *Id.* at 328, 351, 352-53, 356-57.

Importantly, Flanagan's prior statement concerning the gender of the individual was *consistent* with her testimony on direct examination. Any inconsistencies were brought out exclusively in her trial testimony. Thus the statement, albeit discovered mid-trial, contained no information that impeached Flanagan or exculpated Hamm. Its lack of favorability and materiality renders Hamm's *Brady* claim without merit.

For all of the foregoing reasons, the Flanagan *Brady* claim is procedurally defaulted from federal review because of Hamm's failure to raise it on direct appeal. Further, ineffective assistance of appellate counsel cannot constitute cause as the ineffective assistance of counsel claim is itself procedurally defaulted or, alternatively, without merit. (*See* Claims VI.F.22 and VI.F.32, *supra*). Alternatively, Hamm is not entitled to habeas relief on this claim because the substantive Flanagan *Brady* claim is without merit.

**C.**    *It was improper for the state court to consider unconstitutionally obtained prior convictions at the sentencing phase in violation of Hamm's rights to due process and to be free of cruel and unusual punishment.* (Doc. no. 1, ¶¶ 52-63, pp. 15-20) (Doc. no. 20, pp. 34-71).

Hamm alleges that the trial court improperly relied on two, unconstitutionally obtained 1978 Tennessee robbery convictions at the sentencing phase of his trial to erroneously find the existence of a statutory aggravating factor under Alabama law, and then utilized that aggravating factor in the weighing process which resulted in Hamm's death sentence. (Doc. no. 1, p. 15). He argues that the trial court's action violated his right to due process of law and the Eighth Amendment's prohibition against cruel and usual punishment. *Id.* (citing *Johnson v. Mississippi*, 486 U.S. 578, 584-85, 108 S. Ct. 1981 (1988) ("allowing [a] petitioner's death sentence to stand although based in part on a reversed conviction violates" the Eighth Amendment because the reversed conviction is not relevant

58

to valid sentencing concerns and undermines the need for heightened reliability in capital sentencing) (additional citations omitted).

Hamm admits he already *unsuccessfully* attacked the validity of the 1978 convictions by filing a post-conviction petition in the State of Tennessee[26] and by proceeding on a federal habeas petition through the denial of certiorari by the United States Supreme Court,[27] but nonetheless

---

[26] On August 7, 1995, the Lawrence County, Tennessee Circuit Court dismissed Hamm's petition. (Rule 32 C.R. Vol. 13, p. 448). In doing so, the court indicated that it had orally dismissed the petition on August 10, 1992, and believed a written order had been entered, but such an order was not reflected in the court file. *Id.* In the dismissal order, the circuit court found that the statute of limitations for post-conviction relief had run under Tennessee Code Annotated § 40-30-102. *Id.* The court further found that "habeas corpus relief under Tennessee Code Annotated § 29-21-101, *et seq.*, would not be appropriate because the State of Tennessee does not consider a petitioner 'imprisoned or restrained of his liberty' within its jurisdiction [when] the sentence owed . . . has long since passed." *Id.* On February 12, 1997, the Tennessee Court of Criminal Appeals affirmed the circuit court's dismissal, and on June 2, 1997, the Tennessee Supreme Court denied the application for permission to appeal. (Rule 32 C.R. Vol. 12, pp. 230-37, 249). These Tennessee state records were admitted into evidence at the evidentiary hearing as Exhibit 6. This record is not complete.

[27] On July 19, 1998, the United States District Court for the Middle District of Tennessee held that it lacked subject matter jurisdiction in a habeas challenge to Hamm's expired 1978 Tennessee convictions because Hamm was not in custody for purposes of his Tennessee convictions under 28 U.S.C. § 2254 and *Maleng v. Cook*, 490 U.S. 488, 492, 109 S. Ct. 1923 (1989). (Rule 32 C.R. Vol. 12, pp. 286-89). Hamm's habeas petition made no mention of actual innocence or any supporting evidence. *Id.* at 251-85. The federal district court in Tennessee did not construe the petition liberally as an attack on Hamm's Alabama conviction as enhanced by his Tennessee convictions based on Hamm's specific statement that he was "not challenging his Alabama conviction, nor the fact that his Alabama sentence was enhanced because of the Tennessee convictions." *Id.* at 289. Even if Hamm had not specifically limited the challenge and the federal district court had given it the liberal consideration previously described, *Maleng* unequivocally prohibits such an attack in that forum. *Maleng v. Cook*, 490 U.S. at 492 (finding that a petitioner is not "in custody" under § 2254(a) on the expired conviction simply because the prior expired conviction he seeks to challenge may possibly be used to enhance a later sentence). In any event, on November 6, 1998, the federal district court denied Hamm's request for COA, as did the Sixth Circuit Court of Appeals on March 17, 1999. *Id.* at 298-300. In both instances, Hamm conceded that *Maleng* controlled and asked only that the Court of Appeals review *Maleng* again. On October 4, 1999, the United States Supreme Court denied Hamm's petition for certiorari. *Hamm v. Campbell*, 528 U.S. 856, 120 S. Ct. 141 (1999). Those federal records also are a part of Exhibit 6, which was admitted into evidence at the Rule 32 evidentiary hearing.

requests that this court review five reasons that his Tennessee convictions were unconstitutionally obtained and improperly enhanced his sentence in his capital case.   (Doc. no. 1 at 15-20).

Such a request brings forth two questions: whether this court has jurisdiction to consider the claim, and if so, whether the claim is procedurally defaulted.   The court addresses the jurisdiction question first.

### 1.    *The question of jurisdiction*

Pursuant to the "in custody" provision of 28 U.S.C. § 2254(a), a federal district court has jurisdiction to address a due process claim attacking a current sentence "'as enhanced by ... allegedly invalid ... prior conviction[s],'" even if the prior convictions are expired.   *Lackawanna County Dist. Attorney v. Coss,* 532 U.S. 394, 402, 121 S. Ct. 1567 (2001) (quoting *Maleng v. Cook*, 490 U.S. at 493-94) (brackets added).   However, "'the *extent* to which the [prior expired[28]] conviction itself may be subject to challenge in the attack upon the [current] senten[ce] which it was used to enhance" is *limited* by "considerations relating to the need for finality of convictions and ease of administration." *Id.* (quoting *Maleng*, 490 U.S. at 494) (brackets in original) (emphasis and footnote added)).

A major limiting consideration described by the Court in *Coss* is whether the prior expired conviction is itself exhausted and/or procedurally defaulted.   Specifically, the Court held that

> once a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid.   *See Daniels* [*v. United States,* 532 U.S. 374,] 382, [121 S. Ct. 1578 (2001)].   If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained.

---

[28] "Expired," as used by the Supreme Court in this context, means that the petitioner "is no longer serving the sentences imposed" in the prior convictions.   *Coss*, 532 U.S. at 401.

*Coss*, 532 U.S. at 403-04 (brackets added).  The one exception to this limitation is when a petitioner

contends that the prior convictions are subject to a "*Gideon* challenge;" *i.e.*, the prior convictions are

a result of the trial court's failure to appoint a defendant counsel in a case where the Sixth

Amendment entitled him to counsel.  *Coss*, 532 U.S. at 404-05 (citing *Gideon v. Wainwright*, 372

U.S. 335, 83

S. Ct. 792 (1963)).  To the Supreme Court, a *Gideon* challenge is a "'unique constitutional defect'"

of "'jurisdictional'" proportion that "warrants special treatment." *Id.* (quoting *Custis v. United

States*, 511 U.S. 485, 496, 114 S. Ct. 1732 (1994)).

Hamm declares that this court has authority to consider this claim either because *Coss* is

inapplicable to his case, or if applicable, his circumstances are excepted from *Coss's* limiting

considerations.  (Doc. no. 20, pp. 37-39).  Neither argument has merit in this case.

      **a.**     *Do the due process principles in Coss control in death penalty cases*?

Hamm acknowledges the line of precedent set by the United States Supreme Court in the

*Custis, Daniels*, and *Coss* decisions, but argues that because these cases "have never been extended

[by the United States Supreme Court] to the death penalty context," ... the *Johnson* rule still has full

force."  (Doc. no. 20, p. 37).  He also argues that "'the special need for reliability'" in death penalty

cases "overcomes the state's interest in finality of convictions," which he describes as being "largely

grounded in its programs imposing disabilities on convicted criminal and sentence enhancements

on recidivist criminals."  *Id.* at 38 (quoting *Johnson v. Mississippi*, 486 U.S. at 584).

Hamm's argument and conclusions are incorrect.  First, the Supreme Court in *Coss* did not

exclude capital offenses from the 28 U.S.C. § 2254 state court convictions it addressed in its holding.

Second, the due process concerns in *Coss* did not exist in *Johnson v. Mississippi.*  In *Johnson*, the

petitioner's prior New York conviction already had been *reversed* when he sought relief from his Mississippi death sentence, and as such, the only issue was "whether the state court was correct in concluding that the reversal of the New York conviction did not affect the validity of a death sentence based on that conviction."  486 U.S. at 580.  Finally, while there is a "special balance in the capital context" between a state's interest in finality of its convictions and the need for reliability in sentencing, *Dobbert v. Wainwright*, 468 U.S. 1231, 1237, 105 S. Ct. 34 (1984), Hamm has provided no United States Supreme Court precedent showing that the circumstances of his case are the result of an unbalanced weighing of reliability and finality, nor does this court find that the reliability of Hamm's sentencing determination has been constitutionally suppressed in the interest of finality of his state court conviction.

> **b.**     *Do Hamm's circumstances fall within the exception to limiting considerations in Coss*?

As a fall back position, Hamm argues that his "case is the rare type of case that involves the outright denial of the right to counsel under *Gideon,*" and as such, this court's jurisdiction is not affected by *Coss's* limiting considerations.  (Doc. no. 20, pp. 38-39).  He supports this contention by asserting that during the 1978 Tennessee proceedings, the trial judge incorrectly informed him that he had no right to appeal and did not appoint him counsel on appeal.  *Id*. at 39-40.  However, pursuant to Tennessee law in effect at the time, a defendant had no general right to appeal from a plea of guilty.  *See Capri Adult Cinema v. State*, 537 S.W. 2d 896, 899 (Tenn. 1976) (stating, "Petitioners concede that ordinarily there can be no appeal from a plea of guilty.  This principle has been stated in a number of cases in this state.").  Moreover, the constitutionality of that Tennessee law was sound because a "State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all." *Griffin v. Illinois*, 351 U.S. 12, 18, 76 S. Ct. 585 (1956).

Because Hamm did not have a right to appeal from his 1978 guilty plea under State or Federal law, it follows that he had no Sixth Amendment right to appellate counsel if Tennessee statutory law did not afford him one. Hamm's *Gideon* challenge is without merit, and he cannot establish that his case is excepted from the jurisdictional limitations of *Coss*.

Hamm also attempts to argue that his circumstances fall within a "second exceptional circumstance" described by Justice O'Connor in *Coss*, that being actual innocence. (Doc. no. 20, pp. 40-41). However, *Coss* is a plurality opinion, and the actual innocence portion of Justice O'Connor's discussion in that opinion was not part of the United States Supreme Court's *holding*. Moreover, the United States Supreme Court has never expanded its holding in *Coss* to include any exception other than a *Gideon* challenge. Therefore, this argument also fails.

As a matter of note, it is true that Justice O'Connor did suggest that an assertion of actual innocence (or a *Brady* violation) might arguably be considered an exception alongside the lone *Gideon* challenge, where perhaps a petitioner *never* had any opportunity to first present the issues to the state court in post-conviction proceedings, and could not do so due to the expiration of the prior sentence. *Coss*, 532 U.S. at 405-06. Even if, assuming for the sake of argument, an assertion of actual innocence could be a second exception to *Coss's* limiting considerations, Hamm could not avail himself of such an argument because he presented his "newly discovered evidence" of actual innocence to the Tennessee state court in his 1992 amended post-conviction petition. Nonetheless, the state court did not excuse Hamm from the three year statute of limitation afforded him to file a post-conviction petition under the state law of Tennessee. The circuit court's decision was affirmed by the Tennessee appellate court. (Rule 32 C.R. Vol. 12, p. 230). Thus, Hamm's presentation of his actual innocence evidence to the Tennessee state courts not only places him outside of the type

of petitioner arguably envisioned by Justice O'Connor, it also places him squarely within the limiting considerations that prohibit this court from exercising jurisdiction over the matter.

Finally, to the extent Hamm may be attempting to declare that challenges to the ineffectiveness of his Tennessee trial counsel and the voluntariness of his 1978 guilty plea also should be considered exceptions to the limiting considerations in *Coss*, this argument fails. For the reasons already discussed at length, such a declaration has no constitutional basis. Further, in *Custis* and *Daniels*, the United States Supreme Court expressly found that faulty guilty pleas and ineffective assistance of counsel did not "'ris[e] to the level of jurisdictional defects,'" and reiterated that *Gideon* challenges qualified as "the sole exception." *Daniels*, 532 U.S. at 378 (2001) (quoting *Custis*, 511 U.S. at 488 (1994)).

At this point, Hamm's Tennessee convictions are conclusively valid because he already has unsuccessfully attacked the convictions in the State of Tennessee and in the federal courts of the Sixth Circuit. Because his current situation falls directly within one of the considerations that limits federal jurisdiction, and does not fall with any exception to that limitation, it follows that this court is without authority to address the claim. For the foregoing reasons, the court will dismiss this claim for lack of jurisdiction.

Alternatively, for the reasons set out in the section immediately following, this court finds this claim is procedurally defaulted.

## 2. *The alternate question of procedural default*

Hamm did not raise this claim at trial or on appeal. When he raised the claim on collateral review, the Alabama Court of Criminal Appeals affirmed the Rule 32 court's determination that the claim was procedurally defaulted pursuant to

> Rule 32.2(a)(3) and (5), Ala. R.Crim. P., because it could have been raised at trial or
> on appeal, but it was not.  We agree with the State.  The alleged unconstitutionality
> of the 1978 Tennessee convictions could have been raised at trial or on appeal.

*Hamm v. State*,  913 So. 2d at 479.

Hamm does not deny that Rule 32.2(a)(3) and (5) required him to raise this claim at trial and on direct appeal.  Nor does he dispute that he raised the claim for the first time during collateral proceedings and the state court refused to consider the claim because of that failure.  (Doc. no. 20, p. 42).  Nonetheless, he contends that he can establish cause and prejudice to overcome the procedural default, and further declares that a fundamental miscarriage of justice will occur if the claim is not addressed.

### a.    *Cause and Prejudice*

Hamm asserts that he can establish cause to overcome the default by four separate means. (Doc. no. 20, pp. 42-43, 69-70).  Three involve independent constitutional claims also raised in Hamm's petition: (1) Claim VI.D., the prosecutor's act of trial by ambush when he failed to disclose that he intended to use the Tennessee convictions as an aggravating factor; (2) Claim VI.F.3, that trial counsel were constitutionally ineffective for failing to investigate the prior convictions; and (3) VI.F.32, that appellate counsel ineffectively represented him on direct appeal.  *Id.* at 42-43, 69. However, as set out subsequently, Hamm's prosecutorial ambush claim is procedurally defaulted or without merit, and both ineffectiveness claims are without merit.  (*See* Sections VI.D, VI.F.3 and VI.F.32, *infra*).  Therefore, none of these claims can be offered as cause to overcome the procedural default of this claim.  The fourth means by which Hamm attempts to establish cause is to argue that Alabama Rules of Criminal Procedure 32(a)(3) and (a)(5) are neither firmly established nor regularly followed.  (Doc. no. 20, pp. 69-70).  But as already set out in Section V.A. *supra*, this argument lacks

foundation.  For all of the foregoing reasons, Hamm could not establish cause to overcome the procedural default of this claim, even if this court had jurisdiction to decide the question.

**b.**      *Miscarriage of Justice*

In a final attempt to sidestep default, Hamm declares that a miscarriage of justice will occur if this claim is not addressed, and quotes the following excerpt from the United State Supreme Court's decision in *Dretke v. Haley*, 541 U.S. 386, 124 S. Ct. 1847 (2004); that Court recognized the miscarriage of justice standard to be

> ". . . a narrow exception to the general rule [of procedural default] when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense or, in the capital sentencing context, of the aggravating circumstances rendering the inmate *ineligible* for the death penalty."

(Doc. no. 20, p. 70) (quoting *Dretke*, 541 U.S. at 388-89) (emphasis added)).  Other than a few additional quotes from *Dretke* that support the same principles set out in the quote above, Hamm fails to provide any contextual argument to show that *his* circumstances satisfy this standard.

Hamm attempted to argue his new evidence of actual innocence in the State of Tennessee in 1992.  As already stated, the state courts found that Hamm's petition was filed outside the Tennessee statute of limitations.  They did not find, or even intimate, that Hamm should be excepted from that statute for any reason.  Such a determination is entitled to deference by this court.  Even if the Tennessee convictions were not a part of the mix, no one disputes that Hamm was nonetheless *eligible* for the death penalty because of the existence of another statutory aggravating factor, and that is his conviction for the capital offense itself—intentional murder during the course of a robbery. *See* ALA. CODE § 13A-5-40(a)(2) (1975).  Therefore, Hamm can never establish actual innocence under the miscarriage of justice exception to procedural default in connection with this claim.

For the reasons discussed, this court is without jurisdiction to address this claim, or in the alternative, the claim is nonetheless procedurally defaulted.  The claim will be dismissed.

> **D.**   *The prosecutor ambushed defense counsel by failing to disclose, or to produce in discovery, the aggravating circumstances that the state intended to prove, in violation of Hamm's constitutional rights to due process, a fair trial, an individualized sentencing hearing, and to be free from cruel and unusual punishment.*  (Doc. no. 1, ¶¶ 64-65, pp. 20-21) (Doc. no. 20, pp. 71-74).

Hamm alleges that at the penalty phase of trial, the State introduced evidence of the two Tennessee convictions as a statutory aggravating factor under Alabama sentencing law; namely, that Hamm had been previously convicted of a felony involving the use or threat of force to the person. (Doc. no. 1, p. 2) (citing ALA. CODE 13A-5-49(2) (1975)).  He argues that the State did not inform him by indictment or disclosure that it would attempt to use the Tennessee convictions to prove the aforementioned statutory aggravator, and as such, the State engaged in a trial by ambush in violation of Hamm's rights to due process, a fair trial, individualized sentencing and to be free from cruel and unusual punishment.  *Id.* at 20-21.

Hamm did not raise this claim on direct appeal.  When he raised the claim on collateral review, the Alabama Court of Criminal Appeals affirmed the circuit court's finding of procedural default on the grounds that Hamm raised the claim at trial but did not raise the claim on direct appeal as ascribed by Rule 32.2(a)(5).  *See Hamm v. State*, 913 So. 2d at 493; (Rule 32 C.R. "Rule 32 opinion" Vol. 33, Tab. 58, pp. 4-5).

Hamm seeks to overcome the procedural default of this claim by arguing that his trial and appellate counsel were constitutionally ineffective.  However, as set out in Claims VI.F.7, and VI.F.32, *infra*, the ineffectiveness of trial counsel cannot be used as cause because it too is procedurally defaulted and no cause and prejudice exists to overcome that default, and the claim of

ineffective assistance of appellate counsel is procedurally defaulted or without merit.  As such, this claim is procedurally defaulted, and the court will dismiss it.

Even if it were not, the claim lacks merit.  Federal constitutional law does not require notice by indictment or discovery to an Alabama defendant of the aggravating factors the State intends rely upon to satisfy Fourth and Fourteenth Amendment due process and fair trial concerns because all potential statutory aggravating factors are set out in the Alabama Code.  *See* ALA. CODE § 13A-5-49 (1975); *Clark v. Dugger,* 834 F.2d 1561, 1566 (11th Cir. 1987) (holding that a defendant has "no right to advance notice of the aggravating circumstances on which the State will rely" when it is well accepted that the State's "sentencing statute itself sufficiently particularized the aggravating circumstances in a capital case.").  Nor does due process require that the defendant be apprised of the particular evidence the prosecution intends to use to prove an aggravating circumstance.  *Gray v. Netherland*, 518 U.S. 152, 167-68, 116 S. Ct. 2074 (1996).

The Eighth Amendment concerns Hamm raises (*i.e.* individualized sentencing and cruel and unusual punishment) also afford him no relief.  (Doc. no. 20, pp. 72-73) (citing *Gardner v. Florida*, 430 U.S. 349, 97 S. Ct. 1197 (1977)).  The constitutional offense in *Gardner* occurred because the trial court considered information to which neither counsel nor the jury had been made privy when the judge sentenced Gardner to death.  In other words, the injury in *Gardner* centered on secret information that Gardner had no opportunity to deny or explain.  Unlike *Gardner*, Hamm's counsel were well aware of Alabama's capital sentencing scheme and investigated the Tennessee convictions before trial.  (*See* Rule 32 R. Vol. 21, pp. 19-20) (wherein defense counsel Harris testified that he "reviewed that before the sentencing hearing itself, the documents that they introduced at the sentencing phase.")).  Counsel also attempted to challenge the admissibility of the convictions on

68

the grounds that the prosecution had failed to disclose its intent to utilize the convictions. The discussion in this section shows why that objection was unsuccessful.

For all of the foregoing reasons, this claim is procedurally defaulted, or in the alternative due to be denied.

**E.**      *The capital sentencing jury was informed that Hamm was charged with two counts of <u>armed</u> robbery in Tennessee, even though he was only convicted of simple robbery, in violation of petitioner's rights guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.* (Doc. no. 1, ¶¶ 66-72, pp. 21-22) (Doc. no. 20, pp. 74-76).

Hamm failed to raise this claim at trial and on direct appeal. When he attempted to raise the claim for the first time on collateral review, the Alabama Court of Criminal Appeals affirmed the circuit court's determination that the claim was procedurally defaulted because it could have been but was not raised at trial or on direct appeal, as required by Rule 32.2(a)(3) and (5), Ala. R. Crim. P. *See Hamm v. State*, 913 So. 2d at 493; Rule 32 C.R. "Rule 32 opinion" Vol. 33, Tab. 58, pp. 3-4. The State court's reliance on an adequate and independent state procedural rule to default the claim also results in a procedural default of the federal habeas claim.

Hamm again argues independent claims of ineffective assistance of trial and appellate counsel as cause to overcome the procedural default of this claim. He bases the trial counsel ineffectiveness claim on a failure to object to the jury being informed that Hamm was charged with armed robbery. However, as set out in Claim VI.F.8, *infra*, the ineffective assistance of trial counsel claim is itself without merit because counsel did indeed voice such an objection, but it was overruled by the trial court. Additionally, for the reasons set out in Claim VI.F.32, *infra*, the ineffective assistance of appellate counsel also is without merit. Therefore, the IAC claims cannot establish the cause for the procedural default of this claim. The court will dismiss this claim.

69

**F.**     *Ineffective Assistance of Trial and Appellate Counsel.*  (Doc. no. 1, ¶¶ 73-119, pp. 22-31) (Doc. no. 20, pp. 76-131).

Discussion of this claim must begin with an explanation of how the court has organized it for analysis purposes, and an introduction to the *Strickland* standard.  Regarding organization the court notes two critical points—the first being that Hamm only expressly identifies four sub-claims underneath his "F" heading, but "F" contains many other allegations and sub-claims that he does not distinguish in that manner.  (Doc. no. 1, pp. 22-31).  To avoid missing any potential sub-claim, the court examined each numbered paragraph (many are one sentence) within this claim and has attached a number to each of the 32 sub-claims the court has identified.  Second, while Hamm has raised the ineffectiveness of appellate counsel (who were also his trial counsel) in an independent sub-claim (Claim VI.F.32, *supra*), he also has alleged counsel were ineffective on appeal either in the title of the other 31 ineffectiveness sub-claims or mentioned it somewhere in the discussion of those claims in the reply brief.  The court will mimic the content of the numbered paragraphs in the titles to Hamm's ineffectiveness sub-claims, some of which reference appellate counsel and some of which do not.  Habeas review of his ineffective assistance of appellate counsel claims, however, shall be reserved for Claim VI.F.32, *unless* an individual IAC appellate sub-claim is procedurally defaulted or the court determines additional discussion is necessary.  Any additional appellate IAC discussion shall appear within the IAC trial counsel sub-claim to which it pertains.

The court's general instruction regarding ineffective assistance of counsel begins with *Strickland v. Washington*, 466 U.S. 668 (1984).  In that landmark case, the United States Supreme Court established a national standard for judging the effectiveness of criminal defense counsel under the Sixth Amendment.  *Strickland*, 466 U.S. at 686.  As the court instructed, "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper

functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Id*. The Court explained:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*466 U.S.* at 687.

The United States Supreme Court recently reiterated that the two-prong test in *Strickland* remains the gold standard for evaluating counsel effectiveness. *Harrington v. Richter*, ---- U.S. ----, 131 S. Ct. 770 (2011). The Supreme Court further explained the proper assessment of a *Strickland* claim through the lens of two possible standards of federal habeas review, *de novo* and under 28 U.S.C. § 2254(d), in the following manner:

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [*Strickland*,] 466 U.S. at 688, 104 S. Ct. 2052. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.*, at 689, 104 S. Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*, at 687, 104 S. Ct. 2052.

> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 694, 104 S. Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.*, at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as

to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*, at 687, 104 S. Ct. 2052.[29]

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S. Ct. 2052; see also *Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and §

---

[29] Elsewhere, the Court wrote:

In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. *See Wong v. Belmontes*, 558 U.S. ----, ----, 130 S. Ct. 383, 390, 175 L. Ed. 2d 328 (2009) (*per curiam*) (slip op., at 13); *Strickland*, 466 U.S., at 693, 104 S. Ct. 2052. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. *Id.*, at 696, 104 S. Ct. 2052. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." *Id.*, at 693, 697, 104 S. Ct. 2052. The likelihood of a different result must be *substantial*, not just conceivable. *Id.*, at 693, 104 S. Ct. 2052.

*Harrington*, 131 S. Ct. at 791-92 (emphasis added).

> 2254(d) are both "highly deferential," *id.*, at 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S. Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 131 S. Ct. at 787-88 (bracketed footnote added). *See also  Premo v. Moore*, ---- U.S. ----, ----, 131 S. Ct. 733, 739-40 (2011).

Attention now is turned to Hamm's ineffectiveness sub-claims.

**1.**     *The State interfered with Hamm's right to effective assistance of counsel by placing unreasonable financial constraints on his court appointed lawyers* (Doc.  no. 1, ¶¶ 73-80,  pp. 22-23) (Doc. no. 20, pp. 130-31).

Pursuant to Alabama law at the time of his trial, Hamm's counsel only could be compensated for $1,000.00 worth of out-of-court costs. (Doc. no. 1, p. 23). Hamm alleges this limitation in funding caused counsel to be ineffective because they could not afford to travel to Tennessee to challenge Hamm's prior convictions or travel through Alabama and Mississippi to document Hamm's impoverished and traumatic background. Counsel also could not afford to conduct the expensive mental health investigation to present Hamm's mental health condition, and could not afford to investigate co-defendant Douglas Roden. Hamm declares this insufficient funding further denied him effective counsel on direct appeal. *Id.*

The last state court to examine this claim on collateral review was the Alabama Court of Criminal Appeals. *Hamm v. State*, 913 So. 2d at 492. The appellate court affirmed the Rule 32 court's denial of the claim as "unsupported by any evidence" because

> [t]he trial court correctly noted that the attorneys who represented Hamm at trial and
> on appeal testified at the [evidentiary] hearing that their representation was not
> affected by the limitation on compensation. (R. 36, 61.)  Although Hamm questioned
> the attorneys, he elicited no testimony from them regarding the allegations he now
> makes about their inability to afford to prepare for the case and represent him
> effectively.

*Id.* (footnote omitted) (brackets added).

Hamm presents no clear and convincing evidence to overcome the deference owed to the

factual findings made by the state court.  Hugh Harris and Martha Williams represented Hamm at

trial and on direct appeal, and both testified at the evidentiary hearing that the limitation on

compensation did not affect their ability to represent Hamm.  (Rule 32 R. Vol. 21, Tab. 42, pp. 36,

61).  Hamm did not elicit any contrary testimony nor did he question counsel about what, if anything,

they would have done differently had they not been limited to $1,000 in out-of-court expenses.  As

such, Hamm has not shown that the state court's determination that he failed to prove counsel was

ineffective for this reason was contrary to or an unreasonable application of *Strickland* and its

progeny. The court will deny this claim.

> **2.** *Trial and appellate counsel suffered from a conflict of interest.*  (Doc. no. 1,
> ¶¶ 81-82, p. 24) (Doc. no. 20, pp. 102-109).

Hamm argues that defense attorney Hugh Harris's failure to give him "undivided loyalty"

violated his right to conflict-free counsel.  (Doc. no. 1, p. 24) (citing *Cuyler v. Sullivan*, 446 U.S.

335, 100 S. Ct. 1708 (1980) (actual conflict of interest adversely affecting lawyer's performance

renders assistance ineffective)).  In support of this claim, Hamm alleges that Harris was appointed

Special Assistant Attorney General ("Special Assistant") during the guilt phase of his trial, but failed

to inform anyone of the appointment or seek a waiver of the conflict.  (Doc. no. 20, p. 102).  Hamm

declares that the appointment inherently divided counsel's loyalty to him.  As evidence in support,

Hamm complains that Harris's guilt phase closing argument was short.  Further, in that argument Hamm asserts Harris conceded Hamm's guilt to the capital offense, minimized his role as defense counsel and provided the jury no guidance regarding felony-murder as a lesser included offense.  *Id*. at 108.

Because Respondent declares that this claim was not raised on direct review or in the Rule 32 petition, and was deemed waived or alternatively found to be without merit on collateral appeal (doc. no. 15, pp. 12-14), the court must first resolve the question of procedural default.  True, the claim was not raised in the Rule 32 petition.  Nonetheless, at the Rule 32 evidentiary hearing, Harris was asked and answered the following questions about the alleged conflict of interest without objection:

> Q. (MS. NAIL)  I ask you to identify that [exhibit], please, sir.
>
> A. This is an appointment by Don Siegelman as special assistant attorney general.
>
> Q. And what is the date on that?
>
> A. That's September 24, 1987.
>
> Q. At that time did you disclose to the defendant that you were Special Assistant to the Attorney General?
>
> A. I don't recall that I did.
>
> Q. And in regards to being a Special Assistant to the Attorney General, what does that include?
>
> A. That was an appointment in order to do road condemnations on the Alabama 69 project from Mitch Smith Chevrolet to Good Hope.
>
> Q. Does that also give you other authorities in representing the attorney general on any other things that they are requiring?

A.    I guess I could have done other civil work for them as a result of that appointment.  I'm not really aware of that.  All I did was that one project.

(Rule 32 R. Vol. 21, Tab. 42, pp. 8-9).  Harris later testified that his appointment did not affect his representation of Hamm.  *Id.* at p. 50.

The Rule 32 court did not address this issue in the order denying the Rule 32 petition.  (Rule 32 C.R. Vol. 33, Tab. 58).  When the claim was raised on collateral appeal, the Alabama Court of Criminal Appeals found that Hamm had waived review because he did not present the claim in the Rule 32 petition.  *Hamm v. State*,  913 So. 2d at 482 (citing *Morrison v. State*, 551 So. 2d 435 (Ala. Crim. App. 1989)).  Alternatively, the appellate court held, "Harris was appointed a special assistant to pursue condemnations on a highway project.  There was no evidence of an actual conflict or any adverse effect on his counsel's performance."  *Id.*

The Alabama Court of Criminal Appeals appears to have misinterpreted *Morrison v. State* when it found that Hamm had waived review pursuant to that case.  *Morrison* instructs that "[a] petitioner for post-conviction relief may not raise on appeal grounds not presented in the petition *or presented at the hearing on the petition*."  551 So. 2d at 437 (emphasis added).  Because Hamm did present and explore this claim at the Rule 32 hearing, the correct holding in *Morrison* shows that the state appellate court's procedural default finding is not preclusive and 2254(d) review is appropriate.

To that end, the Eleventh Circuit has instructed,

Ineffective assistance of counsel claims in the conflict of interest context are governed by the standard articulated by the Supreme Court in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980).  *Cuyler* establishes a two-part test that we use to evaluate whether an attorney is constitutionally ineffective due to a conflict of interest.  To show ineffectiveness under *Cuyler*, a petitioner must demonstrate: (a) that his defense attorney had an actual conflict of interest, and (b) that this conflict adversely affected the attorney's performance.  *See Cuyler*, 446 U.S. at 348-49, 100 S. Ct. 1708.

76

A series of opinions from this court have interpreted and refined the meaning of both prongs of the *Cuyler* test. To satisfy the "actual conflict" prong, a defendant must show something more than "a possible, speculative, or merely hypothetical conflict." *Lightbourne v. Dugger*, 829 F.2d 1012, 1023 (11th Cir. 1987). In *Smith v. White*, 815 F.2d 1401 (11th Cir. 1987), we developed a test that enables us to distinguish actual from potential conflicts of interest:

> We will not find an actual conflict of interest unless appellants can point to specific instances in the record to suggest an actual conflict or impairment of their interests.... Appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative causes of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. If he did not make such a choice, the conflict remain(s) hypothetical.

*Smith*, 815 F.2d at 1404.

> Assuming a defendant can demonstrate that his attorney labored under an actual conflict of interest, the *Cuyler* test demands that he show that this conflict adversely affected the representation he received. To prove adverse effect, a defendant needs to demonstrate: (a) that the defense attorney could have pursued a plausible alternative strategy, (b) that this alternative strategy was reasonable, and (c) that the alternative strategy was not followed because it conflicted with the attorney's external loyalties. See *Freund*, 165 F.3d at 860.

*Reynolds v. Chapman*, 253 F.3d 1337, 1342-43 (11th Cir. 2001).

Hamm cannot show that the state court's rejection of this claim is contrary to or an unreasonable application of *Cuyler*, as that standard has been developed in this circuit. Harris was appointed Special Assistant Attorney General on one occasion to work on a civil matter— road condemnations that had no relationship to Hamm's criminal case. Hamm's contention that an actual conflict arose from the appointment has no foundation.

Also unpersuasive are the various allegations Hamm relies on to show counsel's performance was adversely affected by some perceived conflict. First, Hamm declares Harris performed "less well" because the closing argument was short. (Doc. no. 20, p. 108) (citing R. Vol. 6, Tab. 12, pp.

1129-37)).  However a short closing argument in and of itself is not evidence of an adverse affect caused by Harris's appointment as a Special Assistant.

Next, Hamm argues that Harris conceded his guilt  to the capital offense in these portions of his closing argument:

> Now, I submit to you that I feel like the Judge will charge you not only of capital murder but also murder and manslaughter.  *And that you can apply that law to the facts of this case* **and return any one of those three verdicts**.

*Id.* (quoting R. Vol. 6, Tab. 12, p. 1131)[30] (emphasis added by Hamm).  Omitted from this excerpt is a further statement by Harris that informed the jury,  "[Y]ou can also apply the law to the facts of this case and return a verdict of not guilty, but that ladies and gentlemen, is your determination not mine."  (R. Vol. 6, Tab. 12, p. 1131).  When the remainder of counsel's statement is revealed and taken in context, the argument becomes clear as a brief discussion of the jury's options and an acknowledgment that the decision rests with the jury alone.  It is not a concession of guilt to the capital offense.

Hamm alleges that Harris attempted to "distance[] himself from his own client *and* his own closing argument," but other than citing page 1130 of the trial transcript, he fails to point out any

---

[30] In the paragraph immediately before this excerpt, counsel also stated:

> Now, I am not going to rehash much of the testimony for you.  You heard a whole lot and it might tend to confuse you more than it would help you.  I tend to trust your judgment as to what you have heard and the evidence that you have heard this week and that is what you decide this case on, not what I say or any other attorney in this case says.  You decide this case based upon the evidence that you hear from the witness stand and any exhibits and you take the law that the Judge will give you and you apply that law to those facts that you have heard from the witness stand, not from me or anyone else.  And then you make your decision based upon the various charges that you receive.

(R. Vol. 6, Tab. 12, p. 1131).

specific facts or make any reasoned argument in support of this conclusory statement.  (Doc. no. 20,

p. 108).  On that transcript page, counsel was completing his thanks to the jury for undergoing

sequestration, and commented genially that some members may or may not be relieved to go home

depending on the

> circumstances you might have.  There may have been a few days when I went home
> to my kids that I wished that I had been at the Holiday Inn with ya'll.  That's the way
> it is.
>
> Our system and our country relies and depends on our constitution.  It has
> made this country strong.  And one of the underlying parts of that is that every person
> is entitled to a fair trial by an impartial []jury.
>
> Even though, it is an inconvenience to you and it is a difficult job for anyone
> to do under any case, I submit to you, ladies and gentlemen, especially in this case
> because of the circumstances and the very nature of the case the burden that rest[s]
> upon you is even more difficult and heavy than in the normal situation.
>
> You have been attentive.  You have been good sports about it, because of just
> the things that you have to and we have gone through a lot this week.  And it has
> been intense for all of us.
>
> Now, in the trial of a criminal case there is always two sides.  And the
> attorneys on each side have to do there [sic] very best to see that their particular side
> or client gets a fair trial.

(R. Vol. 6, Tab. 12, p. 1130 (brackets added)).

On the remainder of this page, counsel begins explaining the presumption of innocence to

the jury.  *Id.* at 1130-31.  Nothing in this selection (or the closing argument as a whole) reveals that

Harris was attempting to minimize his role or distance himself from representing Hamm.  Instead,

it shows counsel's expression of respect for the jury's service and understanding of the difficulty of

the task of jury service, both of which were designed to build his credibility and rapport with the

jury.

Finally, Hamm complains that counsel did not provide any guidance to the jury on the subject of felony murder as a lesser-included offense. (Doc. no. 20, p. 108) (citing R. Vol. 6, Tab. 12, pp. 1131-33)). But as discussed earlier, Hamm was not entitled to a jury instruction on felony murder. (*See* Claim VI.A, *supra*). Further, his claims of ineffective counsel for not objecting to the court's failure to give a felony murder instruction and failing to raise the issue on appeal are procedurally defaulted and without merit. (*See* Claims VI.F.5 and VI.F.32, *infra*).

Hamm cannot show that the state court's rejection of this claim is contrary to or an unreasonable application of clearly established federal law, nor can he show the state court's factual findings were unreasonable in light of the evidence before it. *Cf.*, *Jones v. Secretary, Dept. of Corrections*, 644 F.3d 1206, 1210 (11th Cir. 2011) (no actual or *per se* conflict of interest in defense counsel's holding of honorary (ceremonial) deputy sheriff status); *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1355–58 (11th Cir.2005) (defense attorney's special deputy sheriff status to possess handgun not a conflict). Thus, Hamm is not entitled to habeas relief on this claim, and the court will deny this claim.

> **3.** *Counsel failed to challenge Hamm's "blatantly unconstitutional prior convictions within the Statute of Limitations," and this failure caused Hamm to receive the death penalty.* (Doc. no. 1, ¶¶ 83-85, pp. 24-25) (Doc. no. 20, pp. 42-44, 94-96).

Hamm declares that counsel was ineffective for failing to properly investigate and challenge two "blatantly unconstitutional" 1978 Tennessee robbery convictions that were used as evidence to support a statutory aggravating factor at his capital trial. (Doc. no. 1, p. 25). He alleges that a competent investigation would have included the transcript of the Tennessee hearing during which he pled guilty to these offenses, and that "[a] cursory review" of the transcript shows the trial court did not inform Hamm "of [all of] his constitutional rights in direct violation of *Boykin*." (Doc. no.

20, p. 94) (citing *Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709 (1969) (the court must notify the defendant of the privilege against compulsory self-incrimination, the right to trial by jury, and the right to confront one's accusers to ensure his plea is knowing and voluntary)).

Hamm contends that if counsel had discovered the *Boykin* error in 1987, Tennessee law still would have allowed a timely post-conviction petition to be filed in that state and "the Tennessee courts would have had to consider the merits of the challenge." (Doc. no. 1, p. 25). In addition to the *Boykin* error, the "merits" to which he refers are that his Tennessee counsel was ineffective; that he did not knowingly, voluntarily and intelligently plead guilty; that he was denied his right to appeal from the guilty pleas; and, "newly discovered evidence that [shows he] never in fact committed robbery - namely, newly discovered evidence from the victim of the crime." (Doc. no. 20, p. 45). Hamm argues that he was seriously prejudiced by Alabama counsel's failure to discover the Tennessee *Boykin* error because Alabama prosecutors and the trial judge relied on the aggravating nature of his prior Tennessee convictions at the penalty phase of the trial to sentence him to death. He declares that the state court's rejection of this IAC claim on this basis is contrary to clearly established Supreme Court precedent. (Doc. no. 1, pp. 24-25) (citing *Strickland v. Washington*, 466 U.S. 668; *Rompilla v. Beard*, 545 U.S. 374, 380-81, 125 S. Ct. 2456 (2005); *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527 (2003); and *Williams v. Taylor*, 529 U.S. at 396)).

    **a.**    *The Alabama Court of Criminal Appeals' rejection of the claim*

Because the last state court to examine this claim on this merits was the Alabama Court of Criminal Appeals, that holding is the one subject to habeas review. The pertinent portion of the opinion reads:

> Hamm contends,..., that trial counsel's performance was deficient because he "*could have challenged the Tennessee convictions in Tennessee courts and had the*

81

*courts address the merits of the claims in 1987*." (Hamm's brief at p. 25) (emphasis in original). Hamm's assertion that Alabama trial counsel had a duty to challenge in a Tennessee court the merits of the nine-year-old convictions so that he could then prevent consideration of the prior convictions at the 1987 capital sentencing hearing is not supported by any legal authority.

The trial court correctly determined that the substantive claim is procedurally barred, and the alternative argument regarding ineffective assistance is without merit. Hamm is not entitled to any relief on this claim.

*Hamm v. State*, 913 So. 2d at 479.

> **b**.    *The habeas standard of review to be applied to the two-pronged constitutional claim*

Before proceeding further, Hamm argues that the Alabama Court of Criminal Appeals' opinion only encompasses a determination of counsel's competence, and does not speak to the prejudice prong of the *Strickland* standard. (Doc. no. 20, p. 96). Therefore, he urges the court to conduct a § 2254(d) review of the state court's decision regarding the objective deficiency prong of his ineffectiveness claim and *de novo* review of the prejudice prong. *Id.* (quoting *Rompilla v. Beard*, 545 U.S. at 390 ("Because the state courts found the representation adequate, they never reached the issue of prejudice, ... and so we examine this element of the *Strickland* claim *de novo*...."); *Wiggins v. Smith*, 539 U.S. at 534 ("[O]ur review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis.")).

Hamm's case bears no resemblance to *Rompilla* or *Wiggins* on this matter. The state courts reviewing Rompilla's and Wiggins's IAC claims *never* made a ruling on prejudice – at the trial or appellate levels. *Rompilla*, 545 U.S. at 378; *Wiggins*, 539 U.S. at 523. Instead, the trial and appellate courts' decisions were based *exclusively* on *Strickland's* objective prong as to the reasonableness of counsel's representation. Unlike either of those cases, Hamm *did* receive a full merits review of this ineffectiveness claim by the Rule 32 court and by the Alabama Court of

Criminal Appeals. (*See* Rule 32 C.R. "Rule 32 opinion" Vol. 33, Tab. 58, pp. 32-33; *Hamm v. State*, 913 So. 2d at 479).  Certainly, the language of the Rule 32 court speaks to both prongs and Hamm does not contest this.[31]  His request for *de novo* review centers on the Alabama Court of Criminal Appeals' decision, which spoke to the objective prong but did not elaborate on prejudice when it affirmed the Rule 32 court's decision and denied the claim on the merits.

However, elaboration is not required for purposes of habeas review.  As recently instructed by the United States Supreme Court,

> By its terms § 2254(d) bars relitigation of any claim "adjudicated on the merits" in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2). There is no text in the statute requiring a statement of reasons.  The statute refers only to a "decision," which resulted from an "adjudication."  As every Court of Appeals to consider the issue has recognized, determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.

---

[31]  The Rule 32 court held:

> Hamm failed to present facts in support of this claim in his Rule 32 petition or at the evidentiary hearing.  In fact, Hugh Harris testified that he was aware of the Tennessee convictions and had obtained copies of the convictions before the trial. (Rule 32 transcript, pp. 16-17)  Thus, Mr. Harris had investigated these convictions before the trial.  The records introduced at Hamm's trial to prove these convictions show that Hamm was charged with two counts of armed robbery but pleaded guilty to simple robbery.  There is no evidence in the record that Hamm did not know what he was doing when he pleaded guilty to these charges.  Further, a review of the record filed by Hamm in the Rule 32 proceeding show that a challenge to these guilty pleas was unsuccessful in 1995 and would have been unsuccessful in 1986.  (Rule 32 transcript, Hamm's Exhibit 6)  Hamm has not show that his attorneys' performance was deficient or that the outcome of the proceedings would have been different had his attorneys challenged the Tennessee convictions.  This claim is therefore without merit.

(Rule 32 C.R. Vol. 33, Tab. 58, pp. 32-33).

*Harrington*, 131 S. Ct. at 784 (2011) (citing *Wright v. Secretary, DOC*, 278 F.3d 1245, 1253-54 (11th Cir. 2002) (other citations omitted)).

Thus, when the Alabama Court of Criminal Appeals concluded that "[t]he trial court correctly determined that.... [Hamm's] alternative argument regarding ineffective assistance is without merit," its decision encompassed both *Strickland* prongs. *See Hamm v. State*, 913 So. 2d at 479*; see also Harrington*, 131 S. Ct. at 784 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."). Further, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. at 803 (citation omitted). Therefore, this court need only peer through the appellate court's decision to that of the circuit court to discern what facts may have been relied upon to support the state court's prejudice determination, and those factual findings are accorded a presumption of correctness.

Having decided that Hamm received a decision on the merits as to both prongs of *Strickland*, the *Strickland* and habeas standards cited above are applicable. Additionally, the court notes a recent Eleventh Circuit decision, in which Judge Carnes explained:

> When faced with an ineffective assistance of counsel claim that was denied on the merits by the state courts, a federal habeas court "must determine what arguments or theories supported or, [if none were stated], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.*, 131 S. Ct. at 786. So long as fairminded jurists could disagree about whether the state court's denial of the claim was inconsistent with an earlier Supreme Court decision, federal habeas relief must be denied. *Id.*, 131 S. Ct. at 786. Stated the other way, only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents" may relief be granted. *Id.*, 131 S. Ct. at 786.

84

Even without the deference due under § 2254, the *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), standard for judging the performance of counsel "is a most deferential one." *Harrington*, —— U.S. at ——, 131 S. Ct. at 788. When combined with the extra layer of deference that § 2254 provides, the result is double deference and the question becomes whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*, 131 S. Ct. at 788. Double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.

*Johnson v. Sec'y, DOC*, 643 F.3d 907, 910-11 (11th Cir. 2011).

> **c.** *Habeas review of the State court's rejection of the first prong of the* Strickland *standard*

The first, and for reasons that follow, only question to be answered is whether reasonable jurists could disagree with the state appellate court's determination that trial counsel had no duty under *Strickland* and its progeny to challenge in a Tennessee court the merits of the nine-year-old convictions so that he could then prevent consideration of the prior convictions at the 1987 Alabama capital sentencing hearing. As part of the analysis, this court has carefully examined the Supreme Court cases relied upon by Hamm to support his contention that the state court's finding that counsel's performance was reasonable is contrary to and an unreasonable application of clearly established federal law. As set out further, this court concludes that Hamm is not entitled to habeas relief from the state appellate court's competency finding because reasonable jurists could disagree on whether Supreme Court precedent required Alabama counsel in 1987 to challenge the 1978 Tennessee convictions in Tennessee.

Hamm's petition points to *Strickland* and a line of Supreme Court cases (*Williams*; *Wiggins*; *Rompilla*) that apply the *Strickland* standard to support his position. (Doc. no. 1, pp. 24-25). In his reply brief, Hamm concentrates his attention on *Rompilla v. Beard*, 545 U.S. at 383-84, 87-88, 90,

which he declares "is perfectly on point." (Doc. no. 20, pp. 94-96). He concludes that "[t]he Alabama court's decision ... is contrary to and involves an unreasonable application of clearly established law, as determined by the Supreme Court's decisions in *Strickland* ... and *Rompilla*." *Id.* at 94. Hamm's argument lacks merit.

The Supreme Court did find that Rompilla's counsel unreasonably failed to investigate a prior criminal conviction, but the Court did so based on the particular "circumstances" in that case. *Rompilla*, 545 U.S. at 387. The Court explained:

> There is an obvious reason that the failure to examine Rompilla's prior conviction file fell below the level of reasonable performance. Counsel knew that the Commonwealth intended to seek the death penalty by proving Rompilla had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law. Counsel further knew that the Commonwealth would attempt to establish this history by proving Rompilla's prior conviction for rape and assault, and would emphasize his violent character by introducing a transcript of the rape victim's testimony given in that earlier trial. App. 665–666. There is no question that defense counsel were on notice, since they acknowledge that a "plea letter," written by one of them four days prior to trial, mentioned the prosecutor's plans. *Ibid.* It is also undisputed that the prior conviction file was a public document, readily available for the asking at the very courthouse where Rompilla was to be tried.
>
> It is clear, however, that defense counsel did not look at any part of that file, including the transcript, until warned by the prosecution a second time ... [i]n a colloquy the day before the evidentiary sentencing phase began[.]

*Rompilla v. Beard*, 545 U.S. at 383-84. (brackets added). The import of counsel's failure to make "reasonable efforts to review the file" was that

> defense counsel could have had no hope of knowing whether the prosecution was quoting selectively from the transcript, or whether there were circumstances extenuating the behavior described by the victim. The obligation to get the file was particularly pressing here owing to the similarity of the violent prior offense to the crime charged and Rompilla's sentencing strategy stressing residual doubt. Without making efforts to learn the details and rebut the relevance of the earlier crime, a convincing argument for residual doubt was certainly beyond any hope.

*Id.* at 386.

Further in the Supreme Court's *Rompilla* opinion, it repeated that the incompetence finding

hinged on the particular facts underlying that case:

> Counsel fell short because they failed to make reasonable efforts to review
> the prior conviction file, *despite knowing that the prosecution intended to introduce
> Rompilla's prior conviction not merely by entering a notice of conviction into
> evidence but by quoting damaging testimony of the rape victim in that case*. The
> unreasonableness of attempting no more than they did was heightened by the easy
> availability of the file at the trial courthouse, and the great risk that testimony about
> a similar violent crime would hamstring counsel's chosen defense of residual doubt.
> *It is owing to these circumstances that the state courts were objectively unreasonable
> in concluding that counsel could reasonably decline to make any effort to review the
> file. Other situations, where a defense lawyer is not charged with knowledge that the
> prosecutor intends to use a prior conviction in this way, might well warrant a
> different assessment.*

*Id.* at 389-90 (emphasis added).

The foregoing excerpts show that the Supreme Court in *Rompilla* stressed that trial

counsels' performances were not unreasonable "'merely'" because they knew the prior conviction

would be utilized as an aggravator factor. Instead, the Supreme Court repeated and thus emphasized

that Rompilla's counsel were unreasonable because the prosecutor twice told them that he intended

to use the prior conviction *in a particular way* – by using a previous victim's trial testimony to

accentuate Rompilla's violent propensity – and counsel did not take obvious steps to negate or

counteract the aggravating effect of that testimony by examining a readily available public record.

*Id*.

Hamm's circumstances are markedly different from the particular circumstances upon which

the United States Supreme Court found counsel to be objectively deficient in *Rompilla*. In Hamm's

case, Hamm does not dispute that his counsel had no reason to believe the purported facts underlying

the Tennessee convictions would be highlighted in any way at sentencing, and they were not. He

87

also does not dispute that counsel's conversations with Hamm about the nature of the Tennessee offenses matched the crimes for which his client had pled guilty.  The only allegations or testimony pertaining to the scope of the investigation (or as it were, limitations thereto) completed by Hugh Harris regarding the Tennessee convictions came from Harris himself at the Alabama Rule 32 evidentiary hearing.  Harris testified that he discussed the nature and circumstances of the Tennessee charges and pleas of guilt with Hamm, including that he pled to lesser charges, and that Hamm's version of events was consistent with the information Harris had obtained from Tennessee.[32]  The only conclusion that can be derived from this testimony is that Hamm admitted his guilt regarding the Tennessee convictions to Harris and was further aware that he had avoided prosecution for more severe charges in exchange for his pleas of guilt.

---

[32] Harris testified that he was appointed to represent Hamm at the end of January or the beginning of February 1987.  (Rule 32 R. Vol. 21, Tab. 42, p. 7).  Harris stated that he was afforded very liberal access to Hamm, and met with Hamm more than 25 times in preparation for trial.  *Id.* at 33-34.  He described his relationship with Hamm as "good," and said that Hamm contacted him for legal advice about other charges Hamm was facing in Mississippi even after the capital case was completed.  *Id.*

Harris was asked what he had done to investigate the Tennessee convictions – other than speaking with Hamm – to which Harris responded, "I had contacted the various courts in Tennessee where these convictions were and had gotten copies of the convictions, so that I knew exactly what he had actually been convicted of in Tennessee.  And it was consistent with what Doyle had told me all along with those cases."  *Id.* at 16.  Elsewhere, Harris also testified that he reviewed with Hamm an NCIC report containing Hamm's criminal record, and repeated that he had

> reviewed convictions in Tennessee, and there again they came back exactly like he told me that they had happened.  Although, he had been charged with some other more serious crimes, he actually pled on some lesser charges and that was argued at the penalty phase of the trial.

*Id.* at 38-39.  No other questions were asked of Harris or his co-counsel about this particular matter during the evidentiary hearing.

Hamm *never* has alleged he told *Harris* anything prior to trial or sentencing that reasonably would have led Harris to believe that the prior convictions were faulty, nor has Hamm contradicted Harris's Rule 32 testimony. Thus, Harris's perception of the validity of the Tennessee convictions is a central, undisputed, historic fact that eviscerates Hamm's assertions that Hugh Harris not only unreasonably limited his investigation of the prior convictions, but should have expanded the investigation and then challenged the Tennessee convictions exclusively in a Tennessee state post-conviction proceeding.[33] Based on what Hamm told him, Harris had no reason to question whether Hamm committed the Tennessee offenses to which he pled guilty or whether Hamm's guilty pleas were voluntary, knowing and intelligent. Thus, Harris's investigation was limited to obtaining copies of the Tennessee convictions, which contained facially valid orders finding of Hamm's plea of guilt to the lesser-included offenses and the punishment imposed.

Taking these circumstances into account, Hamm's argument boils down to an assertion that no reasonable counsel in 1987 would have foregone, as a matter of course, obtaining the transcript of a guilty plea colloquy in nine year-old-out-of-state convictions that were to be offered in support of an aggravating factor in a death penalty case. These circumstances bear no resemblance to *Rompilla*. *Rompilla* does not mandate that reasonable counsel must obtain transcripts of guilty plea hearings for prior convictions offered as aggravators to discover *Boykin* errors when no other affirmative indications would make counsel aware that the plea colloquy transcript could reveal evidence that would help negate the State's aggravating case.

---

[33] The grounds upon which Hamm alleges Harris should have challenged the Tennessee convictions in a Tennessee post-conviction proceeding are: (1) *Boykin* error, (2) denial of his right to appeal from the Tennessee conviction, (3) the Tennessee plea was not knowing or voluntary, (4) that his Tennessee counsel was constitutionally ineffective, and (5) by finding alleged newly discovered evidence that showed actual innocence.

In fact, Hamm's circumstances fall within those that the *Rompilla* Court held "might well warrant a different assessment."  545 U.S. at 390.  "Different circumstances" that might warrant a "different assessment," coupled with the standard of habeas review this court must engage in, make certain that reasonable jurists could disagree as to whether the Alabama Court of Criminal Appeals' finding that Hamm's counsel's performed competently under the circumstances was a decision contrary to or an unreasonable application of *Strickland* and its progeny.  *Id.*  Thus, affording the state court the "double deference" it is due, Hamm has failed to show that he is entitled to habeas relief.

Hamm also appears to rely on the *Rompilla* Court's[34] approval of the 1982 ABA Standards for Criminal Justice to support his claim that counsel was objectively deficient, and he quotes from the following page of that opinion:

> The notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense.  As the District Court points out, the American Bar Association Standards for Criminal Justice in circulation at the time of Rompilla's trial describes the obligation in terms no one could misunderstand *in the circumstances of a case like this one*:
>
> > "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.  The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities.  The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty."  1 ABA Standards for Criminal Justice 4–4.1 (2d ed. 1982 Supp.).

(Doc. no. 20, p. 95) (quoting *Rompilla*, 545 U.S. at 387 (emphasis added by this court) (footnote

---

[34] Rompilla's trial occurred in 1988.

omitted)).[35]

To the extent Hamm may be suggesting that the *Rompilla* Court adopted the ABA Standards

for its own *Strickland* reasonableness standard, the suggestion is fruitless.   As the *Strickland* Court

held:

> In any case presenting an ineffectiveness claim, the performance inquiry must
> be whether counsel's assistance was reasonable considering all the circumstances.
> Prevailing norms of practice as reflected in American Bar Association standards and
> the like, e.g., ABA Standards for Criminal Justice 4–1.1 to 4–8.6 (2d ed. 1980) ("The
> Defense Function"), are guides to determining what is reasonable, but they are only
> guides.  *No particular set of detailed rules for counsel's conduct can satisfactorily
> take account of the variety of circumstances faced by defense counsel or the range
> of legitimate decisions regarding how best to represent a criminal defendant.*  Any
> such set of rules would interfere with the constitutionally protected independence of
> counsel and restrict the wide latitude counsel must have in making tactical decisions.
> *See United States v. Decoster*, 199 U.S. App. D.C., at 371, 624 F.2d, at 208.  Indeed,
> the existence of detailed guidelines for representation could distract counsel from the
> overriding mission of vigorous advocacy of the defendant's cause.  Moreover, the
> purpose of the effective assistance guarantee of the Sixth Amendment is not to
> improve the quality of legal representation, although that is a goal of considerable
> importance to the legal system.   The purpose is simply to ensure that criminal
> defendants receive a fair trial.

---

[35]  In the omitted footnote (n.6) and the footnote immediately following (n.7), the Supreme
Court commented on the 1989, 1993 and 2003 versions of ABA Standards, and pointed out that in
1989, the ABA developed a separate guideline for death penalty cases.  *Id.* (citing ABA Guidelines
for the Appointment and Performance of Counsel in Death Penalty Cases (1989) and its 1993 and
2003 amendments)).  Notably,  the Court quoted the following portion of the 2003 version, which
it described as being the most explicit to date:

> "Counsel must ... investigate prior convictions ... that could be used as aggravating
> circumstances or otherwise come into evidence.  If a prior conviction is legally
> flawed, counsel should seek to have it set aside.  Counsel may also find extenuating
> circumstances that can be offered to lessen the weight of a conviction."   ABA
> Guidelines for the Appointment and Performance of Defense Counsel in Death
> Penalty Cases 10.7, comment. (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913,
> 1027 (2003) (footnotes omitted).

*Rompilla*, 545 U.S. at 387.  Thus, not until 2003 did the ABA Standards even mention that counsel
should file a challenge to an invalid prior conviction.

*Strickland*, 466 U.S. at 688-89 (emphasis added).

The *Rompilla* Court utilized the ABA standards as a *guide*, and did not substitute ABA "Standards" for its own reasonableness standard under *Strickland*. *Rompilla*, 545 U.S. at 387. The *Rompilla* Court's determination of a counsel's obligation in that case turned not on the particular ABA provision it cited but the Court's own assessment that *under the particular circumstances* of Rompilla's case, those guidelines provided assistance in determining reasonableness.

The salient legal inquiry for this court is whether any reasonable jurists would debate whether the Alabama Court of Criminal Appeals' application of the *Strickland* standard resulted in a decision that is contrary to or an unreasonable application of clearly established federal law. The United States Supreme Court's recent ruling bears repeating:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 131 S. Ct. at 787-88.

The finding by the Alabama Court of Criminal Appeals that counsel were not objectively deficient for failing to challenge the nine-year-old Tennessee convictions was not contrary to, nor did it involve an unreasonable application of clearly established federal law. The decision also was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For the foregoing reasons, Hamm has not demonstrated that no reasonable jurist would have interpreted *Strickland* and *Rompilla* in the manner the Alabama Court of Criminal Appeals did in his case. Because Hamm has failed to show he is entitled to relief on the objective *Strickland* prong,

the court need not address the prejudice aspect of Hamm's claim.  Hamm is not entitled to habeas

relief on this claim of ineffective assistance of counsel, and the court will deny this c laim.

    **4.**    *Counsel failed to investigate and present mitigating evidence at the penalty[36] phase of trial*.  (Doc. no. 1, ¶ 86, p. 26) (Doc. no. 20, pp. 77-94).

    **a**.    *Preliminary matters of import*

In the IAC portion of his petition, Hamm has scattered several complaints about the manner

in which trial counsel investigated and presented mitigating evidence at the penalty phase of trial,

and these complaints initially are referred to as claims F.4 and F.14 and F.30.   After close

examination of the allegations and evidence underlying each of these sub-claims, the court finds it

prudent to address these sub-claims as one claim for a number of reasons.  The court begins with the

allegations.

    **i.**    *Claim parameters*

When Hamm raised the allegations underlying these claims in his brief on collateral appeal,

sub-claims F.4,  F.14 and F.30 were presented as one argument.  (Rule 32 C.R. Vol. 29, Tab. 45, pp.

70-77).  Therefore, when the Alabama Court of Criminal Appeals examined and rejected the claims

on collateral appeal, it considered as one claim what Hamm now separates into three.  *See Hamm*

*v. State*, 913 So. 2d at 486-88.  Further, to the extent he presents any reasoned argument in his reply

brief, Hamm does not draw any distinction between what he now encourages the court to consider

as separate sub-claims.  (Doc. no. 20, pp. 79-94).  As such, no logical reason arises to carve out and

repetitiously  disperse  throughout  this  opinion  what  amounts  to  a  subject  that  begs  one,

---

[36] Hamm uses the word "guilt" once in the habeas petition and once in the reply brief, without
providing argument, explanation and context in either.  Because the facts and legal argument in the
petition and reply brief only pertain to the penalty phase of trial (doc. no. 20, pp. 79-94), the
parameters of the claim only involve the penalty phase of trial.

comprehensive discussion.  Thus, from this point forward, unless otherwise noted, reference to "the claim" in this section encompasses Hamm's sub-claims F.4, F.14 and F.30.

**ii.**     *The scope of allegations underlying the claim*

Sub-claim F.4 is comprised of one paragraph in the habeas petition.  In it, Hamm alleges that "[t]rial counsel was ineffective in failing to investigate and to present mitigating evidence at the" penalty phase of his trial.  (Doc. no. 1, ¶ 86, p. 26).  Instead, he asserts counsel only offered the testimony of Hamm's sister and a correctional officer.  Hamm complains that there was "no possible strategic reason" for trial counsel's failure to investigate and present "a wealth of documents" and witness testimony that would have supported four categories of mitigating evidence, which he describes as including: (a) mental health impairments, (b) education, (c) family upbringing, and (d) medical problems.  According to Hamm, the "documentary evidence includes lengthy criminal records of his family members, his school records, [and] his medical and mental health records." Further, the "testimonial evidence included the testimony of a social worker, of a psychologist, and psychiatrist." *Id.*

When the unified claim was raised on collateral appeal, Hamm included two important matters into the same.  First, on collateral appeal and as part of his contention that counsel failed to present evidence of his medical problems, Hamm alleged that counsel did not investigate and present evidence of the effects of drugs and alcohol use on Hamm during the penalty phase of trial.  (Rule 32 C.R. Vol. 29, Tab. 45, pp. 75-76).  In his habeas petition, he unnecessarily separates this allegation into a separate claim and argues counsel failed to present at trial evidence of drug and

94

alcohol use on his mental[37] health.  (Doc. no. 1, "Claim VI. F.14" ¶¶ 96-97, p. 28).  He also repeats

counsel's various failures regarding the  mitigating evidence near the end of this claim in his petition

by rephrasing the same allegations in several paragraphs.  (Doc. no. 1, "Claim VI. F.30" ¶¶ 113-16,

p. 30).   Finally, the court notes that in his habeas petition, Hamm declares that counsel failed to

argue to the trial court "reasons why petitioner's life should be spared" as part of Claim VI.F.30.  (*Id.*

at 30).   While Hamm raised these allegations in the Rule 32 petition (Rule 32 C.R. Vol. 21, Tab.

40, p. 39), he did not raise them on collateral appeal.  Therefore, these allegations are procedurally

defaulted.

### iii.    *Evidence within habeas parameters*

Hamm cites the trial transcript when arguing this claim, and certainly that record is part of

the evidence that should be considered in this process.  However, much of the post-conviction

"evidence" Hamm cites to support the claim was not admitted at the Rule 32 hearing and will not

be considered.  (Doc. no. 20, pp. 78-94).  Because the citations to evidence that was not admitted are

significant, the *admitted* post-conviction evidence must be clarified.  As an example, in his reply

brief Hamm cites Volume 11 of the State post-conviction record at length, but the information

contained in this Volume (submitted in support of *pro se* motions and letters filed by Hamm) was

included in the court record but not admitted into evidence at the hearing.  *Id.* (*See* Rule 32 R. Vol.

21, Tab. 42, pp. 5-6 ("All of that has been file stamped and included as a part of the Court

---

[37] He also fails to explain why, in his petition, he alleges the effects of alcohol and drug use
pertain to his mental health when on collateral appeal, he alleged it was a medical problem.
However, the court sees no practical difference since Hamm never called any mental health expert
at the Rule 32 evidentiary hearing to give expert testimony concerning Hamm's purported mental
and/or medical problems (*i.e.* brain damage, seizures, head injuries, drug and alcohol use) in any
effort to prove the claim.

record."))[38]  Hamm also cites to many other pages of other volumes of the post-conviction record that were not admitted into evidence.  (Doc. no. 20, pp. 78-86).

For purposes of habeas review, the State court's evidentiary rulings govern the scope of the evidence and allegations that may considered by this court.  In short, this court is bound by the post-conviction evidence (testimonial and documentary) that was *admitted* and considered by the state courts.

> **(1)**  *Hugh Harris's Rule 32 testimony and Exhibits 1 through 5, the exhibits admitted into evidence at the Rule 32 hearing*

At the Rule 32 hearing, Hamm only called Mr. Harris and Ms. Williams, his trial and appellate counsel, as witnesses.  Harris testified that he investigated Hamm's family and medical (both physical and mental) history, family background and criminal history and requested and was granted a mental evaluation of Hamm at Taylor Hardin.  (Rule 32 R. Vol. 21, Tab. 42, pp. 11-18, 38-42).  Harris's strategy was "to keep out, other than the family history, Doyle's criminal records other than what the State presented at trial."  *Id.* at 15.

During the hearing, Exhibits 1 through 5,[39] identified as Hamm's "birth, education, employment, family, criminal records, his medicals, family medicals," were admitted into evidence in support of the claim, and only Hugh Harris was questioned about the exhibits.  (Rule 32 R. Vol. 21, Tab. 42, pp. 12, 63; 3-52).  Harris admitted he did not have the content of the post-conviction exhibits at trial, but also stated,

---

[38]  *See* discussion Section VI.B.1 *supra*.

[39]  The volume and page numbers for Exhibits 1 to 5 are taken from an order entered by the Rule 32 court and the Clerk's index, the accuracy of which Hamm does not challenge.  (Rule 32 C.R. Vol. 22, pp. 1-4).

> We were aware of these records but the indication, there were just a few charges that the State brought out at trial in regard to his criminal history. These are records [that] would have indicated serving time on some other crimes that were not actually brought forth at trial and would have actually given enhancement to the death penalty phase to get into his history other than what was actually presented at that time.

*Id.* at 15 (brackets added). Harris testified that he was aware of Hamm's criminal history through Doyle Hamm himself and he talked to Hamm's sister Ruthie about evidence of Doyle's "epilepsy and that was really the only basis that we had for having an evaluation at Taylor-Hardin was his physical history." *Id.* A review of the records and Harris's testimony confirm his statement.

### (a)  *Exhibit 1*

Exhibit 1 is comprised of certified copies of the criminal records of Doyle Hamm's father and seven brothers. (Rule 32 C.R. Vol. 22, pp. 3-200; Vol. 23, pp. 201-317).[40] Hugh Harris identified Exhibit 1 as the "criminal history of ... Doyle's family, those issues were addressed at the sentencing phase." (Rule 32 R. Vol. 21, Tab. 42, p. 13). He also declared, "Although, we did not have the exact documents we knew of the extensive history of the members of his family, which was brought out at the sentencing phase." *Id.*

### (b)  *Exhibit 2*

Exhibit 2 begins with the affidavit of mitigation investigator Gaye Nease,[41] and is followed by her chronology of Hamm's history and his family's history, which she attests were derived from

---

[40] Exhibit 1 further contains a composite list of typed and handwritten criminal charges pertaining to Hamm's father, brothers, ex-wife, several in-laws, and one sister, Linda, who once was charged with public intoxication in 1978. (*Id.*, Vol. 22, p. 4). Linda's public intoxication charge was not brought to Hugh Harris's attention at the hearing.

[41] Hamm asserts Gaye Nease is a social worker in his reply brief. (Doc. no. 20, p. 78). She is not. Per her affidavit, she is a lawyer by degree and a mitigation expert at the Southern Center for Human Rights. (Rule 32 C.R. Vol. 23, p. 319). Nease gave no opinion whatsoever about Hamm's life, and her affidavit is dedicated solely to explaining her position as mitigation expert, and that her chronology was derived from other information attached to it. *Id.*

97

information she gathered: *i.e.* interviews with Hamm and his family (conducted by herself, Bernard Harcourt and another investigator) and birth, education, employment, marriage and divorce records. (Rule 32 C.R. Vol. 23, pp. 318-400; Vol. 24, pp. 401-541).  Hugh Harris described Exhibit 2 at the Rule 32 hearing as containing "some indication of Doyle's criminal history, as well as some related family members.  And the majority of that information would have been detrimental to Doyle, and as a trial tactic we would not have gone into those issues."  (Rule 32 R. Vol. 21, Tab. 42, p. 14).

Harris also attested that

> there is an affidavit with evidently a chronology of Doyle and the members of his family and their criminal history, and there again, that was addressed at trial.  We actually brought in as much as Doyle would agree for us to bring in about his family history.[42]  I was aware of his divorce, had talked to Doyle about bringing his daughter.  He was not agreeable to that, and we didn't pursue that any further.  I reviewed the Taylor-Hardin [evaluation]."[43]

---

[42] Exhibit 2 contains an interview with Hamm's sister Ruthie Hamm Murphy (also spelled Murphree) (*see* Rule 32 C.R. Vol. 24,  p. 423), who testified in his behalf at the penalty phase of trial.  In the Exhibit 2 interview, Ruthie admitted that in 1978, Colbert County officials charged her and two of her brothers with assault with a deadly weapon as a result of a drunken and drug-influenced altercation with other extended family.  *Id.*  Ruthie told the investigator that the charges were dismissed when the Hamm family agreed to leave Colbert County permanently.  *Id.*  Hugh Harris was not specifically questioned about Ruthie's criminal history at the Rule 32 evidentiary hearing.  He was asked about Ruthie coming to testify at the penalty phase of trial; he said, "Yes, and Ruthie did come and that was the only time that Doyle really got upset with us was when we put her on."  (Rule 32 R. Vol. 21, Tab. 42, p. 39).  Harris further stated that

> [t]he only time [Hamm] got mad at us –  ... [h]e did get upset when we put his sister on to go into the family history, and he told me at that time that was nobody's business other than his family.  But I told him from our situation we had to introduce that evidence.  I would do the same thing today.  And he acquiesced in that but he was not happy about it.

*Id.* (first and second brackets added).

[43] Harris is referring to Hamm's 1987 pre-trial psychological evaluation at Taylor-Hardin Secure Medical Facility.  A review of the trial record shows a May 11, 1987, pre-trial hearing in support of Hamm's Motion for Psychiatric Evaluation, wherein Ruthie Murphy attested to Hamm's history of seizures and epilepsy.  (R. Vol. 1, Tab. 4, pp. 11-28).  On May 15, 1987, the trial judge granted Hamm's motion for a psychiatric evaluation.  *Id.* at 31-32.

*Id.* (bracketed footnotes added).[44]

### (c)    *Exhibit 3*

Exhibit 3 is comprised only of the birth, death, military service and death records of Hamm's family.  (Rule 32 C.R. Vol. 24, pp. 542-600; Vol. 25, pp. 601-03).  None of the information in Exhibit 3 pertains to Doyle Hamm personally.

### (d)    *Exhibit 4*

Exhibit 4 contains medical and psychological records of some members of Hamm's family. (*Id.*, Vol 25, pp. 604-800; Vol. 26, pp. 801-09).  None of these records have any information concerning Hamm himself.  Thus, Harris apparently was looking at Exhibit 5 when he described Exhibit 4 as containing "some indication of [Doyle Hamm's] physical as well as his mental history which documents the seizures that he had suffered over a period of time prior to being charged in Cullman County, and that was one of the things that was reviewed at Taylor-Hardin when he was evaluated there."  (Rule 32 R. Vol. 21, Tab. 42, p. 14) (brackets added).

### (e)    *Exhibit 5*

Exhibit 5 *is* comprised of Doyle Hamm's medical records, which were generated in Lawrence County Jail in 1978, and the state prisons of Tennessee and Mississippi from 1980 to 1986.  The records describe seizure-like events and a brief participation in a sleep deprivation study.  (Rule 32 C.R. Vol. 26, pp. 810-1000; Vol. 27, pp. 1001-1167).

Harris declared that Exhibit 5 contained

> some more records of when [Hamm] was treated while he was incarcerated. Although, that gave us a basis to have him treated from a trial standpoint, I wouldn't

---

[44] While Harris described the foregoing quoted portion as being from Exhibit 3, the content shows that this description is indeed a continuation of Exhibit 2.  Exhibit 3 contains no chronology and is comprised of the birth, death, military service and death records of Hamm's family.  (Rule 32 C.R. Vol. 24, pp. 542-600; Vol. 25, pp. 601-03).

have brought any of these records because it's going to show a number of incarcerations other than what was actually brought forth in front of the jury and the judge at trial in determining sentencing.

(Rule 32 R. Vol. 21, Tab. 42, p. 14) (brackets added).

> **(2)**  *Other testimony and documentary evidence that purportedly should have been admitted*

Hamm complains that the trial court did "not allow" Dr. Dale Watson or Gaye Nease to testify at the Rule 32 hearing. (Doc. no. 20, p. 77). But the truth is that Hamm did not *call* Watson, Nease, or a social worker, psychologist, or psychiatrist to *testify* at the evidentiary hearing. (Rule 32. R. Vol.21, Tab 42, pp. 1-64).

> **(a)**  *Dr. Dale Watson and Exhibit 7*

Hamm attempted to offer a psychological evaluation by Dr. Dale Watson into evidence at the Rule 32 hearing, and the State objected to it. (Rule 32 R. Vol. 21, Tab. 42, pp. 18-19). The colloquy reads:

> MS. NAIL: Your Honor, at this time I would like to introduce Defendant's Exhibit 7. This is an evaluation that has been done in regards to Mr. Hamm that I received last week that Mr. Harcourt – my client sent it and it's one of the requests as to the defendant to be admitted into evidence.
>
> MS. HUGHES: Judge, we object to it. We don't have an opportunity to cross examine this psychiatrist or psychologist.
>
> THE COURT: Who is the psychologist?
>
> MS. NAIL: Dale G. Watson, PhD.

*Id.* At this juncture, the trial court reserved its ruling on the State's objection. It also observed that Dr. Watson's report had been prepared on July 19, 1999, but the evaluation had been performed on January 25, 1996— over three years earlier. Post-conviction counsel did not ask Mr. Harris or Ms. Williams any additional questions about any information in Dr. Watson's report. *Id.* at 19. Near the close of the evidentiary hearing, the trial court sustained the State's objection to the report and did

not admit Dr. Watson's report into evidence. *Id.* at 63. The Alabama Court of Criminal Appeals affirmed the Rule 32 court's evidentiary ruling. *Hamm*, 913 So. 2d at 478-79.

Regarding the habeas petition, Hamm already has complained that the Rule 32 court unfairly denied the admission of Dr. Dale Watson's evaluation into evidence, a concern upon which he requested an evidentiary hearing in this court. (Doc. no. 21, pp. 3-4; Doc. 23, pp. 8-10; Doc. no. 1, p. 26). However, the magistrate judge denied that request without prejudice in an order previously entered (doc. no. 24, pp. 3-6), and this court agrees with the assessment of the magistrate judge that Hamm has demonstrated "no substantial error regarding the allegation that the Rule 32 court unfairly denied the admission of an expert affidavit. The Alabama Court of Criminal Appeals considered this matter and affirmed the trial court's decision not to admit this evidence." *Id.* at 4 (citing *Hamm*, 913 So. 2d at 478-79). The court finds no valid reason to revisit the matter considering the strict requirements of 28 U.S.C. § 2254(e).

**(b)** *Gaye Nease*

As for Hamm's complaint about Gaye Nease (a mitigation investigator—not a social worker), he never called Nease as a live witness at the hearing. However, the Rule 32 court did allow Nease's affidavit and chronology of Hamm's background to be admitted into evidence as part of Exhibit 2. Therefore, the court considered the information in connection with the claim. (Rule 32 C.R. Vol. 23, pp. 318-400; Vol. 24, pp. 401-541).

**b.** *Habeas review of the claim*

Having placed the parameters of Hamm's claim, allegations and supporting evidence into proper habeas perspective, the court now turns to its 28 U.S.C. § 2254(d) review analysis and begins with the last state court to examine this claim on the merits, the Alabama Court of Criminal Appeals. When Hamm raised this claim on collateral appeal, the Alabama Court of Criminal Appeals affirmed

101

the trial court's rejection of the claim, and made the following findings of fact and conclusions of law:

Hamm argues that trial counsel failed to properly investigate aggravating and mitigating circumstances for the penalty phase and failed to present "compelling evidence" at the sentencing portion of Hamm's trial. Hamm alleges that trial counsel should have discovered and entered into evidence volumes of documents, including records of the criminal history of Hamm's father, uncles, and brothers; records of Hamm's medical history, including his abuse of alcohol and other drugs; and records of Hamm's educational history. The circuit court found that trial counsel conducted an adequate investigation into Hamm's past and were well aware of the difficult circumstances in which Hamm grew up. The court further found that counsel presented much of this information by way of testimony from Hamm's sister at the sentencing hearing. (C. 79-80, 99-100, 103-111.) The court further found that Hamm failed to establish any prejudice, because the evidence was cumulative and would not have affected the outcome of the proceeding. (C. 110.) As the court noted in its Rule 32 order, the sentencing court found the following nonstatutory mitigating circumstances to exist:

"The Defendant was born February 14, 1957, and Defendant was raised by his Mother and Father and lived in Colbert County, Alabama, until 1975. Defendant was the eighth of ten children born to those parents. It appears that he had a good Mother, but no[t] much can be said of his Father. It appears that his Father was a heavy drinker and had spent time in prison. It seems that he tried to instill in his children the idea that if they did not steal they weren't a 'Hamm'. The Defendant's Father died in 1971 when Defendant was thirteen years old. Afterwards, he was raised by his Mother. Ruthie Murphree, his Sister, helped the Mother raise the Defendant. Ruthie is slightly older than the Defendant and has no record of criminal activity. She is married and is a housewife. The Defendant's Brothers, James, Roy, Horace, Jimmy, O'Neal, David, and Danny, all either served time in prison or are now serving time in prison. James died in 1969 and Roy hanged himself in 1978. Defendant has another Sister, Linda Hamm Murphree, age 29, who is married to Johnny Murphree and who appears to be a nice person who has never been in trouble.... The fact that the Defendant and all his Brothers have prison records is certainly an indication that their Father was a terrible influence on his children. His conduct while participating in the raising of these young boys created an obstacle to the development of their character, which was, indeed, difficult to overcome. The Defendant had no control over the conduct of his Father, and, of course, this type of conduct by his Father was irresponsible and deplorable. It absolutely had a negative influence on the Defendant. It is to be noted, however, that the two girl children were able to rise

102

above this influence and appear to be good citizens.  The Defendant
had a poor education and suffered from epilepsy."

(C. 106-07) (quoting T. 1374.)

The trial record further demonstrates that Hamm's sister testified that their
father gave the children alcohol and told them that if they did not drink, they were not
"a Hamm." (T. 1225.) Hamm's sister also testified as to Hamm's abuse of alcohol
and other drugs. (T. 1227-28, 1231-32.) The sister testified about the family's living
conditions when Hamm was young, and she detailed the abuse the father inflicted on
the children.  (T. 1220-26.)

At the postconviction hearing, trial counsel reviewed the exhibits Hamm now
argues should have been admitted at his trial.  One of Hamm's counsel testified that
as a matter of trial strategy, he would not have introduced many of the records,
because Hamm's sister could testify about the information defense counsel wanted,
without putting before the jury information that would have been detrimental to
Hamm, such as his complete criminal history.  (R. 12-16, 50.)  Attorney Harris
testified that he did not believe it was necessary to introduce the documents when
Hamm's sister testified.  He said, "The beauty of the testimony is we could get the
points out that we wanted to, whereas the documentation would have had a lot of
information and evidence that I wouldn't have wanted in front of the jury." (R. 50.)

We agree with the circuit court's finding that defense counsel were not
ineffective for failing to introduce at trial the records that were introduced at the Rule
32 hearing.  The attorneys investigated Hamm's background and that of his family,
and presented this information through the testimony of Hamm's sister.  This type
of strategy is virtually unassailable. *Strickland v. Washington*, 466 U.S. 668, 689-90,
104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Furthermore, the trial court correctly determined that the documents would
have been cumulative of evidence actually presented at sentencing.  (C. 111.)  We
note, additionally, that the sentencing court did not disbelieve the testimony at trial,
because the court cited much of it in the sentencing order.  (T. 1372-1375.)  The
postconviction trial court correctly concluded that Hamm failed to establish defective
performance.  In denying Hamm's Rule 32 claim, the court further noted that, even
if the documents had been presented at trial, the sentencing outcome would not have
been different.  The court concluded that the evidence would have been cumulative
of evidence presented at trial.  (C. 110.)  "'Thus, the appellant has not shown that
there is a reasonable probability that the outcome of his trial would have been
different, but for trial counsel's performance.'" *Williams v. State*, 782 So. 2d 811,
825 (Ala. Crim. App. 2000).  Hamm is not entitled to relief on this claim.

*Hamm v. State*,  913 So. 2d at 486-88.  *See also* (Rule 32 C.R. "Rule 32 opinion" Vol. 33, Tab. 58,

pp. 79-80, 99-101, 103-11).

For Hamm to receive habeas relief in this court, he must show that no reasonable jurist would have applied *Strickland* and its progeny to the allegations and evidence underlying this claim and decided the claim as the Alabama Court of Criminal Appeals did in its opinion.  Stated differently, Hamm must show that the Alabama Court of Criminal Appeals' competence and prejudice findings are an unreasonable interpretation of *Strickland* and the facts before it.  Hamm declares that "[t]he degree of incompetence and the prejudice in this case map perfectly onto the Supreme Court decisions in *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); and *Williams v. Taylor*, 529 U.S. 362, 396 (2000)."  (Doc. no. 20, p. 79).  But these cases bear virtually no resemblance to Hamm's circumstances and do not compel the result he seeks.

The reason for counsels' deficiency in *Rompilla* already has been discussed at length, so the reader is referred to that portion of the Memorandum Opinion.  (*See* Claim VI.F.3, *supra*).  Had Rompilla's counsel investigated his previous criminal conviction as they were twice explicitly warned by the prosecution would be used to support an aggravator, they would have found a wealth of mitigating evidence concerning Rompilla's devastating childhood that no other source had uncovered.  Because counsel unreasonably failed to examine the prior conviction, at sentencing the jury and trial judge were never made aware of Rompilla's horrific life history, and instead were led to believe his upbringing was benign.  After reweighing of the aggravating and all mitigating circumstances, including those presented during post-conviction proceedings, the Court found that Rompilla showed prejudice as a result of counsel's failure.  *Rompilla v. Beard*, 545 U.S. at 374-76.

Similarly, Wiggins's counsel was found to be deficient because, although counsel claimed to have strategically limited their penalty phase evidence to a residual doubt argument, the trial record showed this argument, with only a comment regarding Wiggins's "difficult life," was weakly attempted and supported at that phase of trial.  *Wiggins v. Smith*, 539 U.S. at 523-27; 534-38.

Moreover, counsel knew before trial that they had strong red flags of Wiggins's awful and tormented past at their fingertips.  Still, counsel made no effort to investigate and research Wiggins's social history and present any of this strong, admissible evidence at the penalty phase of trial.  *Id.* at 535. After weighing all aggravating and mitigating evidence, including Wiggins's evidence of his childhood, the Supreme Court determined that a reasonable probability arose that the outcome of the sentencing could have been changed by the new information, and thus Wiggins was prejudiced by counsel's failure.  *Id.* at 510.

Finally, the Court found counsel in *Williams* to be objectively deficient because they did not even perform a penalty phase investigation until one week before the sentencing hearing, and discovered none of the information pertaining to Williams's "nightmarish childhood," borderline mental retardation, his assistance to prison officials in breaking a drug ring, and the prison official's opinion that Williams was one of the least likely inmates for violence.  *Williams v. Taylor*, 529 U.S. at 363-64.  After "evaluat[ing] the totality of, and accord[ing] appropriate weight to, the available mitigation  evidence" against the aggravating and mitigating factors at trial and during post-conviction proceedings, the Supreme Court found Williams's case displayed a reasonable probability that the outcome of the sentencing may have been altered had the jury known of his background. *Id.* at 364 (brackets added).

Unlike *Rompilla*, *Wiggin*s and *Williams*,[45] the mitigating evidence within Hamm's family, educational and mental/medical history *was* investigated and known to Harris before trial *and* Harris had to convince his client to allow this history to be presented to the jury through the testimony of

---

[45]  The reader also is advised that also unlike Hamm's case in this court, the Supreme Court's prejudice review in *Rompilla, Wiggins* and *Williams* was *de novo* because the state courts never made a ruling regarding the prejudice prong.  Therefore, the Court did not have to apply an extra layer of deference that this court must apply.

Hamm's sister Ruthie at the penalty phase of trial. When the mitigating evidence at trial and the *admitted* mitigating evidence presented at the post-conviction proceeding are placed side-by-side, the state court was not unreasonable to determine that counsel's strategy was reasonable and the post-conviction evidence simply was cumulative to that presented at the penalty phase.

Counsel conducted an investigation into Hamm's background and history that allowed the jury to be presented all of the mitigating aspects of that history, without subjecting Hamm to the double-edge sword of his full criminal record and other negative material. Such an investigation and any limitations on it were reasonable under counsel's valid penalty phase strategy. Unlike *Rompilla*, *Wiggins*, and *Williams*, the jury *was well aware of Hamm's piteous background, poor education, and mental and medical difficulties*. The exhibits admitted at the evidentiary hearing contained evidence not only cumulative to the case Harris presented at the penalty phase, but also contained information that was very prejudicial to Hamm that counsel had wisely determined not to present to the jury. Therefore, Hamm cannot show the state court's determination that he was not prejudiced was an unreasonable evaluation of the totality and weight of the available mitigation evidence at trial and during post-conviction proceedings against the aggravating factors presented at trial.

Hamm makes several distinct arguments in an effort to convince this court to make the opposite determination, but they are unavailing. For instance, Hamm alleges his trial counsel did not present "mental health experts"[46] at the penalty phase of his trial to testify about mitigating neuropsychological evidence and evidence of the effects of drug and alcohol use. (Doc. no. 20, p. 77). But post-conviction counsel had the opportunity to present this evidence at the Rule 32 hearing

---

[46] At the Rule 32 hearing, Harris testified that Hamm was examined for competency purposes at Taylor-Hardin, and "Doyle had told us all along that there was nothing wrong with him. And from our meetings with him and his participation with us there was never any evidence or indication that I found that he was not competent. " (Rule 32 Vol. 21, Tab. 42, pp. 13-18).

and did not do so.  (*See* VI.F.4.a.iii, pp. 91-98, *supra*).  Therefore, Hamm failed to prove this claim.

Additionally, Hamm complains that corroborating expert testimony and documentary evidence should have been introduced because the testimony of Hamm's sister "sounded like a bunch of lies concocted for the sentencing hearing."  *Id.* at 81.  But Hamm does not dispute that his sister Ruthie testified to his piteous family upbringing, his history of seizures, alcohol and drug use, and poor education.  He also does not dispute that Ruthie was not asked any questions about his criminal history and that a large portion of that history never was heard by the jury.  Again, Hamm failed to present any such corroborating expert testimony during post-conviction proceedings and the documentary evidence that was admitted is cumulative to Ruthie's testimony and/or contains negative information that would have been prejudicial to Hamm had it been presented at the sentencing hearing.

As far as the believability of Ruthie was concerned, Harris testified that through Ruthie's testimony, "We presented ... much more than Doyle wanted presented.  But we presented.  That is probably the one or part of, emotional parts of the trial for both Doyle and myself was that particular line of questioning."  (R. Vol. 21, Tab. 42, pp. 40-41).  Moreover, for reasons set out in the next paragraph, there is no reason to think that the jury did not credit Ruthie's testimony, and the trial judge clearly found Ruthie's testimony to be credible as evidenced by the sentencing order.

Hamm brings forth two other points that he believes undermine trial counsel's alleged strategy and the reasonableness of counsel's investigative limitations.  First, Hamm asserts that during the Rule 32 hearing, Harris testified that he would not have used exhibits pertaining to the Hamm family's criminal history.  (Doc. no. 20, pp. 90-91) (quoting Harris's testimony, Rule 32 R. Vol. 21, Tab. 42, p. 13)).  According to Hamm, Harris's declaration is a "straight lie" because Ruthie testified about the Hamm family's criminal history at the penalty phase of trial.  *Id.*  But a simple

review of this testimony *in context* shows that Harris was referring to Exhibits 4 and 5.  (Rule 32 R. Vol. 21, Tab. 42, pp. 14-15).  As set out earlier, Exhibit 4 only pertains to some family medical records.  Exhibit 5 contains Hamm's medical records, but all of these were generated in penal facilities.  Harris did not lie: he made it clear that he would *not* have used any exhibits that would have revealed Hamm's extensive criminal history.  Exhibit 5 would have done precisely that.

Next, Hamm points to Harris's testimony that "the jury [who voted 11 to 1 in favor of death] felt like if Ruthie and her sister could have gone through life without being involved in crime that the boys could have too."  (Doc. no. 20, p. 91) (quoting Rule 32 R. Vol. 21, p. 41)).  Hamm infers that had Harris obtained and used the criminal histories and background admitted in Exhibits 1 and 2, he could have shown that the sisters also had lengthy criminal histories, and implies the jury's recommendation may have been altered by that information. *Id*. Hamm's argument is without merit. His sister Linda was charged with public intoxication when she was just 21 years old.  She has no further criminal history.  While Ruthie was charged at age 25 with a more serious crime as a result of a family brawl, she was never prosecuted for or convicted of it.  She too has no further criminal history.  Therefore, the truth remains that neither Linda nor Ruthie have been involved in a life of crime, whereas literally hundreds of pages document the criminal records of Hamm's father and seven brothers.  (*See* Rule 32 C.R. Vol. 22, pp. 3-200; Vol. 23, pp. 201-317).  Thus, as the jury reasonably would have determined, and as found by the trial court at sentencing, the girls were able to rise above the negative familial influence.

Further, no one asked Hugh Harris whether he was aware of Ruthie or Linda's run-ins with the law before trial.  Thus, the record is silent as to whether counsel may have determined that Ruthie, having no criminal convictions, still would be the best and most believed narrator of Hamm's life before the jury.  Further, the jury's impressions of the girls and boys in the Hamm

family were brought out during post-trial discussion between counsel and the jury.  (Rule 32 R. Vol. 21, Tab 42, p. 41).  Hamm has not shown how counsel could have predicted the jury would have drawn the distinction.  More importantly, even if Ruthie or Linda's 1978 charges had been revealed, again the fact remains that neither of the girls had *significant* criminal records similar to Hamm and his brothers.  In other words, the state court's decision not unreasonable that no reasonable probability existed that the outcome of sentencing would have been changed by this revelation.

Harris did not want to bring any information concerning Hamm's extensive criminal history to the attention of the jury, which is undeniably reasonable and, as held by the Alabama Court of Criminal Appeals, virtually unassailable trial strategy.  As pointed out by the Alabama Court of Criminal Appeals in its opinion, Harris's decision to use Ruthie to "get the points out that he wanted to," while avoiding documentary evidence of information he did not want "in front of a jury" was reasonable and sound.  (Rule 32 R. Vol. 21, Tab. 42, p. 50).  The appellate court's determination that the cumulative (and negative) post-conviction exhibits, in conjunction with the aggravating and mitigating factors presented at trial, did not give rise to *Strickland* prejudice is not an unreasonable application of *Strickland* and its progeny.  This claim is due to be denied.

> **5.**     *Counsel failed to object to the trial court's failure to give a felony murder instruction, and failed to raise this issue on appeal.*  (Doc. no. 1, ¶ 87, p. 26) (Doc. no. 20, pp. 15-17; 99-101).

Th entire claim in the habeas petition reads "Counsel failed to object at trial to the court's failure to give a felony-murder instruction and failed to raise this claim on appeal, resulting in petitioner's improper conviction for capital murder."  (Doc. no. 1, p. 26).  In his reply brief, Hamm asserts that if a proper felony-murder instruction had been given, the jury could have believed "that Mr. Hamm was intoxicated and *that his companion, Douglas Roden, shot the victim during the course of a robbery*."  (Doc. no. 20, p. 101) (emphasis added).  From this platform, Hamm alleges

that trial and appellate counsel were ineffective for failing to object to the instruction or raise the issue on appeal. *Id.* at pp. 15-17; 99-101.

Hamm desires habeas relief from the rejection by the Court of Criminal Appeals of a somewhat similar IAC claim on collateral appeal, and specifically targets the appellate court's findings that "(1) 'the evidence indicated Hamm intended to commit both the robbery and the murder;' and (2) the jury received a manslaughter instruction and 'any speculation that the jury might have found Hamm guilty of felony-murder is eliminated by the fact that it found him guilty of capital murder.'" *Id.* at 100 (quoting *Hamm v. State*, 913 So. 2d at 484).

As an initial matter, the demand for § 2254(d) relief and the declaration that Roden was the triggerman give the impression that Hamm raised the Roden issue to the state court on collateral appeal. He did not. Accordingly, to the extent Hamm now raises the Roden specter not only for the first time in habeas review, but in his reply brief—not the petition—it is procedurally defaulted and shall not be considered.[47]

The claim as actually raised on collateral appeal is that Hamm's "principle defense at trial was voluntary intoxication." (Rule 32 C.R. Vol. 29, Tab. 45, p. 89). He then declared that there was disputed trial evidence regarding his intoxication level and, therefore, the trial court should have instructed the jury on the lesser-included offense of felony-murder along with the manslaughter instruction that the court gave. *Id.* at 89-90 (citing *Beck v. Alabama*, 447 U.S. 625 (1980), as interpreted in *Daniel v. Thigpen*, 742 F. Supp. 1535 (M.D. Ala. July 25, 1990)). Hamm argues that had a felony-murder instruction been given, the jury could have found that he "intended to commit

---

[47] Nor would consideration of a *Martinez* exception to overcome the procedural default of the claim be of assistance because, as set out in footnote 49, *infra*, the underlying ineffective assistance of trial counsel claim does not have any merit.

a robbery, but was voluntarily intoxicated and unintentionally killed a person during the course of robbery." *Id*.

Therefore, Hamm only argued on collateral appeal that counsel was objectively deficient for failing to request a felony-murder instruction based on evidence of his voluntary intoxication. *Id.* at 90-91 (citing *Beck v. Alabama*, 447 U.S. 625 and *Daniel v. Thigpen*, 742 F. Supp. 1535 ). As for prejudice, he alleged "the failure to give the jury the third option of convicting" him of the serious crime of felony-murder "under-mined the reliability of the jury's verdict" and caused him to be convicted of capital murder because "most reasonable jurors" do not consider manslaughter to be "a serious crime" that carries "a serious sentence." *Id.*

In addressing and rejecting this claim on collateral appeal, the Alabama Court of Criminal Appeals made the following findings:

> Hamm argues that trial counsel improperly failed to request a jury instruction on felony-murder. The trial court instructed the jury on voluntary intoxication and instructed the jury that a finding of voluntary intoxication would reduce the capital murder to manslaughter. (T. 1182.) Hamm now argues that the jury should have been given a third option – to convict him of felony-murder. He contends that, because "most reasonable jurors" do not view manslaughter as a serious crime associated with a serious sentence, the failure to give a jury charge on felony-murder undermined the reliability of the jury's verdict.

> At the postconviction hearing, attorney Williams testified that she and cocounsel discussed a felony-murder charge with the trial judge, but the facts did not support the charge. Williams testified: "The coroner's report showed that [the victim] had been shot from approximately - I don't remember - 18 inches kind of sticks in my head, and a charge like that wasn't supported by the facts presented at trial, and we were concerned that it might be confusing to the jury also." (R. 55.)

> Following the postconviction hearing, the trial court determined that trial counsel's performance was not deficient in failing to request an instruction on felony-murder because the evidence did not support that charge and that Hamm did not establish any prejudice by the failure to request the instruction. (C. 44-47.) We agree.

> First, the evidence did not support a jury instruction on felony-murder. The evidence indicated that Hamm intended to commit both the robbery and the murder.

111

Hamm shot the victim at close range after he forced the victim onto the floor behind the counter in the motel.

"Even in a capital case a defendant is not entitled to instructions on a lesser included offense unless there is a rational theory from the evidence presented supporting such an instruction. *Roberts v. State*, 735 So. 2d 1244 (Ala. Cr. App. 1997). As we stated in *Jenkins v. State*, 627 So. 2d 1034, 1049-50 (Ala. Cr. App. 1992), aff'd, 627 So. 2d 1054 (Ala. 1993), *cert. denied*, 511 U.S. 1012, 114 S. Ct. 1388, 128 L. Ed. 2d 63 (1994):

"'The appellant next argues that the trial court erred in not instructing the jury on the lesser included offense of felony-murder. "An individual accused of the greater offense has a right to have the court charge on the lesser offenses included in the indictment, when there is a reasonable theory from the evidence supporting his position." *McMillian [v. State]*, 594 So. 2d [1253] at 1267 [(Ala. Cr. App. 1991)]. (Emphasis added.) As Judge Bowen stated in *White v. State*, 587 So. 2d 1218, 1231 (Ala. Cr. App. 1990), *aff'd*, 587 So. 2d 1236 (Ala. 1991), *cert. denied*, 502 U.S. 1076, 112 S. Ct. 979, 117 L. Ed. 2d 142 (1992):

" ' " 'The purpose of the felony-murder doctrine is to hold felons accountable for unintended deaths caused by their dangerous conduct.' W. LaFave and A. Scott, 2 Substantive Criminal Law § 7.5 at 210 (1986)."

" '(citations omitted). There was no evidence to support an instruction on felony-murder. In the instant case the evidence revealed that the victim died as a result of manual strangulation. "There is no rational basis for a verdict convicting him of felony-murder." *White*, 587 So. 2d at 1231; § 13A-1-9(b), Code of Alabama 1975.'

"Also, we stated in *Dobyne v. State*, 672 So. 2d 1319, 1345 (Ala. Cr. App. 1994), *on remand*, 672 So. 2d 1353 (Ala. Cr. App. 1994), *aff'd*, 672 So. 2d 1354 (Ala. 1995), *cert. denied,* 517 U.S. 1169, 116 S. Ct. 1571, 134 L. Ed. 2d 670 (1996):

" 'Lesser included offense instructions should be given when there is a "reasonable theory from the evidence" supporting such an instruction. *Jenkins [v. State*, 627 So. 2d 1034 (Ala. Cr. App. 1992), *aff'd*, 627 So. 2d 1054 (Ala. 1993)]. Here, there was no reasonable theory to support a charge on felony-murder. " 'The purpose of the felony-murder doctrine is to hold felons accountable for unintended deaths caused by their dangerous conduct.' " *White v. State*, 587 So. 2d 1218, 1231 (Ala. Cr. App. 1990), *aff'd*, 587 So. 2d 1236 (Ala. 1991), *cert. denied*, 502 U.S. 1076, 112 S. Ct. 979, 117 L. Ed. 2d 142 (1992). Here, the evidence did not show that the shootings were unintended. The court did not err in not instructing the jury on the lesser included offense of felony-murder.' "

*Hall v. State*, 820 So. 2d 113, 138-39 (Ala. Crim. App. 1999), *aff'd*, 820 So. 2d 152 (Ala. 2001).

A gunshot from close range to the temple of a prone victim cannot support Hamm's allegation that the homicide was unintentional. Therefore, Hamm was not entitled to a felony-murder instruction, and trial counsel did not render deficient performance when they failed to request that instruction.

Second, the jury that heard Hamm's case was instructed on voluntary intoxication and on the lesser-included offense of manslaughter. The jury rejected that lesser offense and convicted Hamm of the greater offense of capital murder. Any speculation that the jury might have found Hamm guilty of felony-murder is eliminated by the fact that it found him guilty of capital murder. E.g., *Buskey v. State*, 650 So. 2d 605, 612 (Ala. Crim. App. 1994). Even if a jury instruction on felony-murder should have been given, Hamm could not establish that he was prejudiced by his attorneys' failure to request that instruction, because his jury rejected the option of finding Hamm guilty of manslaughter.

Hamm was not entitled to a jury instruction on felony-murder, and his trial counsel were not ineffective for failing to request that instruction. Hamm is not entitled to relief on this claim.

*Hamm v. State*,  913 So. 2d at 482-84.

Hamm has not shown clear and convincing evidence to overcome the presumption of correctness owed to these factual findings made by the Alabama Court of Criminal Appeals as part of its IAC determination on collateral appeal. Nor has he done so regarding the appellate court's

factual findings concerning the evidence of Hamm's guilt at trial on direct appeal. *See* Section I, *supra,* (citing *Hamm v. State*,  564 So. 2d at 455-57).

The one factual finding with which he does attempt to take issue is the Rule 32 court's reliance on co-counsel Williams' post-conviction testimony that, in her opinion, the execution style of the killing did not support a charge of felony-murder.  (Doc. no. 20, p. 15).  Hamm insists that Williams' testimony was simply *post-hoc* rationalization because the trial record shows that co-counsel Hugh Harris thought that the trial court was going to give a felony-murder instruction when he told the jury during closing argument,  "'I submit to you that I feel that the Judge will charge you not only of capital murder, but also murder and manslaughter.'"  *Id.* (citing R. Vol. 6, Tab. 12, p. 1131).  This excerpt does not indicate Harris believed the court would instruct on felony-murder.  Rather, it reflects that counsel felt the judge would charge on "murder" as a lesser-included-offense of capital murder, which the trial court did.[48]   Hamm presents no other trial evidence— whether that evidence is witness testimony, physical evidence, questions asked by defense counsel or guilt phase arguments—to suggest that the defense harbored a defense theory based on felony-murder at the close of the evidence at the guilt phase of trial.  The factual findings made by the state appellate court are entitled to the presumption of correctness due in habeas review.

Hamm does allege that the Alabama Court of Criminal Appeals, in reviewing whether Hamm was entitled to the lesser-included offense ("LIO") instruction, applied a legal "standard that looked at the evidence from the prosecutor's perspective," when the correct constitutional standard demanded that the evidence be "viewed as a whole."  (Doc. no. 20, p. 100).  In short, Hamm argues that Alabama's LIO standard (that there be a *reasonable* or *rational* theory from the evidence to

---

[48] The trial judge's murder instruction is located in the trial record at Vol. 6, Tab. 14, pp. 1179-80.

support the instruction) is too narrow because the holding in *Beck*, as interpreted in *Daniel v. Thigpen*, 742 F. Supp. 1535, requires a LIO instruction "on every lesser included offense that has any evidentiary basis." (Doc. no. 20 at p. 100) (emphasis omitted).

This court already has rejected, as an alternate ruling, the substantive *Beck* claim. (*See* Claim VI.A. *supra*). Neither *Beck* nor its progeny require that a trial court give an instruction on every lesser-included offense that has *any* evidentiary basis. Further, Hamm has offered no Supreme Court case that has even considered, much less made a holding as to, the constitutionality of Alabama's "reasonable theory from the evidence" standard. Thus, the Alabama Court of Criminal Appeals' assertion that Hamm was not entitled to the felony-murder instruction under that standard—as a precursor to its finding that counsel was not deficient for failing to request such an instruction—is neither contrary to nor an unreasonable application of clearly established federal law.

The state court's determination that Hamm never could establish he was prejudiced for lack of a felony-murder instruction is also not an unreasonable application of *Strickland*. The jury found Hamm guilty of capital murder, and the testimonial and physical evidence against him were overwhelming. Hamm did not receive a manslaughter conviction, which would have required the jury to find that he was so intoxicated that he could not form the requisite intent to kill. Because Hamm's reason for arguing entitlement to the felony-murder instruction on collateral appeal also exclusively hinged on the negating effect of voluntary intoxication—which the jury conclusively rejected—no reasonable probability exists that the outcome of Hamm's trial would have been changed even if counsel had requested a felony-murder instruction.[49]

---

[49] Even if the trigger-man aspect of this claim were not procedurally defaulted, the court also finds that Hamm would not be entitled to habeas relief even if he had argued an IAC claim during state court collateral proceedings, with the underlying allegations resting on the theory that he was intoxicated and Roden was the triggerman. Again, *Beck* does not establish a constitutional entitlement to the instruction. Further, as explained above, a LIO instruction in Alabama only is

The  findings by the state courts that counsel were not ineffective in failing to request a jury instruction on felony-murder were not contrary to, nor did they involve an unreasonable application of *Strickland*.  The state court decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Hamm is not entitled to habeas relief on this claim of ineffective assistance of counsel.  Therefore, the court will deny it.

> **6.** *Counsel failed to object to the trial court's jury instruction on accomplice liability and failed to raise the issue on appeal*.  (Doc. no. 1, ¶ 88, p. 27) (Doc. no. 20, pp. 120, 123).

In this one-sentence claim, Hamm alleges that his "[c]ounsel failed to object at trial to the court's jury instruction on accomplice liability and failed to raise the issue on appeal, resulting  in [Hamm's] improper conviction." (Doc. no. 1, p. 27) (brackets added).  The only support he offers is that counsel did not object at trial to the instruction on accomplice liability and failed to raise the

---

given when a reasonable theory from the evidence supports it.  Even if counsel had considered a theory of Roden as the triggerman when he cross-examined both Rodens about their plea agreement and previous lies, and cross-examined Ms. Flanagan about inaccuracies in her identification of the triggerman, once Hamm's confession came into evidence, such a theory no longer appeared reasonable.  The other forensic evidence, including Hamm's fingerprints on the murder weapon and the fact that Cunningham was laying prostrate on the floor when he was shot at point blank range also squarely place intent, action and guilt at Hamm's feet.  When all of this corroborative evidence is viewed together, an almost indisputable conclusion arises that Hamm was in fact the triggerman.

Hamm does not point to *any* evidence at trial that would have supported a *reasonable* theory that Roden—not Hamm—was the shooter.  Counsel's strategic decision to utilize Hamm's intoxication to attempt to achieve a manslaughter conviction was not unreasonable in light of the evidence presented at trial.  As counsel himself testified at the post-conviction proceeding, "Our strategy at guilt phase was to do everything we could to keep the confession out.  And at sitting here today I can still feel the chill bumps we had when that confession was played to that jury and we saw the jury's face when they heard that confession.  We had a doggone good shot at getting an acquittal without that confession." (Rule 32 R. Vol. 21, Tab. 41, p. 36).  Counsel could not have been objectively deficient for choosing to request a manslaughter instruction that could have been supported by the evidence instead of asking for a felony-murder instruction that was not supported by the evidence.  The jury's verdict shows that Hamm was not prejudiced by counsel's decision.

issue on appeal.  This claim is identical to the claim as set out in his collateral appeal brief,[50] and it reads:

> Trial counsel also unreasonably failed to object to the instruction on accomplice liability, which was incorrect as a matter of state law.  In the context of capital murder, a non-triggerman accomplice is only 'as guilty as the party who commits the crime' if, and only if, he has a particularized intent to kill the victim.  The same instruction on accomplice liability that was given in Mr. Hamm's case was held error to reversal in *Tomlin v. State*, So. 2d _ [sic], CR-89616, Slip Op. At 13-14 (Ala. Cr. App. July 26, 1991).[51]

(Doc. no. 20, p. 123) (brackets added).  Thus, as in the immediately preceding section, *supra*, Hamm presents the issue as if evidence supported a reasonable theory that Hamm was the non-triggerman. Again, the state court's determination that counsel had no reasonable basis to object to the instruction surpasses 2254(d) review.

On collateral appeal, the Alabama Court of Criminal Appeals affirmed the Rule 32 court's rejection of this claim, and held:

> We agree with the court below that the jury charge adequately addressed the principles of accomplice liability and the specific intent to kill. (T. 1170-71, 1175-80.)   There being no reason for trial counsel to object to the charge, their failure to object was not deficient performance.   The trial court correctly denied Hamm relief on this claim.

*Hamm v. State*, 913 So. 2d at 484.

When the Rule 32 court's opinion is examined, the pertinent portions of it read:

> Hamm contends that his attorneys should have objected to the  instruction on accomplice liability because there was some evidence that Hamm was the non-triggerman accomplice because Teresa Flanagan could not positively identify Hamm as the triggerman.  Hamm also asserts that the jury instruction on accomplice liability was improper because the court instructed the jury that a non-triggerman

---

[50]  *See* Rule 32 C.R. Vol. 29, Tab. 45, p. 91.

[51]  This is properly cited in the opinion of the Alabama Court of Criminal Appeals as *Tomlin v. State*, 591 So. 2d 550 (Ala. Crim. App. 1991).

accomplice is just as guilty as the triggerman regardless of whether he had a particularized intent to kill the victim.

In this case, contrary to Hamm's assertion, there was no evidence before the jury that Hamm was not the triggerman. The fact that Teresa Flanagan could not identify Hamm as the second person going into the motel does not prove that Hamm might not have been the triggerman. It simply means that Flanagan could not positively identify who the triggerman was. In fact, the evidence in this case was overwhelming that Hamm was the triggerman. Flanagan testified that the second person in the motel that night was wearing a green army fatigue jacket. (Trial transcript, pp. 303, 309, 310-312, 315) Regina Roden and Douglas Roden both testified that Hamm was wearing the army fatigue jacket when this murder occurred. (Trial transcript, pp. 830, 882-884) Regina Roden and Douglas Roden both testified that Hamm was the person responsible for murdering Patrick Cunningham at the Anderson Motel. (Trial transcript, pp. 829-831, 833, 885-894) In addition, Hamm confessed to this crime. (Trial transcript, pp. 1382-1400) Hamm admitted that he went into a motel in Cullman, pulled a gun on the clerk, the clerk laid down on the ground, he took the money and then shot the victim in the head. (Trial transcript, pp. 1383-1385) Hamm also admitted taking money from the cash register and the clerk. (R. 1383-1385) Thus, contrary to Hamm's assertion, it is clear that Hamm was the triggerman in this case and not an accomplice.

Further, a review of the court's instruction shows that it is a correct instruction on accomplice liability. The court instructed the jury that, if a person aids and abets another in the commission of a crime, that person is as guilty as the party who commits the crime if the assistance was "done knowingly by the parties and done intentionally." (Trial transcript, p. 1170). The trial court also properly charged the jury that, in order for the offense to be capital, the murder had to be an intentional murder. (Trial transcript, pp. 1175-1179) Thus, the court did instruct the jury that a non-triggerman must have a particularized intent. It is also interesting to examine the charge on accomplice liability in the context in which it was given. As set forth above, the trial court first instructed the jury on how it should weigh the testimony of persons who testified after promise of immunity or reward for their testimony. (Trial transcript, pp. 1169-1170) The court then instructed the jurors on accomplice liability and specifically charged the jury that Regina Roden and Doug Roden were accomplices in this case. The jury could have inferred from this jury instruction that the testimony of Regina Roden and Doug Roden was entitled to little, if any, weight. Thus, this jury instruction on accomplice liability was favorable to Hamm.

It is clear from what is set forth above that Hamm's attorneys were not ineffective for failing to object or raise on appeal any issue concerning the accomplice liability jury instruction. There was no evidence in this case that Hamm was an accomplice. Further, the instruction was favorable to Hamm. There was no deficient performance and there is not a reasonable probability that, had there been an objection to this instruction or had this been raised as an issue on appeal, the

outcome of the proceedings would have been different.  This allegation of ineffective assistance is therefore without merit.

(Rule 32 C.R. Vol. 33, Tab. 58, pp. 52-55).

In support of this claim, Hamm does make a conclusory assertion that the accomplice liability instruction in his case was exactly like an instruction found to be erroneous in *Tomlin v. State*, 591 So. 2d 550 (Ala. Crim. App. 1991).  But an examination of that case shows nothing of the sort. Tomlin and his co-defendant, a purported hitman, were accused of capital murder, the capital nature of it being the double murder of Ricky Brune and Cheryl Moore.  *Id.* at 552-53.  No eyewitnesses testified to the murders as the victims were found dead in a car on the side of I-65, close to Mobile, Alabama, having been murdered with a shotgun and a .38 caliber gun.  The evidence showed that Tomlin had stated to witnesses, one of whom was an undercover narcotics officer, that he intended to kill Brune because Brune had murdered his brother,[52] that he and his co-defendant had shown .38 and .44 caliber guns to witnesses, and that Tomlin had been in the Mobile area around the time the murders occurred.  *Id.*

At the close of the guilt phase, the trial court in *Tomlin* gave a circuitous first degree murder instruction that described the offense as more than "simple murder," but never spoke to a particularized intent to kill as an element of the offense.  Nor did the court instruct the jury that it had to find that Tomlin intended to kill Brune *and intended to kill Moore* as a *prerequisite* to finding him guilty of double murder.  591 So. 2d at 557 ("Under the accomplice liability doctrine, a non-triggerman accomplice may be convicted of the capital offense of double murder only if he had the particularized intent that both victims be killed.") (other citations omitted).  During deliberations, the jury asked for clarification, but the trial court responded with the same faulty instructions.  Under

---

[52] Evidence showed that Brune had killed Tomlin's brother in an altercation.

these facts and the elements of the particular capital offense with which Tomlin was charged, the Alabama Court of Criminal Appeals found the trial judge's instructions constituted reversible error under Alabama law. *Id*.

The underlying facts, the elements of the capital offense, and the instruction given in Hamm's case do not resemble *Tomlin*. Hamm does not provide any other evidence, much less clear and convincing evidence, to show that the factual findings made by the state court in his case were unreasonable in light of the evidence before it. Those findings are entitled to the presumption of correctness due in habeas proceedings. It follows that the state court's legal conclusion – that his counsel were not ineffective in failing to object to and Hamm was not prejudiced by the accomplice liability instruction given in his case – is neither contrary to, nor an unreasonable application of clearly established federal law. Hamm is not entitled to habeas relief on this claim of ineffective assistance of counsel. The claim is due to be denied.

> **7.**   *Counsel failed to object to the prosecutor's failure to disclose aggravating circumstances.* (Doc. no. 1, ¶ 89, p. 27) (Doc. no. 20, pp. 73-74).

Hamm alleges the following in support of this habeas claim:

> Counsel failed to adequately object to the prosecutor's failure to disclose the aggravating circumstances that the state intended to prove at the sentencing hearing and failed to raise this issue on appeal, resulting in petitioner's denial of a fair and individualized sentencing procedure.

(Doc. no. 1, p. 27).

Respondent correctly argues (doc. no. 20, pp. 14-15) and Hamm does not dispute that he did not raise this claim *at all* on collateral appeal either at the trial or appellate level. Accordingly, the claim is procedurally defaulted because Hamm did not raise it on appeal from the denial of the Rule 32 petition. *See Collier v. Jones*, 910 F.2d 770, 773 (11th Cir. 1990) (stating claims that never were

raised in state court and are now barred by state procedural rules, are procedurally defaulted for purposes of federal review).

In his reply brief, Hamm offers this claim as cause to overcome the procedural default of the substantive claim (*see* Claim VI.D., *supra*) but makes no attempt to dispute the procedural default of the discrete ineffectiveness claim. (Doc. no. 20, pp. 73-74). Even if one were to hypothetically consider a *Martinez* exception as a possibility to overcome the procedural default of this claim, for the reasons set out in the discussion of Claim VI.D., *supra*, no cause and prejudice exists as to an ineffectiveness of post-conviction counsel because the underlying ineffective assistance of trial counsel would have no merit. This claim is procedurally defaulted, and the court will dismiss it.

> **8.** *Counsel failed to object to the introduction of evidence that Hamm was charged with armed robbery in Tennessee.* (Doc. no. 1, ¶ 90, p. 27) (Doc. no. 20, pp. 75-76; 96-98).

Hamm complains that counsel failed to "ensure" that his convictions for "simple" robbery were purged of the references to "armed" robbery before certified copies of these documents were admitted as evidence at the penalty phase of trial. (Doc. no. 1, p. 27; Doc. no. 20, pp. 96-98). He also alleges counsel failed to raise the issue on appeal. (Doc. no. 1, p. 27). In his reply brief, Hamm erroneously declares that the state appellate court found this claim to be abandoned for failure to cite legal authority. (Doc. no. 20, p. 98). Instead, the Alabama Court of Criminal Appeals affirmed the Rule 32 court's rejection of the claim on the merits, and held:

> In denying relief on this claim, the postconviction trial court found that trial counsel objected to the admission of the evidence, on grounds that it referred to a charge greater than that of which Hamm was convicted. (C. 56-57.) The court further noted that the [sic] neither the jury instructions nor the findings of fact at sentencing referred to "armed" robbery. (C. 58-59.) We agree with the circuit court's determination that Hamm failed to prove deficient performance, because counsel objected on the grounds Hamm now argues. (T. 1212-13.) We further agree with the court that Hamm failed to establish prejudice, because only the convictions of "simple" robbery were introduced at trial (T. 1213-14) and considered by the trial court at sentencing (T. 1371). Hamm is not entitled to relief on this claim.

*Hamm v. State*, 913 So. 2d at 488.

Hamm does not dispute the appellate court's findings concerning the historic facts that occurred at the sentencing hearing.  The record of the sentencing shows that counsel objected to and argued that the jury should not be permitted to see copies of the armed robbery indictments attached to the simple robbery convictions.  (R. Vol. 7, Tab. 19, pp. 1212-14).  The trial court sustained his objection and the indictments were removed.  However, when the prosecutor moved to admit the convictions, counsel objected on the "same grounds," but this time the trial court overruled his objection.  *Id.*  (*See also* R. Vol. 8, pp. 1562-63).

After all of the evidence was presented at the penalty phase of trial, the parties completed closing arguments and the trial court administered instructions to the jury.  Neither the prosecution nor the trial court mentioned, much less belabored , the fact that Hamm had been *charged* with *armed* robbery.  Instead, the prosecutor's emphasis on the Tennessee matters was that the robbery convictions established the aggravating factor "that this defendant has been previously convicted of two felonies involving a threat o[f] violence to another person."  (R. Vol. 7, Tab. 21, pp. 1246-47).  (*See also*, the State's rebuttal *id.,* Tab. 23, pp.1272-75).  Further, the trial judge instructed the jury during the sentencing phase that

> The aggravating circumstances which you may consider in this case, if you find from the evidence that they may have been proved beyond a reasonable doubt are as follows: the defendant was previously convicted of a felony involving the use or threat of violence to the person.
>
> Now, ladies and gentlemen, there are two prior convictions offered into evidence by the State in this case.  I charge you that each of those convictions were convictions for felonies involving the use or threat of violence to the person.  But I want you to understand fully and completely that the question of whether the defendant had been previously convicted of those crimes is a question of fact for you to determine.  You must be convinced beyond a reasonable doubt that the defendant was convicted previously of one or more of these offenses.

The other aggravating circumstance that I will charge you on, ladies and gentlemen, is that the capital offense, that is the capital offense for which the defendant was charged in the indictment and for which you have determined that he was guilty of, that said offense was committed while the defendant was engaged in a robbery.

*Id.* at Tab. 24, pp. 1291-92.

The jury returned with a sentencing recommendation that Hamm be punished by death by a vote of eleven for death and one for life without parole. *Id.* at Tab. 25, p. 1308. The jury did not specify which aggravating circumstance or circumstances it found, but Alabama law does not require such specification; and in any event, by virtue of the capital murder conviction, the jury necessarily found that a capital offense was committed while the defendant was engaged in the commission of robbery, first degree. Finally, in its sentencing order, the trial court found two aggravating circumstances: that the capital offense was committed during the course of robbery in the first degree, and that Hamm had been previously convicted of two felonies involving violence to a person, which the court identified as *simple* robbery. *Id.* at Vol. 7, p. 1371.

Hamm takes issue with the state court's factual finding that his defense counsel were aware of and did object to the charges as set out in the certified copies of the convictions. He begins by alleging that competent counsel would have been aware the convictions contained references to the armed robbery charges, and made sure those references were removed from the convictions. *Id.* at 95-96 (citing *Rompilla v. Beard*, 545 U.S. at 386-87 for the proposition that it is counsel's duty to closely investigate the prosecutor's evidence to ensure reliability). Hamm contends that Harris was not aware of the charges in the convictions. As proof of this lack of diligence, Hamm declares that during the July 26, 1999 evidentiary hearing, Hugh Harris testified that he "thought that the word[s] 'armed robbery' had been expunged from the documents." (Doc. no. 20, p. 75). This suggestion does not mesh with Harris's testimony at the hearing.

At the evidentiary hearing, Harris testified that he thought that he had objected to the introduction of armed robbery evidence, and that the actual convictions "showed a simple robbery." (Rule 32 R. Vol. 21, Tab. 42, pp. 42-43).  Harris was then asked, "Rather than the armed robbery?," to which Harris responded, "Yes."  *Id.* at p. 43.  The logical inference from Harris's testimony is that the Tennessee cases showed Hamm had been *convicted* of simple robbery, rather than the greater offense of armed robbery.  Harris was not asked specifically if he was aware the convictions contained a reference to the fact that Hamm had been charged with armed robbery.  Morever, Harris was not exactly sure what had happened at trial and agreed that the September 28, 1987, trial record would reflect what he had done.  *Id.*  The trial record does reflect that Harris made the objections, but he was overruled.  What occurred at trial controls, not Harris's memory of the events 12 years after the fact.  Hamm has not provided clear and convincing evidence to overcome the state court's factual findings regarding this matter.

Hamm also suggests he is due habeas relief from the State court's rejection of the IAC claim on the possibility that the certified convictions, which list a greater charged offense, render the convictions invalid for consideration as an aggravating factor.  (Doc. no. 20 at 75) (quoting *Brown v. Sanders*, 546 U.S. 212, 220-21, 126 S. Ct. 884 (2006) ("If the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it, due process would mandate reversal."); *Stringer v. Black*, 503 U.S. 222, 232, 112 S. Ct. 1130 (1992) ("when the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale.")).  However, this argument is unavailing because in those cases, the Supreme Court's holdings did not pertain to the possibility Hamm suggests.  Instead, the Court was examining how

to independently re-weigh the balance of aggravating and mitigating factors when another court already has found invalid a statutory aggravating factor that the jury and trial court had considered.

Hamm does not allege that the certified copies of his Tennessee convictions are invalid to the extent those copies truthfully reflect he was convicted of simple robbery. None of the Supreme Court cases cited by Hamm hold that convictions offered to support an aggravating factor transform into an invalid aggravator because the conviction contains a reference to a greater charged offense. The simple robbery convictions are accurate—Hamm indeed was convicted of those offenses. Therefore, the convictions present valid evidence of the aggravator that concerns prior felony convictions for threats of violence. Certainly, the jury saw the armed robbery charges, but no representation by argument, instruction, or exhibit ever stated or insinuated that Hamm was convicted of armed robbery and the charges were not highlighted by the prosecution or the court. Finally, the trial judge did not consider the armed robbery *charge* as an aggravating circumstance. To the contrary, as noted above, he referred to the convictions as simple robbery.

For all of the foregoing reasons, Hamm cannot establish that the state court's determinations that neither trial nor appellate counsel were objectively deficient and that Hamm was not prejudiced in connection with the allegations underlying this claim are contrary to or an unreasonable application of the *Strickland* standard. Nor are the state court's factual findings unreasonable based on the evidence before it. Hamm is not entitled to habeas relief on this claim of ineffective assistance of counsel, and the court will deny this claim.

> **9.** *Counsel failed to adequately investigate and challenge Hamm's prior convictions in Tennessee.* (Doc. no. 1, ¶ 91, p. 27).

This one sentence claim represents the claim as represented in the habeas petition. (Doc. no. 1, p. 27). It is also virtually identical to the first sentence of habeas claim VI.F.3, which already has

been addressed, *supra*.  Because Claim VI.F.3 has been fully addressed, the court need not discuss

the issue further.

> **10.** *Counsel failed to adequately object to the court's instructions at the penalty phase and failed to raise the issues concerning penalty phase instructions on appeal.*  (Doc. no. 1,  ¶ 92, p. 27) (Doc. no. 20, pp. 113-14).

The title sentence above is the claim as pled in the habeas petition.  (Doc. no. 1, p. 27).

Hamm identifies three penalty phase instructions as being problematic in his reply (doc. no. 20, pp.

113-14), but because the Alabama Court of Criminal Appeals described each of the instructions

when it affirmed the Rule 32 court's rejection of the IAC claim connected to the instructions on

collateral appeal, this court initially will defer to the appellate court's delineation of the claim in its

opinion.  A portion of that opinion reads:

> Hamm now argues that trial counsel should have objected to the following: the trial court's explanation of mitigating circumstances; the court's failure to instruct the jury that it could recommend a sentence of life imprisonment without the possibility of parole even if it found one or more aggravating circumstances to exist; and the court's instruction that permitted the jury to count the underlying robbery as an element of the crime and an aggravating circumstance.
>
> The circuit court noted that the court's jury charge on mitigating circumstances and on the option of a life-imprisonment-without-parole sentence substantially followed the pattern jury instructions adopted by the Alabama Supreme Court, and determined that counsel's failure to object to these instructions did not constitute deficient performance.  (C. 62-63.)  We agree.  The Alabama Supreme Court has stated that the preferred practice in capital trials is to follow the pattern jury instructions.  *Ex parte Hagood*, 777 So. 2d 214, 219 (Ala. 1999).  Alabama courts have often held that a trial court's use of Alabama's pattern jury instructions weighs heavily against a finding of plain error.  *E.g., Price v. State*, 725 So. 2d 1003, 1058 (Ala. Crim. App. 1997), *aff'd*, 725 So. 2d 1063 (Ala. 1998), *cert. denied*, 526 U.S. 1133, 119 S. Ct. 1809, 143 L. Ed. 2d 1012 (1999).
>
> The record reveals that the trial court's instructions substantially followed the pattern instructions and accurately stated the law.  Counsel were not deficient for failing to object to the instructions.  *Johnson v. State*, 612 So. 2d 1288, 1297 (Ala. Crim. App. 1992), *cert. denied*, 612 So. 2d 1288 (Ala. 1993).
>
> The circuit court correctly noted that Alabama appellate courts have repeatedly rejected claims regarding the alleged impropriety in "double counting"

126

robbery as an element of the crime and as an aggravating circumstance. (C. 64.) See *Stallworth v. State*, 868 So. 2d 1128, 1170 (Ala. Crim. App. 2001). Trial counsel were not deficient for failing to make an objection that had no legal basis.

The trial court correctly determined that counsel's performance was not deficient for failing to make the foregoing objections. Because Hamm failed to prove the deficiency component of the ineffective-assistance-of-counsel test, he is not entitled to relief on the claim.

*Hamm v. State*, 913 So. 2d at 489.

> **a.**   *Failure to object to the trial court's explanation of mitigating circumstances*

In his reply brief, Hamm declares counsel "failed to object to ... improper penalty phase instructions." (Doc. no. 20, p. 113). He claims that "[t]he court's oral charge ... failed to adequately explain the meaning and function of mitigating circumstances," and he finds fault with two aspects of the court's instruction. First, he alleges that the trial judge "circuit[ously] defined mitigating circumstances as 'any circumstances that indicate or tends to indicate that the defendant should be sentenced to life without parole instead of death.'" *Id.* Although he quotes the trial record for this purported statement, he gives no record citation. He also asserts that the trial judge "failed to list or explain the applicable non-statutory circumstances." *Id.*

In fact, the trial record shows that after reading and explaining Alabama's statutory mitigating factors to the jury, Hamm's trial judge then instructed:

> A mitigating circumstance does not have to be included in the list that I have read to you in order for it to be considered by you. In addition to the mitigating circumstance as previously specified, mitigating circumstances shall include any aspect of a defendant's character, his life or record or any of the circumstances of the capital offense that tend to indicate that the defendant should not be sentenced to death. That is that the punishment should be imprisonment for life without parole instead of death.

> A mitigating circumstance considered by you should be based on the evidence that you have heard either in the guilt stage or this sentencing stage.

(R. Vol. 7, Tab. 24, p. 1298).

Premised on the above instruction, the state appellate court on collateral review examined and rejected Hamm's ineffectiveness claim. Hamm does not mention the legal and factual findings made by the Alabama Court of Criminal Appeals on collateral review, much less argue, that no reasonable jurist would have rejected the claim for the reasons expressed by that court.

Hamm's silence means that he does not dispute that the instructions substantially complied with Alabama law (*i.e.* the pattern jury instructions approved by the State of Alabama) and does not contend the pattern jury instructions are *per se* constitutionally suspect. Importantly, in language similar to the jury charge at issue, the United States Supreme Court has itself described the type of mitigating circumstances at issue as "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954 (1978). Thus, contrary to Hamm's assertion, the trial judge's instruction was explicit and direct—not circuitous—in its adherence to the *Lockett* definition.

Moreover, had the trial judge "listed[53]" the non-statutory mitigating circumstances the jury could consider—as Hamm protests he should have done—the instruction would have been improper because it would have limited the non-statutory mitigating circumstances to a "list" when the standard is "any." As it stands, the court properly gave the jury no limitation as to what it could consider to be non-statutory mitigating factors from the penalty phase evidence presented to it.

For the foregoing reasons, the state court's rejection of the IAC claim is neither contrary to nor an unreasonable application of *Strickland*, nor is it based on an unreasonable determination of the facts in light of the evidence before it. The court finds this claim should be denied.

---

[53] Hamm does not identify what the contents of such a list should be.

**b**.    *Failure to object to the court's failure to instruct the jury that it could recommend a sentence of life imprisonment without the possibility of parole even if it found one or more aggravating circumstances to exist*

Hamm alleges that counsel were ineffective because they failed to "object and make sure" that the trial judge instructed the "jury that it had the option of sentencing [him] to life imprisonment even if it found one or more aggravating circumstances and no mitigating circumstances." (Doc. no. 20, pp. 113-14). He argues that "[l]imiting the jury's option to sentence [him] to life without parole ... established a legal presumption in favor of the death penalty that violated [his] constitutional rights to due process and individualized sentencing." *Id.* (citing *Moore v. Kemp*, 809 F. 2d 702 (11th Cir. 1987)).

For many of the same reasons underlying the previous sub-claim, Hamm cannot establish that he is entitled to habeas relief from the state court's rejection of this ineffectiveness sub-claim. First, Hamm's reliance on *Moore v. Kemp*, 809 F.2d 702 (11th Cir. 1987) to support his position is misplaced because the problems with the instructions in *Moore* are very different from Hamm's alleged instructional difficulty. In *Moor*e, a Georgia capital case, the petitioner alleged the penalty phase instructions at his trial "did not clearly and explicitly inform [the jury] of its option to impose a life sentence even if it found the existence of a statutory aggravating circumstance." *Id.* at 730. But what Hamm proposes is that the jury should have been instructed "that it had the option of sentencing [him] to life imprisonment even if it found one or more aggravating circumstances *and no mitigating circumstances*." (Doc. no. 20, pp. 113-14). That question was not presented in *Moore* as demonstrated by the following discussion, nor has Hamm shown by clear and convincing evidence that his proposition is an accurate reflection of Alabama law.

In the sentencing instructions, Moore's trial judge explained that, if the jury did not find the existence of an aggravating circumstance, the jury was not authorized to consider the death penalty

and the defendant should be sentenced to life without parole. *Moore*, 809 F.2d at 732. The court also instructed the jury that if it found the existence of an aggravating circumstance, it was authorized to consider the death penalty. The court then informed the jury that in arriving at the appropriate sentence it could consider evidence of aggravating circumstances (which "increase ... the enormity of the offense," and mitigating circumstances, which extenuate or reduce "the degree of moral culpability," but gave the jury no direction on the relationship between the two. Finally, and most egregiously, the court twice for the two counts instructed the jurors that if they found the existence of an aggravating circumstance, they would have to use the verdict forms that sentenced Moore to death. In between the first and second time the instructions were given, the court stated, "If, on the other hand, upon considering this case and all of the facts and circumstances, you impose a life sentence, the form of your verdict would be, on Count I, 'We, the Jury, fix punishment of the defendant Carzell Moore, on Count I, at life imprisonment.'" *Id.*

In response to the foregoing scenario, the Eleventh Circuit determined that the question before it was "whether the trial judge's charge, taken as a whole, *see Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S. Ct. 396, 400, 38 L. Ed. 2d 368 (1973), adequately informed the jury that it had the option to recommend against death, notwithstanding the presence of a statutory aggravating circumstance." *Moore*, 809 F.2d at 732 (additional citations omitted). The Court found that the "instruction, taken as a whole, at best was contradictory and confusing as to the jury's function if it determined that an aggravating circumstance was present." Therefore, the Court reversed Moore's death sentence because "the instruction failed to provide clearly and explicitly the constitutionally required guidance." *Id.*

The critical differences between the instructions given in Hamm's case are demonstrated by the following excerpt of the sentencing instruction:

Now, I want you to understand that, because I am giving instructions to you does not mean that you are to assume as true any question of fact referred to in these instructions. Instead it is left for you to determine what the facts are and what the recommended sentence should be. The law of this State provides that the punishment for the capital offense for which you have convicted this defendant is either death by electrocution or life imprisonment without eligibility for parole. The law also provides that which of those two punishments should be imposed upon the defendant depends upon whether any aggravating circumstances exist and if so whether the aggravating circumstances outweigh any mitigating circumstances that might exist.

An aggravating circumstance is a circumstance best provided by law which indicates or tends to indicate that the defendant should be sentenced to death.

A mitigating circumstance is any circumstances [sic] that indicate or tends to indicate that the defendant should be sentenced to life imprisonment without parole instead of death.

The issue at this sentence hearing concerns circumstances of aggravation and circumstances of mitigation that you should consider and weigh against each other in deciding what the proper punishment is in this case.

In making your verdict, concerning what the punishment should be, you must determine whether any aggravating circumstance exists, and if so, you must determine whether any mitigating circumstances exist. In making your determination, concerning the existence of aggravating and mitigating circumstances you should consider the evidence presented at this sentence hearing. You should also consider any evidence that was presented during the guilt phase of this trial that is relevant to the existence of any aggravating or mitigating circumstances.

The law of this State provides that a list of aggravating circumstances which may be considered by the jury in determining punishment if the jury is convinced beyond a reasonable doubt from the evidence that one or any of such aggravating circumstances exist in the case.

. . . .

If you should find that no aggravating circumstance has been proved beyond a reasonable doubt to exist in this case, then you must return a verdict recommending that the defendant's punishment be life imprisonment without parole.

In that event you need not concern yourself with the mitigating circumstances in this case.

131

If you find beyond a reasonable doubt that one or more of the aggravating circumstances on which I instructed you does exist in this case, then you must proceed to consider and determine the existence of mitigating circumstances.

The law of this State provides a list of some of the mitigating circumstances which you may consider, but that list is not a complete list of the mitigating circumstances you may consider.

I will now read to you a list of some of the mitigating circumstances that you may consider. The defendant has no significant history of prior criminal activity. The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance. The victim was a participant in the defendant's conduct or consented to the act. The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor. The defendant acted under extreme duress or under the substantial domination of another person. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

A person's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law is not the same as his ability to know right from wrong generally, or to know what he is doing at a given time or to know what he is doing is wrong.

A person may indeed know that doing the act that constitutes a capital offense is wrong and still not appreciate its wrongfulness, because he does not fully comprehend or is not fully sensible to what he is doing or how wrong it is.

Further, for this mitigating circumstance to exist the defendant's capacity to appreciate does not have to have been totally obliterated. It is enough that it was substantially lessened or substantially diminished. Finally, this mitigating circumstance would exist even if the defendant did appreciate the criminality of his conduct, if his capacity to conform to the law was substantially impaired since a person may appreciate that his actions are wrong and still lack the capacity to refrain from doing them.

You may consider as a mitigating circumstance the age of the defendant at the time of the crime.

A mitigating circumstances does not have to be included in the list that I have read to you in order for it to be considered by you. In addition to the mitigating circumstance as previously specified, mitigating circumstances shall include any aspect of a defendant's character, his life or record or any of the circumstances of the capital offense that tend to indicate that the defendant should not be sentenced to death. That is that the punishment should be imprisonment for life without parole instead of death.

132

A mitigating circumstance considered by you should be based on the evidence that you have heard either in the guilt stage or this sentencing stage.

. . . .

It is your responsibility to determine the facts and the punishment. . . . .

The process of weighing aggravating and mitigating circumstances is not a mechanical process. Your weighing of the circumstances against each other should not consist of merely adding up the numbers of aggravating circumstances and comparing it to the total number of mitigating circumstances. The law recognizes that it is possible in some situations that one or a few aggravating circumstances might outweigh a larger number of mitigating circumstances. The law also recognizes that in at least some situations that a large number of aggravating circumstances might be outweighed by one or a few mitigating circumstances.

In other words, the law contemplates that different circumstances may be given different weights or values in determining the sentence in a case. And you, the jury, are to decide what weight or value is to be given to a particular circumstance in determining the sentence in light of all of the other circumstances in this case.

You must do that in the process of weighing the aggravating circumstances and mitigating circumstances.

In regard to weighing the aggravating circumstances and mitigating circumstances, if you determine beyond a reasonable doubt that one or more aggravating circumstances exists as defined to you, and that there are mitigating circumstances as defined to you, and if you further determine that the aggravating circumstances do not outweigh the mitigating circumstances, you should return a verdict recommending that the penalty be life without parole.

If you are convinced beyond a reasonable doubt that one or more of the aggravating circumstances exists as defined to you and if you determine that they outweigh the mitigating circumstances, if any, as defined to, you should return a verdict recommending that the penalty be death.

(R. Vol. 7, Tab. 24, pp. 1289-90, 1296-98; 1300-02) (redaction supplied).

This court has detailed the trial judge's instructions at length to highlight the differences between the instructions given in Hamm's case and the inadequacies of the instructions in the *Moore* case. Hamm's jurors were told Hamm was eligible for the death penalty only if they found the existence of an aggravating circumstance. The jury was further told that in the event aggravating

133

circumstances were found they must weigh those circumstances against the mitigating circumstances, and that the weight to be attached to each circumstance was entirely within their discretion. The jury was never told that they must sentence Hamm to death simply because they found an aggravating circumstance. In short, the trial judge's detailed instructions to the jury bear no resemblance to the problematic instructions given in *Moore*. Hamm does not dispute that the trial judge instructions substantially complied with Alabama law, and has made no effort by clear and convincing evidence to show that the trial court was required by Alabama law to give the instruction he claims counsel should have insisted upon.

For the foregoing reasons, Hamm has failed to establish he is entitled to habeas relief from the state court's rejection of this ineffectiveness claim under *Strickland* standards. The claim is due to be denied.

> **c.**   *Failure to object to the trial court's instruction that permitted the jury to count the underlying robbery as an element of the crime and an aggravating circumstance*

Hamm cannot show the state court's rejection of this claim is contrary to or an unreasonable application of *Strickland v. Washington*. The Supreme Court long has held that an aggravating circumstance may duplicate an element of the capital offense if the class of death-eligible defendants is sufficiently narrowed by the definition of the offense itself, as it is in Alabama. *See Lowenfield v. Phelps*, 484 U.S. 231, 244-46 (1988). Hamm's counsel had no constitutional ground upon which to voice an objection to the instruction, and thus it follows that he cannot show the state court's rejection of an IAC claim based on such a failure to object offends 28 U.S.C. § 2254(d).

The findings by the state courts that counsel were not ineffective in failing to object to the penalty phase jury instructions were not contrary to, nor did they involve an unreasonable application of clearly-established federal law. The decisions also were not based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding.  Hamm is not entitled to habeas relief on this claim of ineffective assistance of counsel, and the court will deny this claim.

> **11.** *Counsel failed to object to the improper prosecutorial comments and to raise this issue on appeal, resulting in the denial of petitioner's right to a fair trial.* (Doc. no. 1, ¶ 93, p. 27)  (Doc. no.  20, pp. 109-112).

The above claim represents Hamm's entire claim in the habeas petition concerning counsel's failure to object to improper comments by the prosecutor.  (Doc. no. 1, p. 27).  Although Hamm's petition designates no phase of the trial in which the alleged improper comments occurred, in his reply brief, he places this claim under the heading, "Other Penalty Phase Ineffective Assistance of Counsel." (Doc. no. 20, pp. 109, 110-12).  Additionally, the allegations underlying the claim, which appear only in Hamm's reply brief, are virtually identical to its predecessor in Hamm's brief on collateral appeal.  (Compare *Id.* at 110-12 and Rule 32 C.R. Vol. 29, Tab. 45, pp. 78-81).  In his brief on collateral appeal, Hamm also placed his allegations under the headings of ineffective assistance at the penalty phase of trial.  (Rule 32 C.R. Vol. 29, Tab. 45, pp. 70, 78).  He further represented that his citations to portions of the trial record were concentrated at the penalty phase of trial.  *Id.* at 78-81.

After careful examination of the trial transcript, the court has discovered that a number of the prosecutorial comments Hamm argues occurred at the penalty phase of trial, however, actually happened during closing arguments at the guilt phase of trial.  The Alabama Court of Criminal Appeals did not mention this distinction when it found some of Hamm's IAC penalty phase comment claims to be abandoned and affirmed the trial court's rejection of other IAC penalty phase comments.  *Hamm v. State*,  913 So. 2d at 488-89.

135

Nonetheless, the appellate court did separately find elsewhere that Hamm had abandoned/waived his IAC claims for failure to object to improper guilt phase prosecutorial argument because this claim was among those Hamm presented in a laundry list without argument or explanation. *Hamm v. State*, 913 So. 2d at 485-86. Hamm was responsible for the manner in which he raised these claims to the appellate court. He did not then nor does he now allege that he was prejudiced at the *penalty* phase of trial based on improper comments made at the *guilt phase* of trial. Instead, he glosses over the timing of the arguments and represents all alleged improper comments as having been made at the penalty phase of trial. The trial record reveals the truth of the matter. Therefore, to the extent that Hamm represents and points to alleged improper *guilt* phase argument as having been made at the *penalty* phase in support of this claim, the allegations shall not be considered because Hamm abandoned them on collateral appeal, and were not fairly presented to the state court.[54]

---

[54] Even if the guilt phase comments were considered in the context of the guilt phase of trial, Hamm could not establish that counsel was ineffective for failing to object to the comments or raise the issue on collateral appeal for the reasons stated by the Rule 32 court, as affirmed by the Alabama Court of Criminal Appeals. *Hamm v. State*, 913 So. 2d at 488-89; (Rule 32 C.R. "Rule 32 opinion" Vol. 33, Tab. 58, pp. 37-47). The guilt comments fall into three categories. First, Hamm declares that two comments improperly play upon *other* improper *penalty* comments (Doc. no. 20, p. 112). However, since the comments occurred at the guilt phase of trial, not the penalty phase, this is a factual impossibility. Further, as set out herein, these two guilt phase comments quoted by Hamm show no impropriety. The criticized comments are that the prosecutor stated, "No matter what I do in my personal life about forgiveness or sympathy for someone who is in trouble, I am in this job. It would be immoral for me not to exact justice as the law call for it." (R. Vol. 6, p. 1139). He also asked " We ask you for nothing more than justice and that is a verdict of guilty of capital murder." *Id.* at 1264. The prosecutor was informing the jury that Alabama law must be applied to the evidence before them. He argued that justice should be based on that law, not pity or forgiveness, and that justice would be a finding of guilt because the facts justified that verdict. These are not improper arguments.

Second, Hamm alleged the prosecutor improperly relied on his personal expertise when he stated, "There were some inconsistencies in their stories. I submit to you that there always are inconsistencies in the stories." (Doc. no. 20, p. 112; R. Vol. 6, p. 1149). Later pages show that the prosecutor was referring generally to eyewitnesses, and in particular Kathryn Flanagan, and the

As for Hamm's claim that the prosecutor made improper comments at the penalty phase of the trial, the Alabama Court of Criminal Appeals made the following findings:

> Hamm further argues that counsel were ineffective at sentencing because they failed to object to "inflammatory and improper arguments" made by the prosecutor. (Hamm's brief at p. 78.) Hamm argues that his attorneys failed to object when the prosecutor[:] made remarks inflaming the passions of the jurors and urging them to "send a message" that the community would not tolerate such killings in the county; argued that the jury had a responsibility to sentence Hamm to death; made comments suggesting he had personal expertise and exploited his position of authority.[FN12]

> > FN12. At page 81 of his brief to this Court, Hamm states, "In these and numerous other passages, *see* R-1286, R-1283; R-1282, the prosecutor engaged in improper argument." Hamm has not identified to this Court what statements on those pages he deems objectionable, and he has failed to present any argument regarding the statements made on the cited pages. Therefore, we deem any claims related to the portions of the prosecutor's argument on the pages merely listed in brief to be abandoned for purposes of appellate review. Rule 28(a)(5), Ala. R. App. P.

---

inconsistencies in her descriptions. *Id.* at 1149-1152. The prosecutor stated that Flanagan was a witness to events that caused her terror, and that she was not dispassionately observing the crime as it unfolded in a calm, cool and collected manner. *Id.* Thus, in context, the prosecutor was not relying on any personal expertise. He was simply arguing a reasonable inference from the evidence. Further, the circuit court found that the comment was a reply to defense comments concerning inconsistent statements. (Rule 32 C.R. Vol. 33, Tab. 58, p. 68). Again, this argument is not improper.

Third, Hamm alleged the prosecutor tried to inflame the jury with prejudice when he argued that Cunningham's death affected everyone in community, and that Cullman "is a good community – people treat each other nice no matter their station – as important as their own life." *Id.* Further, the prosecutor asked the jury to "think about Cunningham and how you would feel if you were in his place. Because the reason you are here is to see that this doesn't happen again." *Id.* at 1162-63. The argument was not inflammatory and it is not improper to ask for justice in the community.

None of these guilt phase comments were improper, so Hamm cannot establish that his counsel were objectively deficient for failing to raise an objection to them. Further, the evidence against Hamm at the guilt phase of trial was so overwhelming that no reasonable probability exists that he could establish he was prejudiced by counsel's failure to object to the comments. Thus, even if these claims were improper and were not procedurally defaulted, Hamm would not be entitled to habeas relief because reasonable jurists could disagree as to whether the state court's application of *Strickland* was unreasonable.

At the postconviction hearing, Hamm did not question defense counsel about their failure to object to any of the alleged instances of prosecutorial misconduct. However, as the trial court noted in its order denying Rule 32 relief, Hamm's trial attorneys testified that they made a conscious effort to avoid infuriating the jury by making needless objections. (C. 65.) The attorneys testified that they wanted to maintain a good relationship with the jury because, once Hamm's taped confession was admitted into evidence over objection, their best hope was to get a majority of the jurors to recommend a sentence of life imprisonment without parole. (R. 27, 60-61.) The foregoing is a legitimate trial strategy, and decisions regarding strategy are ones a reviewing court is loathe to overturn based on the reviewing court's hindsight. *Davis v. State*, 720 So. 2d 1006, 1013 (Ala. Crim. App. 1998), *cert. denied*, 525 U.S. 1149, 119 S. Ct. 1049, 143 L. Ed. 2d 55 (1999).

The circuit court reviewed the prosecutor's penalty-phase closing argument in light of Hamm's claims, and determined that none of the prosecutor's arguments were improperly made and that counsel's performance was not deficient. (C. 66-71.) The court further found that Hamm had failed to prove that he was prejudiced by the instances of alleged prosecutorial misconduct. (C. 66.) As to those claims properly presented for review in Hamm's brief, we agree with the circuit's court's findings and analysis on this issue.

We further note that before the attorneys made their opening arguments at trial, the court instructed the jury that the attorneys' arguments were not evidence. (T. 249-50.) Before the penalty phase of Hamm's trial began and again before sentencing deliberations, the trial court reminded the jury to observe the instructions the court had given at the beginning of the trial. (T. 1202, 1288.) We have often held that reviewing courts presume that jurors follow a trial court's instructions. *E.g., Taylor v. State*, 666 So. 2d 36 (Ala. Crim. App.1994), *aff'd*, 666 So. 2d 73 (Ala.1995), *cert. denied*, 516 U.S. 1120, 116 S. Ct. 928, 133 L. Ed. 2d 856 (1996). Trial counsel were not ineffective for failing to object to the prosecutor's arguments, and Hamm failed to establish that there was a reasonable probability that, had counsel objected to the allegedly improper comments, the outcome of the proceeding would have been different. *Williams v. State*, 782 So. 2d 811, 834 (Ala. Crim. App.), *cert. denied*, 782 So. 2d 842 (Ala. 2000). Hamm is not entitled to any relief on this claim.

*Hamm v. State*, 913 So. 2d at 488-89.

Turning now to habeas review of these IAC claims pertaining to improper prosecutorial argument at the penalty phase of trial, the court reiterates its approval of the Alabama Court of Criminal Appeals' finding that Hamm had abandoned any claims of improper prosecutorial misconduct when he cited several pages in the penalty phase record, but failed to inform the court

138

which portions of the prosecutor's argument were purportedly improper.  Accordingly, this aspect of the IAC claims are procedurally defaulted.  As for those IAC penalty phase claims that remain, the court observes at the outset that all of the alleged improper comments occurred after the presentation of evidence at the penalty phase of trial.  Moreover, all but one comment occurred during the prosecution's *rebuttal* to defense counsel's closing argument.  Hamm declares that numerous prosecutorial comments were improper because they were made "to exploit his position of authority." (Doc. no. 20, p. 111) (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629 (1935) ("'improper suggestions, insinuations, and especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.'")).  The comments to which Hamm attributes impropriety can be divided into four categories: (1) sending a message to the community, (2) civic duty, (3) expression of personal belief, and (4) religious law.

The first comment was made during the prosecutor's initial argument to the jury at the close of the penalty phase of trial.  (Doc. no. 20, pp. 110-11).  In it, the prosecutor asked the jury to "send a message to the community" that it would not tolerate execution-style killings.  (R. Vol. 7, Tab. 21, pp. 1248-49).  Hamm alleges this comment exploited the prosecutor's position of authority and exhorted revenge.  (Doc. no. 20, pp. 110-11).

Because the state appellate court affirmed the circuit court's reasons for rejecting the IAC claim, and the Rule 32 court took pains to place the comment in context, examination begins with the pertinent portion of the Rule 32 court's opinion, which in turn begins with the comment itself:

> The judge told you that anything that we say is not to be considered by you as evidence in this case.  Merely, again we are trying to put that picture before you or submit to you what we think that the law says in regard to the facts.
>
> Again as district attorney – as your district attorney in Cullman County I am going to ask you at this time to send a message and think about what I am going to say maybe during the time that

you are deliberating.  And I am going to ask you to send a message that we as citizens of Cullman County are not going to put up with someone coming out of here from Mississippi or outside of the county from anywhere or within this county and committing an execution style killing like this man had to one of our citizens who had every right to be alive here today.  There is no reason that we should be here today.

In closing I would like to ask you to send a message that we are not going to put up with it – this type execution style killing here in Cullman County Alabama.

(Trial transcript, pp. 1248-1249) This was not the prosecutor exercising his authority but was merely an exhortation by the prosecutor for justice and for the jury to properly perform its duty.

(Rule 32 C.R. Vol. 33, Tab. 58, pp. 40-41).

The remaining comments were made after Hamm's counsel made closing arguments.  Both Williams and Harris made closing arguments and asked the jury to sentence Hamm to life without parole.  (R. Vol. 7, Tab. 22, p. 1259).  Harris's closing argument contained several religious references, none of which were objected to by the prosecutor.  For instance, counsel stated that Hamm would be "severely punished whether the penalty be death or life in the penitentiary until God makes the decision to take him."  (R. Vol. 7, Tab. 22, p. 1256).  Harris mentioned that he was 36 years old, had been practicing law in Cullman County for 11 years and he could not remember another capital case in the county.  *Id.* at 1258.  Harris also argued:

Now, we talked a little bit about in Voir Dire about the terms and the statements of an eye for an eye and turning the other cheek.  And in the Old Testament we were taught under the strict law an eye for an eye.  If somebody killed, they deserved to die, but also in the Old Testament we see where God when Cain took Able's life that he didn't take Cain's life, but he merely banished him from the land in which he lived.

And then on the other hand the New Testament teachings of turn the other cheek.  And Christ himself in the Sermon on the Mount told the people there that he was speaking to – the multitudes to turn the other cheek.  And Christ came because of the failure of human beings to be able to function under the strict law of the Old Testament.  And he came forth with a doctrine of love and mercy.

140

> In one of the most atrocious and horrible killings that existed in the history of the world Christ suffered that, God's own son. And we see God reacting in a way that he didn't strike out against those people. And we see his own son as he hung there in pain and agony that existed there where he said, "Father, forgive them for they know not what they do."
>
> I hope that we are a people of love and mercy. And for death to be the punishment the individual must absolutely be responsible for the crime.

*Id*. at 1259-61. Thereafter, Harris discussed with the jury the horrific nature of Hamm's childhood and upbringing, the influence of alcohol and drugs on him, and his confession and asked that they search their hearts and sentence him to life without parole. *Id*.

At this juncture, prosecutor Tom Sorrells made his rebuttal argument, an argument Hamm alleges contained many improprieties to which defense counsel unreasonably failed to object. For instance, Hamm alleges that in urging the jury to exercise their civic duty, the prosecutor engaged in overreaching and exploited his position of authority because he told the jury that it was their responsibility to sentence him to death. (Doc. no. 20, pp. 110-11) (citing R. Vol. 7, Tab. 22, pp. 1272, 1286-87)). Moreover, the prosecutor exhorted them to take the deceased victim in the jury room as a 13th juror and consider what he had to say. *Id.* at 112 (quoting R. Vol. 7, Tab. 22, p. 1286). The prosecutor also told the story of Sergeant York, a devout pacificist who, when called to duty in World War I did kill the enemy to save others. *Id.* (quoting R. Vol. 7, Tab. 22, pp. 1270-71). Additionally, Hamm contends that the prosecutor improperly expressed his personal belief that Hamm should be sentenced to death, thus abusing his position when he stated, "I'm not the kind of prosecutor that says, oh let's go burn everybody," and when he stated that he was forgiving in his personal life, but was required by his job as a prosecutor to do justice. *Id.* (quoting R. Vol. 7, Tab. 22, pp. 1268-69 and 1286). Hamm alleges the prosecutor improperly invoked religious law in two comments, the first of which reads, "We are not God but –defense counsel said leave to God– but

some things are given to us to do." *Id.* at pp. 111-12 (quoting R. Vol. 7, Tab. 22, p.1268). Finally, the prosecutor stated, the "Bible also says that the governments are ordained by God and *you are to obey what the governments say*." *Id.* (quoting R. Vol. 7, Tab. 22, p. 1280 (italics in brief)). Hamm contends these arguments were improper because the prosecutor was informing the "jury that their duty to sentence him to death was Divine." *Id.*

Again, because the state appellate court affirmed the circuit court's reasons for rejecting the IAC claim, analysis begins with the pertinent portion of the Rule 32 court's opinion. Excepting one comment, the Rule 32 court addressed all of these alleged improprieties together, and it came to the same legal conclusion in connection with them all. First, the court acknowledged the following comment in the context in which it was made:

> I am not the kind of prosecutor [sic] that says, oh let's go burn everybody. I know it is a serious thing for you. It is your responsibility. Just as you answered it that you believe in the death penalty in appropriate cases. And they all say we believe in that too, but not this case.

(Trial transcript, pp. 1267-68). It is clear after reading this argument that the prosecutor did not express his opinion that his office had made the judgement, in that case, above all others, warranted the death penalty. Thus, the holding in *Brooks v. Kemp*, 762 F.2d 1383, 1411 (11th Cir. 1985) .... does not apply to this case.

(Rule 32 C.R. "Rule 32 opinion" Vol. 33, Tab. 58, pp. 39-40).

As for the remaining comments, the circuit court ruled:

> Hamm next contends that the prosecutor improperly implied that the jury had to reach a certain verdict in order to do its job. A review of these alleged improper arguments reveals that the prosecutor in these remarks never pressured the jurors to reach a certain verdict. (Trial transcript, pp. 1268, 1270-71, 1272, 1286, 1287, 1280) In fact, the portions quoted from the record in the Rule 32 petition reveal that the statements of the prosecutor were merely exhortations for the jury for justice and for the jury to properly performs its duty....

*Id.* at 41-42 (citation omitted). Finally, the court did not find the arguments concerning the 13th juror to be inflammatory. *Id.* at p. 43.

142

Hamm does not complain that the state court's determinations were an unreasonable application of *Strickland*. Instead, he argues this claim as if *de novo* review were appropriate. (Doc. no. 20, pp. 111-14). But again, the habeas standard of review applicable here is one of double deference. Thus, for Hamm to gain habeas relief on these IAC claims, he must show that no reasonable jurist, in applying the *Strickland* standard to the underlying allegations, would determine that counsel was not deficient in failing to object to various prosecutorial comments or no reasonable probability arose that the outcome of the sentencing phase of trial would have been different had counsel made the objections. Hamm has made no effort to do so.

When the state court's rejection of this claim is afforded the habeas deference due it, Hamm simply is not entitled to relief. As initially and correctly noted by the Rule 32 court in its opinion:

> Hamm presented no evidence in support of this claim at the Rule 32 hearing. Both of Hamm's attorneys testified at the Rule 32 hearing but Hamm did not question either attorney about their failure to object to these alleged instances of prosecutorial misconduct. Hamm's attorneys did testify that after the statement was admitted into evidence that they made a conscious effort not to infuriate or upset the jury with needless objections. Hamm's attorneys wanted to maintain a good relationship with the jurors in hopes of having the jury return with a life without parole sentence recommendation. (Rule 32 transcript, pp. 27-28, 60-61) Hamm failed to prove deficient performance on the part of his attorneys. In fact, the attorneys' decision not to anger the jury with needless objections was good strategy.

> Hamm has also failed to show that he was prejudiced by these alleged instances of prosecutorial misconduct. It should be noted that even arguments that are undesirable, erroneous or even universally condemned will not be enough to grant Hamm a new trial unless the prosecutor's arguments infected the entire trial process, causing a denial of fundamental fairness. *Donnelly v. DeChristof[o]ro*, 416 U.S. 637, 643 (1974). This Court also noted the following in evaluating the claims regarding the prosecutor's argument:

> > The challenged statements were not uttered or heard in isolation. We will consider them in the context they were made.

> *Waters v. Zant,* 46 F.3d 1506, 1524 (11th Cir. 1995).

(Rule 32 C.R. Vol. 33, Tab. 58, pp. 37-38).

The Alabama Court of Criminal Appeals affirmed the Rule 32 court's analysis and notations in connection with the individual comments to which counsel purportedly should have objected. This analysis, which underlies the state court's rejection of Hamm's IAC claims, does not represent an unreasonable application of *Strickland*. Hamm argues that individual comments made by the prosecutor were improper, but when the comments are taken in context, this court cannot find that the state court's determination to the contrary is so unreasonable that federal interference must ensue. To the extent the state court found that counsel chose not to infuriate or annoy the jury as a matter of strategy, the Eleventh Circuit has upheld such a tactic. *Hubbard v. Haley*, 317 F.3d 1245, 1261 (11th Cir. 2003). Moreover, in *Land v. Allen*, the Eleventh Circuit held:

> Prosecutorial misconduct can be a basis for relief if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (quotations omitted). In determining whether arguments are sufficiently egregious to result in the denial of due process, we have considered the statements in the context of the entire proceeding, including factors such as: (1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether there was a contemporaneous objection by defense counsel; (3) the trial court's instructions; and (4) the weight of aggravating and mitigating factors. *Romine v. Head*, 253 F.3d 1349, 1369-70 (11th Cir. 2001).

573 F.3d 1211, 1219-20 (11th Cir. 2009).

Even if the remarks were improper, Hamm is entitled to no relief under *Land*. As noted above, the remarks were isolated and many times responsive to defense assertions. Immediately preceding the arguments, the trial court reminded the jury that the statements of counsel were not evidence. (R. Vol. 7, Tab. 20, p. 1244). And, as previously discussed, there were two aggravating circumstances, no statutory mitigating circumstances, and some non-statutory mitigating factors. In sum, the court finds that any purported error did not "so infect[] the trial with unfairness as to make the resulting [sentence] a denial of due process." *Land*, 573 F.3d at 1219 (citing *Darden*, 477 U.S. at 181) (brackets added).

For all of the foregoing reasons, the findings by the state court that counsel were not ineffective in failing to object to the prosecutorial comments during the penalty phase arguments were not contrary to, nor did they involve an unreasonable application of clearly established federal law.  Thus, Hamm is not entitled to habeas relief.

> **12.** *Counsel failed to adequately research, prepare and argue motions, including a motion for change of venue, and failed to raise these issues on appeal.* (Doc. no. 1 ¶ 94, pp. 27-28) (Doc. no. 20, p. 120).

This assertion is one of the "laundry list" claims that the Alabama Court of Criminal Appeals held Hamm had waived pursuant to Rule 28(a)(5), Ala. R. App. P., because of his failure to provide citation to legal authority, the record and present any arguments in support of it.  Although Hamm raised this claim in his Rule 32 petition, the appellate court's determination that Hamm abandoned this claim on collateral appeal is a ruling based an adequate and independent state procedural rule. (*See* Section V.B.2, *supra*).  As such, the claim is procedurally defaulted pursuant to federal preclusionary rules, and the court will dismiss this claim.

> **13.** *Counsel failed to object to the trial court's consideration of illegally obtained and prejudicial letters of Hamm and to the improper pre-sentence report, and failed to raise this issue on appeal, resulting in the court's improper sentence of death.* (Doc. no. 1, ¶ 95, p. 28) (Doc. no. 20, pp. 114-15).

The title sentence above is the claim as pled in the habeas petition.  (Doc. no. 1, p. 28).  No further explanation from Hamm's reply brief is necessary at this time because the Alabama Court of Criminal Appeals set out the allegations underlying the claim in its opinion rejecting it, which reads:

> Hamm argues that trial counsel were ineffective because they failed to "object properly" to the presentence report.  He specifically objects to the inclusion in the report of information about his involvement in other crimes, and asserts that the allegations were used as nonstatutory aggravating circumstances.  He further argues that trial counsel should have objected to the court's consideration of personal letters Hamm had mailed from jail.  (Hamm's brief at page 82-83.)  The presentence report was not included in the direct appeal record, and it was not introduced at the Rule 32

hearing.  Therefore, *Hamm has not satisfied his burden of proving the allegations regarding improper information in the report or considered at sentencing.*

      The circuit court found that trial counsel objected to the information about a Mississippi charge for which Hamm had not been convicted, and the court struck the information from the presentence report. (T. 1311-12.) Counsel's performance was not deficient as to that charge, because an objection was made and the information was struck.  Furthermore, the trial court's sentencing order refers only to statutory aggravating circumstances.  There is no indication that the circuit court reviewed any letters or any improper information about prior charges, and it is clear from the sentencing order that the court did not rely on any information if it was reviewed. (T. 1368-75.)  Therefore, we conclude that, even if improper information about prior charges was improperly included in the report, and even if counsel's performance was deficient because they failed to object (and we do not make such a finding here), Hamm has not established that he was prejudiced in any way.  Because he has failed to establish that counsel were ineffective, Hamm is not entitled to any relief on this claim.

*Hamm v. State*,  913 So. 2d at 490 (emphasis added).

Hamm does not dispute the historic factual findings made in the Court of Criminal Appeals opinion, and thus provides no clear and convincing evidence (doc. no. 20, pp. 114-15) to overcome the Court's finding that nothing in the record indicates that the trial court considered any letters or improper information at sentencing.  The habeas record, which encompasses the trial and post-conviction record, does not contain any letters or the PSI report.  Thus, the only evidence pertaining to this claim is the transcript of the sentencing hearing, and the transcript confirms that the trial judge struck the information objected to by defense counsel.  The transcript contains no mention of the improper information in the sentencing order.  Therefore, Hamm failed to prove this claim during collateral review.  He has provided no evidence in the present matter demonstrating that the state court findings are erroneous.  Accordingly, the findings by the state courts that counsel were not ineffective in failing to object to the court's consideration of Hamm's letters and the presentence report were not contrary to, nor did they involve an unreasonable application of clearly established federal law.  Hamm is not entitled to habeas relief on this claim of ineffective assistance of counsel.

> **14.**     *Counsel failed to investigate and present at trial the effects of drugs and alcohol use on Hamm's mental health*. (Doc. no. 1, ¶¶ 96-97, p. 28).

The title sentence above is the essence of the claim as pled in the habeas petition.  (Doc. no. 1, p. 28).  However, when Hamm raised this claim on collateral appeal, he did so within the context of a claim that already has been addressed in this Memorandum Opinion.  (See Claim VI. F.4, *supra*).  Accordingly, the court has no reason to discuss this claim further.

> **15.**     *Counsel failed to adequately object to the prejudicial security measures taken at trial and to raise this issue on appeal, resulting in the denial of petitioner's right to fair trial*.  (Doc. no.1, ¶ 15, p. 28) (Doc. no. 20. p. 120).

The title sentence above is the full claim as pled in the habeas petition.  (Doc. no. 1, p. 28).  Hamm presents nothing further in support of this claim in his reply brief.  (Doc. no. 20, pp. 115, 120).  Although Hamm raised this claim in his Rule 32 petition,  it is one of the "laundry list" claims that the Alabama Court of Criminal Appeals held Hamm had waived on collateral appeal pursuant to Rule 28(a)(5), Ala. R. App. P., because of his failure to provide citation to legal authority or the record and to present any arguments in support of it.  The appellate court's determination that Hamm abandoned this claim on collateral appeal is a ruling based an adequate and independent state procedural law.  (*See* Section V.B.2, *supra*).  As such, the claim is precluded from federal review, and the court will dismiss it.

> **16.**     *Counsel failed to object to venire members that were unalterably in favor of the death penalty and failed to raise this issue on appeal, resulting in the denial of petitioner's rights to an impartial jury and to the free exercise of peremptory challenges*.  (Doc. no. 1, ¶ 99, p. 28) (Doc. no. 20, pp. 120, 123-24)
>
> *and*
>
> **17.**     *Counsel failed to challenge for cause venire member Sylvia Burks and failed to raise her partiality on appeal*.  (Doc. no. 1, ¶ 100, p. 28) (Doc. no. 20, pp. 123-24).

The title sentences above are the claims as pled in the habeas petition.  (Doc. no. 1, p. 28). The claims are addressed together because the trial court record shows that none of the three venire members complained about in these two subsections, namely William R. McQuillin, Kevin Myrex and Sylvia Burks, were seated as jurors.  (R. Vol. 7, p. 1380A).  In fact, after unsuccessfully challenging Mr. McQuillin and Mr. Myrex for bias in favor of the death penalty and after questioning Ms. Burks  on her personal bias as a teacher of the victim's son,[55] defense counsel utilized his 2nd, 3rd and 4th peremptory strikes to remove these veniremembers from the pool.  (R. Vol. 2, p. 220; R. Vol. 7, p. 1380A).  A habeas petitioner may raise the denial of a challenge for cause as error only when the challenged venireperson actually sat on his jury.  *See*, *e.g.*, *Spivey v. Head*, 207 F.3d 1263, 1273 (11th Cir. 2000) ("Claims that the jury was not impartial must focus upon the jurors who actually sat.") (citing *Ross v. Oklahoma*, 487 U.S. 81, 86, 108 S. Ct. 2273 (1988) (holding that any claim that a jury was not impartial must focus "on the jurors who ultimately sat"), and *Heath v. Jones*, 941 F.2d 1126, 1133 (11th Cir. 1991) (holding that a habeas petitioner can only raise the trial court's denials of challenges for cause of those prospective jurors who eventually sat on the jury)).

Because Hamm's counsel did raise challenges for cause as to Mr. McQuillin and Mr. Myrex and did inquire of Ms. Burks' situation with the victim's son and then remove these venirepersons by using his peremptory challenges, Hamm cannot establish counsel was deficient at trial or for failing to raise a substantive claim on direct appeal.  Hamm cannot possibly establish that his jury was unconstitutionally partial; *ergo*, he cannot show he was prejudiced by counsel's purportedly inadequate challenge at the trial level or failure to raise a substantive claim on direct appeal.  Hamm also offers no Supreme Court precedent showing an independent constitutional right to "free

---

[55]  Counsel argued that Burks was due to be struck because the victim's son had spoken to her about his father being killed.  (Doc. no. 20, p. 124).  The trial record demonstrates that she stated that the victim's son only told her "that his father had been killed."  (R. Vol. 1, p. 144).

exercise" of peremptory challenges that would justify a claim of ineffective counsel when a petitioner believes counsel's challenge for cause was inadequate.

Moreover, the Alabama Court of Criminal Appeals rejected these IAC claims on the grounds that the trial record supported the trial court's findings that the jurors were not subject to a challenge for cause for several reasons: their colloquies with counsel and the court did not show they were unalterably in favor of the death penalty; Alabama law did not require Ms. Burks's removal simply because she knew the victim's son; and further, Ms. Burks testified she had no fixed opinion as to Hamm's guilt. *Hamm v. State*, 913 So. 2d at 484-86. Hamm has offered no clear and convincing evidence to overcome the heavy deference owed to a trial judge's rulings on the question of juror bias.

The findings by the state courts that counsel were not ineffective for failing to challenge jurors for cause were not contrary to, nor did they involve an unreasonable application of clearly established federal law. The state court decisions were also not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Hamm is not entitled to habeas relief on this claim of ineffective assistance of counsel.

> **18.** *Counsel failed to elicit information from the venire members in voir dire, to adequately challenge potentially biased venire members and to strike certain jurors.* (Doc. no. 1, ¶ 101, p. 28) (Doc. no. 20, p. 120).

The title sentence above represents the entirety of this claim as pled in the habeas petition and the reply brief. (Doc. no. 1, p. 28) (Doc. no. 20, p. 120). This claim has been adequately addressed in Claims VI.F.16 and VI.F.17 so no further discussion is necessary.

> **19.** *Counsel failed to adequately object to the unequal distribution of peremptory challenges between the State and the defense and failed to raise this issue on appeal.* (Doc. no. 1, ¶ 102, p. 29) (Doc. no. 20, p. 120).

> **20.** *Counsel failed to adequately object to the introduction of bullets, a green army jacket, and to testimony surrounding these items, and failed to raise*

*these issues, resulting in the deprivation of due process and a fair trial.*
(Doc. no. 1, ¶ 103, p. 29) (Doc. no. 20, p. 120).

21.  *Counsel failed to adequately investigate the culpability of other persons, resulting in petitioner's improper conviction for capital murder.*  (Doc. no. 1, ¶ 22, p. 29).

22.  *Counsel failed to adequately object to the State's failure to turn over in discovery exculpatory material and failed to raise this issue on appeal.*  (Doc. no. 1, ¶ 105, p. 29) (Doc. no. 20, p. 120).

23.  *Counsel failed to adequately object to the trial court's instruction on reasonable doubt and failed to raise the issue on appeal, resulting in a denial of due process.*  (Doc. no. 1, ¶ 106, p. 29) (Doc. no. 20, p. 120).

24.  *Counsel failed to adequately object to the trial court's refusal to give the proposed jury instruction on voluntary intoxication and failed to raise this issue on appeal.*  (Doc. no. 1, ¶ 107, p. 29) (Doc. no. 20, p. 120).

25.  *Counsel failed to object to the introduction of gruesome, prejudicial, manipulated and unnecessary photographs and failed to raise this issue on appeal.*  (Doc. no. 1, ¶ 108, p. 29) (Doc. no. 20, p. 120).

26.  *Counsel failed to adequately object to the admission of Hamm's statement and of evidence seized in the search of the trailer and failed to adequate argue these issues on appeal.*  (Doc. no. 1, ¶ 109, p. 29) (Doc. no. 20, p. 120).

27.  *Counsel failed to adequately present mental health defenses at the guilt and punishment phases, resulting in the improper sentence of death.*  (Doc. no. 1, ¶ 110, p. 30) (Doc. no. 20, p. 120).

28.  *Counsel failed to object to the trial court's failure to qualify expert witnesses and failed to raise this issue on appeal.*  (Doc. no. 1, ¶ 111, p. 30) (Doc. no. 20, p. 120).

The title sentences above are the verbatim claims as pled in the habeas petition.  (Doc. no.

1, pp. 29-30).  Although Hamm raised these claims in his Rule 32 petition, on collateral appeal these

claims were the "laundry list" claims that the Alabama Court of Criminal Appeals held Hamm had

waived pursuant to Rule 28(a)(5), Ala .R. App. P., because of his failure to provide citation to legal

authority or the record, and to present any arguments in support of them.  These claims were not

properly presented on appeal from the denial of the Rule 32 petition, and thus are procedurally barred from federal review.  The court will deny these claims.

> **29.**    *Counsel failed to object to the cruel and unusual nature of death by electrocution or lethal injection, and failed to raise this issue on appeal.* (Doc. no. 1, ¶ 112, p. 30) (Doc. no. 20, p. 115).

> **a.**    *Electrocution*  (Doc. no. 1, ¶ 112, p. 30) (Doc. no. 20, p. 115).

This claim is another of the "laundry list" claims that the Alabama Court of Criminal Appeals held Hamm had waived pursuant to Rule 28(a)(5), Ala. R. App. P., because of his failure to provide citation to legal authority and make an argument.  Hamm's failure to properly present this issue on appeal from the denial of the Rule 32 petition results in a procedural default for federal habeas purposes.  Moreover, to the extent this claim addresses Alabama's former use of electrocution as the means of execution, it is moot, because electrocution is no longer Alabama's primary, or even preferred, method of capital punishment.  For the foregoing reasons, this claim is due to be dismissed as procedurally defaulted, or in the alternative, is deemed moot.

> **b.**    *Lethal Injection*    (Doc. no. 1, p. 30).

Hamm did not raise an IAC claim based on trial counsel's purported failure to adequately object to death by lethal injection as cruel and unusual punishment either in the Rule 32 petition or on collateral appeal.  Therefore, the claim is procedurally defaulted.  Even if it were not, it is well known that lethal injection was not instituted as a method of capital punishment in Alabama until 2002.  Hamm was sentenced to death in 1987.  Mr. Harris and Ms. Williams represented Hamm at trial and throughout the direct appeal process, which became final in 1990.  Thus, an ineffectiveness claim against Mr. Harris and Ms. Williams for failing to object to lethal injection as a form of capital punishment or raise the issue on direct appeal is a factual and legal impossibility.  For the foregoing reasons, this claim is procedurally defaulted or without merit.

**30**.      *Counsel failed to investigate and present a compelling case in mitigation*.
(Doc. no. 1,  ¶¶ 113-116, p. 30).

Because of the manner in which Hamm raised this claim on collateral appeal, the state

appellate court addressed this claim with the other claims alleging counsels' shortcomings regarding

presenting mitigating circumstances. (*See* Claim VI.F.4, *supra*).  As such, the claim already has been

addressed and no further discussion is necessary.

**31.**      *Counsel failed to prepare, investigate, and present an effective defense on
behalf of petitioner, resulting in his capital conviction and sentence of death*.
(Doc. no. 1, ¶  117, p. 31) (Doc. no. 20, p. 31).

This claim presents another of the "laundry list" claims that the Alabama Court of Criminal

Appeals held Hamm had waived pursuant to Rule 28(a)(5), Ala. R. App. P., because of his failure

to provide citation to legal authority or the record, or to make an argument.  Although Hamm raised

this claim in his Rule 32 petition, his abandonment of the claim on collateral appeal renders it

procedurally defaulted for purposes of federal review. (*See* Section V.B.2, *supra*).  The court will

dismiss this claim.

**32.**      *Counsel failed to effectively represent Hamm on appeal*.  (Doc. no. 1, ¶ 118,
p. 31)  (Doc. no. 20, pp. 116-118, 121).

In this one sentence habeas claim, Hamm alleges that appellate counsel were ineffective for

raising claims with little likelihood of success and "failing to raise meritorious claims concerning

infringements of petitioner's rights in violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth

Amendments to the United States Constitution."  (Doc. no. 1, p. 31).  In his reply brief, Hamm

alleges that appellate counsel were ineffective for failing to raise any of the issues raised in his

federal habeas petition on direct appeal.  (Doc. no. 20, pp. 116-18, 121).

With respect to the claim that counsel failed to effectively represent Hamm on appeal, the

Alabama Court of Criminal Appeals held:

[I]n Part VII.C. of his brief, Hamm argues that he was denied the effective assistance of counsel on appeal because counsel failed to raise any of the substantive issues discussed in the previous sections of this opinion. The circuit court denied Hamm relief on this claim, based on its determination that appellate counsel were not deficient. (C. 112-13.) We agree with the circuit court.

At the postconviction hearing, the attorneys who represented Hamm on direct appeal - the same attorneys who represented Hamm at trial- testified that they focused on what they believed, based on their research and experience, to be the most viable issues to raise on appeal. (R. 24, 56-57.) The process of evaluating a case and selecting those issues on which the appellant is most likely to prevail has been described as the hallmark of effective appellate advocacy. *Smith v. Murray*, 477 U.S. 527, 536, 106 S. Ct. 2661, 91 L. Ed. 2d 434 (1986).

> "Appellate counsel is presumed to exercise sound strategy in the selection of issues most likely to afford relief on appeal. *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993), *cert. denied,* 510 U.S. 984, 114 S. Ct. 487, 126 L. Ed. 2d 437 (1993). One claiming ineffective appellate counsel must show prejudice, i.e., the reasonable probability that, but for counsel's errors, the petitioner would have prevailed on appeal. *Miller v. Keeney*, 882 F.2d 1428, 1434 and n. 9 (9th Cir.1989)."

*Thomas v. State*, 766 So. 2d 860, 876 (Ala. Crim. App.1998), aff'd, 766 So. 2d 975 (Ala. 2000).

Moreover, this Court and the Alabama Supreme Court conducted the plain error review mandated by Rule 45A, Ala. R.App. P.,[FN14] and found no error or defect warranting reversal. *Hamm v. State*, 564 So. 2d 453, 463-64 (Ala. Crim. App. 1989), *aff'd*, 564 So. 2d 469 (Ala. 1990). Even if counsel had raised on appeal all of the issues postconviction counsel now argues should have been raised, Hamm would not have been entitled to appellate relief, because none of the claims would have supported a finding of reversible error.

> FN14. Rule 39, Ala. R. App. P., was amended effective May 19, 2000, as to death penalty cases. The amendment provided that a plain error review of death penalty cases will be at the discretion of the Supreme Court, rather than a matter of right for the defendant.

The circuit court correctly denied Hamm relief on his claim that he was denied the effective assistance of counsel on appeal.

*Hamm v. State*,  913 So. 2d at 491-92.

The United States Supreme Court has recognized that appellate counsel should not raise every claim or even every nonfrivolous claim but rather "may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288, 120 S. Ct. 746, 765-66 (2000), citing *Jones v. Barnes,* 463 U.S. 745, 103 S. Ct. 3308 (1983).  Hamm alleges that pursuant to Alabama's plain error rule, "the appellate courts would have reviewed and granted relief on one or more of the meritorious claims now raised," but Hamm never identifies a  claim or makes a reasoned argument that could support habeas relief in the context of ineffective assistance of appellate counsel.  (Doc. no. 20, p. 116).

The findings by the state courts that counsel were not ineffective on appeal were not contrary to, nor did they involve an unreasonable application of clearly established federal law.  The state decisions were also not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  Hamm is not entitled to habeas relief on this claim of ineffective assistance of appellate counsel.

**G.**     *The Rule 32 state post-conviction court unconstitutionally prohibited Hamm's attorney, Bernard Harcourt, from representing him at his Rule 32 hearing in violation of his rights to due process and to be free from cruel and unusual punishment.*[56]  (Doc. no. 1, ¶¶ 120-127, pp. 32-36) (Doc. no. 20, pp. 131-140).

*and*

---

[56] The constitutional grounds upon which Claim G is based changed throughout the collateral proceedings.  It was presented in the state appellate court as a Sixth Amendment right to counsel claim rather than a due process/cruel and unusual punishment claim.  No reference to due process/cruel and unusual punishment appears in either the state appellate brief or reply brief.  *See respectively*, (Rule 32 C.R. Vol. 29, Tab. 45, pp. 1-10; *id.*, Vol. 30, Tab. 47, pp. 1-16).  It was referenced in petitioner's application for rehearing and  petition for certiorari review.  (Rule 32 C.R. Vol. 30, Tab. 49, pp. 1-7).  In his petition for writ of certiorari before the United States Supreme Court, Hamm argued a violation of his right to counsel and right to due process.  (*Id.*, Vol. 32, Tab. 32, pp. 17-26).  The United States Supreme Court denied the petition for writ of certiorari.  Hamm raises a cruel and unusual punishment challenge in conjunction with his right to counsel claim for the *first time* in this court.  Regardless of when Hamm raised his due process and cruel and unusual punishment claims, the result is the same.

**H.**    *The state court abdicated its role of impartial judicial decisionmaker by impermissibly signing, without even the slightest modification, the state's "proposed memorandum opinion" in violation of Hamm's federal due process rights.* (Doc. no. 1, ¶¶ 128-131, pp. 36-38) (Doc. no. 20, pp. 140-144).

Claims G and H are complaints about the Rule 32 process rather than Hamm's conviction and sentence. Because federal habeas review is reserved for "a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States," Hamm's complaints do not state a cognizable claim for habeas relief. *See* 28 U.S.C. § 2254(a); *Quince v. Crosby*, 360 F.3d 1259, 1262 (11th Cir. 2004); *see also Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir. 1987).

Moreover, as stated many times in this opinion, Hamm was not entitled to post-conviction counsel of his choice. Additionally, even though the Eleventh Circuit Court of Appeals has "criticized the verbatim adoption of proposed orders, the Supreme Court and this Court have consistently upheld the use of such orders as long as they were adopted after adequate evidentiary proceedings and are fully supported by the evidence." *Brownlee v. Haley*, 306 F.3d 1043, 1067, n.19 (11th Cir. 2002) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (other citations omitted)). Further, the "extensive record from the Rule 32 proceedings in this case 'eliminates any doubt about the [trial] judge's involvement in the matter and careful analysis of ... [the] evidence.'" *Id.* (quoting *Ammons*, 783 F.2d 982, 984 n.4 (11th Cir.1986)). The court will dismiss these claims.

**I.**    *The trial court's instruction on accomplice liability denied Doyle Hamm his rights guaranteed by the Sixth, Eighth and Fourteenth Amendments.* (Doc. no. 1, ¶¶ 132-134, pp. 38-39) (Doc. no. 20, pp. 145-146).

**J.**    *The trial court's penalty phase jury instructions were constitutionally flawed and denied Doyle Hamm his rights to the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.* (Doc. no. 1, ¶¶ 135-143, pp. 40-41) (Doc. no. 20, pp. 146-148).

**K.**    *The state made improper comments at Hamm's capital trial that denied Hamm's rights to a fair trial and to an individualized sentence, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.* (Doc. no. 1, ¶¶ 144-176, pp. 42-49) (Doc. no. 20, pp. 148-154).

**L.**    *The trial court's consideration of a prejudicial and improper pre-sentence report and of improperly obtained correspondence between Hamm and his family and friends violated Hamm's rights to due process and a fair trial guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.* (Doc. no. 1, ¶¶ 177-185, pp. 49-51) (Doc. no. 20, pp. 154-155).

**M.**    *The security measures at Hamm's trial created a loaded atmosphere that denied his due process right to a fair trial.* (Doc. no. 1, ¶¶ 186-190, pp. 51-52) (Doc. no. 20, pp. 155-156).

**N.**    *The trial court failed to excuse from the jury venire persons whose beliefs and experiences substantially impaired their ability to sit on Hamm's jury, in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and state law.* (Doc. no. 1, ¶¶ 191-197, pp. 52-53) (Doc. no. 20, pp. 156-157).

**O.**    *The trial court denied Hamm his right to a peremptory challenge and to the equal protection of the law when it allowed him only 37 peremptory strikes and allowed the state 38.* (Doc. no. 1, ¶ 198, p. 53) (Doc. no. 20, p. 157).

**P.**    *The trial court committed reversible error when it admitted into evidence an unmarked green army jacket, bullets found in that jacket and testimony surrounding the jacket and bullets, because the jacket remained unattended on a desk in the police department in City Hall for over three days.* (Doc. no. 1 , ¶¶ 200-205, pp. 54-55) (Doc. no. 20, pp. 157-158).

**Q.**    *The trial court improperly instructed the jury on reasonable doubt and improperly refused Hamm's proposed jury instruction concerning voluntarily [sic] intoxication, in violation of state law, the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.* (Doc. no. 1, ¶¶ 206-210, pp. 55-56) (Doc. no. 20, pp. 158-161).

**R**.    *The introduction of unnecessary and prejudicial photographs of the deceased violated Hamm's rights under the Sixth, Eighth and Fourteenth Amendments.* (Doc. no. 1, ¶¶ 211-215, pp. 56-57) (Doc. no. 20, pp. 161).

**S.**    *The trial court erred in failing to qualify the expert witnesses, in violation of the United States Constitution.* (Doc. no. 1, ¶¶ 216-218, p. 57) (Doc. no. 20, pp. 161-162).

**T.**     *The trial court's failure to change the venue of the trial denied Hamm a fair trial and an impartial and individualized sentencing hearing in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.* (Doc. no. 1, ¶¶ 219-225, pp. 57-58) (Doc. no. 20, pp. 162-163).

Only a handful of the above claims were raised at trial, and none were raised on direct appeal. When Hamm attempted to raise the claims on collateral review, the Alabama Court of Criminal Appeals affirmed the circuit court's determination that the claims were procedurally defaulted pursuant to Rule 32.2(a)(2) or (a)(3), and (a)(5). *Hamm v. State*, 913 So. 2d at 493. The procedural default of these claims by the state court on the basis of adequate and independent state procedural rules necessarily precludes federal review of the claims. Moreover, Hamm's proffer of ineffective assistance of trial and appellate counsel claims as cause to excuse the procedural default of Claims I through T is unavailing because the IAC claims also are procedurally defaulted or without merit. (*See* Claims VI.F. 6, 10-13, 15-17,19-20, 23-25, and 28, *supra*).

For the foregoing reasons, these claims are procedurally defaulted, and this court will dismiss them.

**U.**     *Death by electrocution or lethal injection is cruel and unusual punishment prohibited by the United States Constitution.* (Doc. no. 1, ¶¶ 226-229, pp. 59-60) (Doc. no. 20, pp. 163-164).

**1.**     *Electrocution.*

Hamm did not claim at trial or on direct appeal that a sentence of death by electric chair violated the Eighth Amendment's proscription against cruel and unusual punishment. When he raised the claim during the collateral review process, the Alabama Court of Criminal Appeals affirmed the Rule 32 court's dismissal pursuant Rule 32.2(a)(3) and (a)(5), Ala. R. Crim. P., because the claim could have been but was not raised at trial or on appeal. *Hamm v. State*, 913 So. 2d at

493.  Further, the discrete ineffectiveness claim linked to this claim cannot provide cause to overcome the procedural default because the ineffectiveness claims also are procedurally defaulted, or without merit.  (*See* Claims VI.F.29(a) and VI.F.32, *supra*).  Because the state court dismissed the claim on adequate and independent state procedural grounds, and no cause exists to overcome the procedural default, this court is precluded from habeas examination of the claim.  Accordingly, the court finds the claim is due to be dismissed.

Alternatively, the United States Supreme Court has not held electrocution as a means of execution to be cruel and unusual punishment.  *See In re Kemmler*, 136 U.S. 436, 10 S. Ct. 930 (1890) (challenge to first execution by electrocution); *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 67 S. Ct. 374 (1947) (challenging a second attempt to execute prisoner by electrocution after first attempt was unsuccessful due to mechanical malfunction).  Moreover, this issue has been rendered moot by the fact that the State of Alabama enacted legislation in 2002 changing the method of execution to lethal injection unless the person sentenced to death affirmatively chooses to be executed by electrocution.  ALA. CODE § 15-18-82.1.

## 2.    *Lethal Injection*

To the extent Hamm attempts to assert a claim that lethal injection is cruel and unusual punishment prohibited by the Eighth Amendment, his claim is not cognizable in habeas.  "A § 1983 lawsuit, not a habeas proceeding, is the proper way to challenge lethal injection procedures."  *Thompkins v. Sec'y, Dept. of Corrs.*, 557 F. 3d 1257, 1261 (11th Cir. 2009) (citing *Hill v. McDonough*, 547 U.S. 573, 579-83, 126 S. Ct. 2096 (2006).  Accordingly, this court is without jurisdiction to entertain the claim and must dismiss it.

Even if the court were able to exercise jurisdiction, Hamm did not raise an Eighth Amendment claim pertaining to legal injection *at all* in state court.  Therefore, the claim is

procedurally defaulted.  *See Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060 (1989).  Hamm cannot

assert that trial and appellate counsels' ineffectiveness claims are cause to overcome the default

because those claims also are procedurally defaulted, or in the alternative without merit.  (*See* Claims

VI.F.29(b) and VI.F.32, *supra*).

> For the foregoing reasons, Hamm is not entitled to habeas relief on this claim because this

court is without jurisdiction to entertain the question, or in the alternative, the claim is procedurally

defaulted. The court will dismiss this claim.

> **V.**    *The trial court failed to find as a mitigating circumstance that Hamm suffers from mental illness, in violation of rights guaranteed to him by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.* (Doc. no. 1, ¶¶ 231-234, p. 61) (Doc. no 20, pp. 164-65).

> The Alabama Court of Criminal Appeals affirmed the circuit court's finding of procedural

default as to this claim pursuant to Rule 32.2(a)(3) and (a)(5) because it could have been but was not

raised at trial or on appeal.  *Hamm v. State*, 913 So. 2d at 493.  Because the ineffective assistance

of counsel claims that could be based on this substantive claim are without merit (*See* Claims VI.

F.4, and VI.F.32, *supra*), no ineffectiveness claims can provide cause to excuse the procedural

default.  Therefore, the court also will dismiss this claim.

> **W.**    *The trial court's failure to suppress Hamm's statement and the evidence seized at the trailer violated state law and denied petitioner his rights guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.* (Doc. no. 1, ¶¶ 235-243, pp. 62-63) (Doc. no. 20, pp. 165-66).

> **1.**    *A history of this claim in State court.*

> The procedural history of this claim is integral to its analysis, so discussion will begin with

the claim as raised at trial.

a. *Direct Review*

i. *Trial*

At trial, Harris moved to suppress Hamm's statement and evidence seized at the trailer on grounds of violations of Alabama law and lack of constitutional probable cause. (R. Vol. 5, p. 936-37). Harris also declared that the police engaged in coercive measures to gain Hamm's statement, and refused Hamm's request for counsel and medical attention. *Id.* at 937-39. Hamm received a full-scale suppression hearing outside the presence of the jury during the trial. *Id.* at 939-1000; Vol. 6, 1001-53. After hearing the evidence, which included the testimony of law enforcement officers and Hamm, the trial court denied the motions to suppress. *Id.* at 1053.

ii. *Direct Appeal*

On direct appeal, Hamm only alleged state law and Fourth and Fourteenth[57] Amendment violations as grounds for relief. (C.R. Vol. 9, Tab. 29, pp. 5, 34-43).[58] That is, he only contended that the fugitive arrest warrant and search warrant were obtained in violation of state law, and that the State had demonstrated no Fourth Amendment probable cause to arrest him or search the trailer. He was denied relief by both the state appellate courts. (*See infra*).

_____

[57] The Fourteenth Amendment's pertinence to the claim is as the instrument through which the Fourth Amendment is applied to the states. *See Maryland v. Pringle*, 540 U.S. 366, 369, 124 S. Ct. 795 (2003) ("Under the Fourth Amendment, made applicable to the States by the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed.2d 1081 (1961), the people are 'to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, ... and no Warrants shall issue, but upon probable cause ....' U.S. Const., Amdt. 4.")).

[58] Hamm's appellate brief relied on the following Supreme Court cases as legal precedent for his Fourth and Fourteenth Amendment claims: *Whitely v. Warden Wyoming State Penitentiary*, 401 U.S. 562, 91 S. Ct. 1031 (1971); *Brown v. Illinois*, 422 U.S. 590, 603, 95 S. Ct. 2254 (1975); *Taylor v. Alabama*, 457 U.S. 687, 102 S. Ct. 2664 (1982); and *Illinois v. Gates*, 462 U.S. 241, 103 S. Ct. 2317 (1983)).

### b.   *Collateral Review*

#### i.   *Rule 32 petition*

In his Rule 32 petition, Hamm made the same Fourth and Fourteenth Amendment claims that were made on direct appeal.  (Rule 32 C.R. Vol. 21, Tab. 40, pp. 31-32).  However, he also added Fifth, Sixth, and Eighth Amendment violations in the title of his claim and made allegations that he was interrogated under coercive circumstances and questioned before being provided counsel and a doctor  *Id.*  The Rule 32 court found the entire claim to be procedurally barred from review in the Rule 32 proceedings on the basis that it was raised at trial and on direct appeal.  (Rule 32 C.R. "Rule 32 opinion" Vol. 33, Tab. 58, pp. 3-4).

As set out in the direct history of this claim, the undisputed trial and post-conviction record shows that the Rule 32 court made an error of fact when it determined that *all* aspects of Hamm's Rule 32 claim had been raised and addressed on direct appeal.

#### ii.   *Collateral Appeal*

In his brief on collateral appeal, Hamm represented to the Alabama Court of Criminal Appeals that he "d[id] not contest that [the Rule 32 claim], concerning the suppression of [his] statement and the evidence seized at the trailer, was raised at trial and on direct appeal and is fully preserved for Federal review."  (Rule 32 C.R. Vol. 29, Tab. 45, p. 94 n.4).  The Alabama Court of Criminal Appeals, relying expressly on Hamm's representation, found that the claim had been raised and addressed at trial and on appeal.  *Hamm v. State*, 913 So. 2d at 493.  As such, the state appellate court made the same error of fact as the circuit court.

### 2.   *Resolution of procedural default concerns*

Hamm alleges that the state court's rejection of his habeas-titled claim is contrary to or an unreasonable application of clearly established federal law.  (Doc. no. 1, ¶¶ 235-243, pp. 62-63)

(Doc. no. 20, pp. 165-66).[59]  Respondent argues that this court is barred from considering the claim under *Stone v. Powell*, 428 U.S. 465, 494, 95 S. Ct. 3037 (1976), or in the alternative, declares the claim is without merit.  (Doc. no. 15, pp. 108-09).  Both positions contain flaws, the most immediate of which involve a number of the embedded claims and allegations that must be culled in accordance with federal preclusionary rules.

    The first claims to be plucked from the mix are those pertaining to the Fifth, Sixth, and Eighth Amendments to the United States Constitution.  As seen in the history of this claim, *supra*, Hamm only alleged state law and Fourth and Fourteenth Amendment violations as grounds for relief on direct appeal.  Moreover, on direct appeal Hamm did not assert that he was interrogated under coercive circumstances or that he was questioned before being provided counsel and a doctor as factual support for his state law or Fourth Amendment claims.  (C.R. Vol. 9, Tab. 29, pp. 5, 34-43).  Instead, these claims and facts appeared for the first time in Hamm's Rule 32 petition.  (Rule 32 C.R. Vol. 21, Tab. 40, pp. 31-32).  The Rule 32 court found the entire claim to be procedurally barred from review in the Rule 32 proceedings on the basis that it was raised at trial and on direct appeal. (Rule 32 C.R. Vol. 33, Tab. 58, pp. 3-4).  As heretofore explained however, this ruling is only correct to the extent Hamm alleged violations of state law and the Fourth Amendment as grounds for the claim.

    On collateral appeal, Hamm conceded the Rule 32 court's findings.  *Hamm v. State*, 913 So. 2d at 493, n.16.  Thus, the state appellate court's opinion also is partially based on an erroneous factual history of the claim. The historic record undisputedly shows that Hamm did not raise the Fifth, Sixth or Eighth Amendment constitutional claims and the factual allegations pertaining to

---

[59]  With the exception of paragraph numbers, this claim as argued in the reply brief is identical to the claim in the petition.  (Compare Doc. No. 1, pp. 62-63, Doc. No. 20, pp. 167-68).

coercion, mistreatment, or refusal of an attorney or physician on direct appeal as required by Rule 32.2 (a)(5), Ala. R. Crim. P. No Alabama procedural mechanism exists that would allow him to do so now. Hamm's "[f]ailure to raise those claims until now means that [he] deprived the state courts of 'the first opportunity to hear the claim[s] sought to be vindicated in a federal habeas proceeding.'" *Bailey v. Nagle,* 172 F.3d 1299, 1305 (11th Cir. 1999) (quoting *Picard v. Connor*, 404 U.S. 270, 276 (1971)) (all but last alteration supplied). Because "it is clear from state law that any future attempts at exhaustion would be futile," this court "may treat [Hamm's] unexhausted claims as procedurally defaulted, even absent a state court determination to that effect." *Bailey*, 172 F.3d at 1305 (additional citation omitted).

For the foregoing reasons, to the extent Hamm now is asserting that the fruits of an unlawful arrest and search were admitted into evidence in violation of his Fifth, Sixth, and Eighth Amendment constitutional rights, these claims are procedurally defaulted. (Doc. no. 1, p. 62). Additionally, because Hamm did not allege coercion, mistreatment, or refusal of counsel and a doctor at all on direct appeal, those factual allegations cannot be considered in support of his claims that state law and the Fourth Amendment were violated.

Hamm does not specifically assert that the ineffective assistance of his trial and appellate counsel should constitute cause for any procedural default of this claim. Even if he had attempted to do so, while the discrete ineffectiveness claims were raised before the Rule 32 court, they were abandoned (*i.e.* procedurally defaulted) on collateral appeal, and, therefore, cannot be utilized as cause to overcome the default. (*See* Section V.B.2 and Claim VI.F.26, *supra*).

**3.**     *Whether the remaining portions of this claim can be addressed*

After carving out the procedurally defaulted aspects of this claim, Hamm is left with the two claims and supporting allegations he did raise on direct appeal. First, Hamm contends that the trial

court should have suppressed his statement as "fruit of an illegal arrest" because the fugitive warrant that precipitated the arrest failed to comply with Alabama law and was issued without probable cause. (Doc. 20, pp. 165-66 (citing ALA. CODE §§ 15-9-40 and 42 (1975)). Second, Hamm declares the trial court should have suppressed evidence seized in the trailer because "the only information connecting Doyle Hamm to the trailer ... came solely from" co-defendant Douglas Roden, and "[t]he search warrant permitted a general exploratory search." *Id.*

This court agrees that the rule in *Stone v. Powell*, 428 U.S. at 494, precludes *habeas* consideration of both aspects of this claim. In *Stone*, the Supreme Court concluded that the costs associated with the suppression of evidence obtained in violation of the Fourth Amendment right to be free from unreasonable searches and seizures were too high to justify consideration of such an issue in the post-conviction context of a *habeas* petition, as long as the defendant was given a full and fair chance to litigate the issue prior to trial. The Court held that, when "the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. at 494; *see also United States v. Johnson*, 457 U.S. 537, 563 n.20, 102 S. Ct. 2579 (1982) ("After *Stone v. Powell*, ... the only cases raising Fourth Amendment challenges on collateral attack are those federal habeas corpus cases in which the State has failed to provide a state prisoner with an opportunity for full and fair litigation of his claim, analogous federal cases under 28 U.S.C. § 2255, and collateral challenges by state prisoners to their state convictions under postconviction relief statutes that continue to recognize Fourth Amendment claims."); *Withrow v. Williams*, 507 U.S. 680, 686, 113 S. Ct. 1745 (1993) ("We simply concluded in *Stone* that the costs of applying the exclusionary rule on collateral review outweighed any potential advantage to be gained by applying it there."). In *Cardwell v.*

*Taylor*, 461 U.S. 571, 103 S. Ct. 2015 (1983) (*per curiam*), the Supreme Court extended the rule in *Stone* to confessions allegedly tainted by an illegal arrest.  *See Peoples v. Campbell*, 377 F.3d 1208 (11th Cir. 2004)*; Harris v. Dugger*, 874 F.2d 756 (11th Cir. 1989); *Agee v. White*, 809 F.2d 1487, 1490 (11th Cir. 1987).

In sum, insofar as a state prisoner has had a full and fair opportunity to challenge the admissibility of his inculpatory statement, he may not subsequently raise the Fourth Amendment arrest issue in a federal *habeas* action. "[F]ull and fair consideration ... includes at least one evidentiary hearing in a trial court and the availability of meaningful appellate review when there are facts in dispute, and full consideration by an appellate court when the facts are not in dispute." *Mason v. Allen*, 605 F.3d 1114, 1120-21 (11th Cir. 2010) (quoting *Bradley v. Nagle*, 212 F.3d 559, 564 (11th Cir. 2000) (internal citations omitted)).

Hamm makes no effort to argue that he did not receive an evidentiary hearing on these claims and allegations before trial nor does he assert that he was denied meaningful appellate review.[60] Moreover, the trial record clearly shows that he did receive an extensive evidentiary hearing before and during trial in which the trial court was made privy to the facts underlying the claim.  Further, he had the opportunity to raise his claims on direct appeal.  He did so, and the Alabama Court of Criminal Appeals addressed the claim as he raised it in a lengthy opinion.  *Hamm v. State*, 564 So. 2d at 458-63.

---

[60] As pointed out earlier in connection with Hamm's embedded and procedurally defaulted Fifth, Sixth and Eighth Amendment claims (*see supra*), Hamm did not make any factual allegations on direct appeal that he was interrogated under coercive circumstances or questioned before being provided counsel and a doctor.  To the extent he may be attempting to present these allegations in support of his Fourth Amendment habeas claim, *Stone v. Powell* still precludes examination of the same because Hamm was afforded a full and fair opportunity to makes such allegations on direct appeal, but did not do so.

The Alabama Supreme Court was the last state court to address this claim on the merits.  In its detailed opinion, the Alabama Supreme Court[61] addressed Hamm's contention that his confession should have been suppressed because it was the fruit of an illegal arrest and his contention that evidence should have been suppressed because it was the fruit of an illegal search warrant.  *Ex parte Hamm*, 564 So. 2d at 471-72.  After a detailed examination, the Court concluded:

> [E]ven if it be conceded that the arrest warrant was defective [under § 15-9-40 and § 15-9-42], the arrest was valid without a warrant, under either § 15-9-41 or § 15-10-3.  The police officers clearly had probable cause to believe that Hamm had committed a capital felony in this jurisdiction.  It follows then that Hamm's subsequent confession was not rendered inadmissible as a result of an illegal arrest.

*Id.*  The Alabama Supreme Court then addressed the search warrant, and held:

> Hamm's final contention is that the search warrant that authorized the search of his nephew's trailer was issued without probable cause, and, therefore, that all of the evidence discovered during that search should have been suppressed.
>
> As noted by the Court of Criminal Appeals, the threshold question in determining if a search has violated a defendant's fourth amendment rights is whether that defendant has standing to challenge the search.  *Hamm v. State*, *supra*, at 462–463.  In *Rakas v. Illinois*, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978), the Supreme Court stated that only those individuals whose own fourth amendment rights may have been violated have standing to challenge the legality of a search and seizure.  The defendant who is seeking to suppress the evidence obtained in the search has the burden of showing that his own fourth amendment rights were violated.  *Rakas*, n. 1, 439 U.S. at 131, 99 S. Ct. at 424, 58 L. Ed. 2d at 393.
>
> Hamm did not meet that burden.  This Court agrees that the evidence produced indicates that Hamm was not lawfully on the premises searched and therefore had no reasonable expectation of privacy.  *Hamm v. State*, *supra*, at 459.  Therefore, we need not address whether the search was valid.  *Ex parte Cochran*, 500 So. 2d 1179, 1183 (Ala. 1985), on remand, *Cochran v. State*, 500 So. 2d 1188 (Ala.

---

[61] The Alabama Supreme Court disagreed with the Alabama Court of Criminal Appeals opinion to the extent the appellate court concluded that Hamm did not have standing to challenge the arrest warrant.  *Ex parte Hamm*, 564 So. 2d at 472.  The Alabama Supreme Court expressed that the appellate court had misinterpreted Fourth Amendment standing as it pertains to purported unlawful seizures of a person.  *Id.*

Cr. App.), aff'd, 500 So. 2d 1064 (Ala. 1986), cert. denied, 481 U.S. 1033, 107 S. Ct. 1965, 95 L. Ed. 2d 537 (1987).

*Id.* at 472-73.

Hamm had an opportunity to, and did raise his Fourth and Fourteenth Amendment claims at every possible stage on direct review.  He received an evidentiary hearing before the trial court and litigated the matter through the Alabama appellate courts on direct review.  To the extent Hamm attempted to raise his claims, he received the full and fair consideration required.  As such, this court is barred from considering this claim under *Stone v. Powell*.  Hamm is not entitled to habeas relief.

> **X.**    *The state court failed to make a full record of the proceedings in state post-conviction in violation of Hamm's right to due process.*  (Doc. no. 1, ¶¶ 244-245, pp. 63-64) (Doc. no. 20, pp. 166-67).

Once again, this claim is not an attack on Hamm's conviction but rather on the Rule 32 process and, therefore, does not state a basis for habeas relief.  "Federal habeas relief is available to remedy defects in a defendant's conviction and sentence, but 'an alleged defect in a collateral proceeding does not state a basis for habeas relief.'"  *Alston v. Dep't of Corr., Fla.*, 610 F.3d 1318, 1325-1326 (11th Cir. 2010) (quoting *Quince v. Crosby*, 360 F.3d 1259, 1262 (11th Cir. 2004) (additional citation omitted)).   The court, therefore, will dismiss this claim.

## VII.  CONCLUSION

All claims in Hamm's petition for writ of *habeas corpus* are due to be dismissed or denied. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE and ORDERED this 27th day of March, 2013.

*Karon O. Bowdre*
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE